Scott W. Souers
Nevada State Bar Number 13405
WILLIAM B. CHERRY & ASSOCIATES
2269 James Avenue
South Lake Tahoe, CA 96150
Telephone: (530) 543-1890
Email: scottsouers@gmail.com
Attorney for John Miller

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

JOHN MILLER

              Plaintiff,

v.

UNITED STATES OF AMERICA and
DOES 1-25

              Defendants.

_____/

Case No.:

COMPLAINT FOR DAMAGES

Plaintiff JOHN MILLER alleges:

    1.      This action arises under the Federal Tort Claims Act, Sections 2671 through 2680 of Title 28 of the United States Code (28 U.S.C.A.§§ 2671-2680). This court is vested with jurisdiction pursuant to Section 1346(b) of Title 28 of the United States Code (28 U.S.C.A. § 1346(b)).

    2.      Plaintiff JOHN MILLER ("MILLER") resides at 1205 South Meadows Parkway, #C3023, Reno, NV 89521, which is within the Northern District of the State of Nevada. The acts and omissions that form the basis of this lawsuit occurred in Washoe County, State of Nevada, which is within the District of Nevada.

    3.      The Bureau of Indian Affairs in the Department of Interior is the interested agency of Defendant United States of America.

    4.      The true names and capacities, whether individual, corporate, associate, or otherwise

Page 1 of 8

1   of Defendant Does 1 through 25, are unknown to Plaintiff. Plaintiff sues these Defendants by those

2   fictitious names and requests permission to amend this Complaint to show the true names and

3   capacities of these Defendants when they are ascertained. Plaintiff further alleges that the Defendants

4   described as Does 1 through 25 are negligently, intentionally, or in some other manner directly and

5   proximately responsible for the damages alleged in this Complaint, together with the named

6   Defendants.

7       5.      Plaintiff is informed and believes, and based on that information and belief alleges, that

8   at all times mentioned in this Complaint all of the Defendants were the aides, servants, employees,

9   or partners of each of the remaining Defendants and that they were at all times mentioned in this

10  Complaint acting within the purpose, course, and scope of that agency, employment, or partnership

11  and with the consent, permission, and ratification of the remaining Defendants.

12      6.      On or about March 3, 2005, Defendant United States of America, through its Bureau

13  of Indian Affairs of the Department of Interior ("BIA") entered into a P.L. 93-638 self determination

14  contract (the "Contract") with the Reno-Sparks Indian Colony ("the Tribe") in which, among other

15  agreements, the BIA agreed to provide monies for law enforcement and investigative services to the

16  Tribe and to monitor the Tribe's use of said funds in accordance with the Contract and applicable law.

17  See Exhibit A, *P.L. 93-638 Contract*, at pp.12, 31.

18      7.      The Contract was ratified by the Tribe and the BIA on a multi-year basis, and at all

19  times relevant to this Complaint, remains in full force and effect.

20      8.      By the terms of the Contract, the BIA is charged with the duty of monitoring the

21  Tribe's actions to ensure compliance with the law and the Contract. By entering into the Contract,

22  the BIA effectively became the co-employer of the law enforcement personnel and administration on

23  tribal lands.

24      9.      Section F.6(1) of the Contract states: "For the purpose of Federal Tort Claims Act

25  Coverage, the Contractor (the Tribe) and its employees ... are deemed to be employees of the Federal

26

27

1   government while performing work under this contract." See Exhibit A, *P.L. 93-638 Contract*, at

2   pp.46-47.

3          10.    Section C.2(2)(j)(v) of the Contract states: "The Contractor shall adhere to the general

4   requirements of tribal personnel systems and policies prior to taking any adverse action against

5   contract employees.  If the tribal personnel system does not contain provisions for adverse actions,

6   the following (1. through 6.) shall be followed."  Subsection (3) requires that the Contractor set a

7   hearing date not less than fifteen days after the employee has been given a written statement of

8   allegations; subsection (4) requires that the Contractor provide the employee and the employee's

9   counsel at the hearing with an opportunity to confront each adverse witness; subsection (5) requires

10  that the Contractor provide the employee and the employee's counsel at the hearing with an

11  opportunity to delineate issues, to present factual contentions in an orderly manner and to generally

12  protect the employee's interest; subsection (6) requires that the Contractor reconsider the decision

13  to take the adverse action based solely on the evidence given at the hearing and provide the employee

14  at the time the decision is announced with a written statement of the reasons for the decision and the

15  evidence relied upon in reaching the decision. See Exhibit A, *P.L. 93-638 Contract*, at pp. 19-20.

16         11.    Plaintiff Miller was a law enforcement officer employed by the Tribe from on or about

17  June 27, 2013 until he was terminated on or about August 22, 2014.

18         12.    Arlan D. Melendez was, at all relevant times, the Tribal Chairman of the Tribe acting

19  within the course and scope of his employment as the Tribal Chairman and on behalf of the Tribe.

20         13.    In June of 2014, Plaintiff filed a workplace harassment complaint, which was submitted

21  to Tribal Administrator Gerald Smith.

22         14.    On or about August 22, 2014, Chief of Police Darrel Bill terminated Plaintiff for an

23  alleged ethics violation.  The alleged ethics violation was based on an allegation that Plaintiff had filed

24  an unemployment claim in his name with the state of Nevada while he was a full time employee of the

25  Tribe.

26

27

15.    Plaintiff was the victim of identity theft.  He informed the Tribe that he had not filed the unemployment claim and requested an opportunity to defend himself against the allegation.

16.    BIA Office of Justice Services Law Enforcement Handbook, Rules and Procedures ("BIA Handbook") section 4-48-01(D) provides that "[b]ecause of the potential liability associated with BIA, P.L. 93-638 contracted programs and Tribal programs receiving federal funding, the Office of Justice Services (OJS) has an obligation to provide for audits and inspections of the programs it operates and funds." Subsection (E) provides that "[s]pecial agents assigned to the PSD [professional standards division] will investigate without bias all allegations of misconduct assigned to them. Agents will conduct fair objective, and impartial investigations and audits . . ." Subsection H provides that "PSD will investigate all allegations of misconduct and perform audits of 638 contract programs in accordance with 25 CFR part 12." 25 CFR part 12.53 states that "[t]he Deputy Bureau Director, OJS maintains an internal affairs component that investigates all allegations of misconduct by BIA officers, and any officer receiving funding and/or authority from the BIA.  All allegations of misconduct must be thoroughly investigated and appropriate actions taken when warranted.  Any person having knowledge of officer misconduct must report that information to the officer's supervisor." See Exhibit B, *BIA Office of Justice Services Law Enforcement Handbook, Rules and Procedures*, at section 4-48-01(D).

17.    BIA Handbook section 4-48-05, "Employee Rights During an Internal Investigation" provides that District SAC's, Chiefs' of Police and supervisors are required to report all allegations of misconduct as defined above to PSD within 24 hours of occurrence.  PSD will review all allegations to determine the appropriate classification and will investigate or refer allegations accordingly." See Exhibit B, *BIA Office of Justice Services Law Enforcement Handbook, Rules and Procedures*, at section 4-48-05.

18.    BIA Handbook section 4-48-05 "Employee Rights During an Internal Investigation" requires that "[p]rior to an interview or special examination, the PSD supervisor will provide the

employee under investigation with confidential written notification of the allegation. This notification will include a copy of the original complaint or a summary adequately listing the relevant facts, and the employee's rights and responsibilities during the investigation." See Exhibit B, *BIA Office of Justice Services Law Enforcement Handbook, Rules and Procedures*, at section 4-48-05.

19.    BIA Handbook section 4-48-06 "Investigation" states that "[t]he objective of the investigation is to determine the truth.  PSD investigations will be objective, fair, and thorough." Subsection D provides that "[i]nvestigators will conduct an interview with the accused employee. An accused employee has the right . . . to be accompanied by an attorney, union representative, supervisor or other personal representative during any interview concerning allegations of misconduct." See Exhibit B, *BIA Office of Justice Services Law Enforcement Handbook, Rules and Procedures*, at section 4-48-06.

20.    BIA Handbook section 4-48-09 "Conclusion of Internal Affairs Investigations" mandates that "[a]fter a thorough, impartial investigation of a particular misconduct allegation has been completed, the responsible investigator will review all the evidence and circumstances and reach one of the four following conclusions: (1) Unfounded . . . (2) Exonerated . . . (3) Not sustained . . . . (4) Sustained . . . (5) Policy or Training Failure . . .. See Exhibit B, *BIA Office of Justice Services Law Enforcement Handbook, Rules and Procedures*, at section 4-48-09.

21.    The Tribe and the BIA immediately terminated Plaintiff without placing him on administrative leave and without conducting an investigation or interview of any kind whatsoever. The Tribe and the BIA failed to follow the Contract and BIA Handbook processes before terminating Plaintiff.

22.    After the Tribe and BIA failed to investigate Plaintiff's alleged misconduct, the Tribe issued a letter to Plaintiff on August 25, 2014 declaring that he was terminated for cause because he had reported a fraudulent unemployment claim to the State of Nevada Unemployment Office on August 14, 2014. The letter stated that the alleged report of the fraudulent unemployment claim was

Page 5 of 8

1    a "clear violation of RSIC (Reno Sparks Indian Colony) Human Resources Policy 164-202, *Code of*

2    *Ethics*, and grounds for immediate termination pursuant to RSIC Human Resources Policy 164.901,

3    *Disciplinary Actions.* See Exhibit C, *RSIC Letter to Plaintiff.*

4         23.    On or about September 2, 2014, Plaintiff filed an appeal of termination with the Tribe.

5    Plaintiff cited RSIC Human Resources Policy 164.901 *Disciplinary Actions, Supervisor's*

6    *Responsibility*, which requires that before being subjected to any discipline, an employee must be

7    given an opportunity to relate his version of the incident and provide an explanation or justification

8    to the supervisor.  Plaintiff's appeal further cited section 164.901 as mandating that employees who

9    commit flagrant misconduct or prohibited conduct may be suspended from one to ten days at the time

10   of the incident pending a management investigation and review of the matter; employees who are

11   cleared of such charges shall be reinstated with full back pay and with no loss of benefits or seniority.

12   Plaintiff's appeal requested that he be reinstated with payback provided. See Exhibit D, *Plaintiff's*

13   *Appeal of Termination.*

14        24.    Neither the Tribe nor the BIA responded to Plaintiff's appeal.

15        25.    On or about December 17, 2015, the State of Nevada Department of Rehabilitation

16   and Training issued a letter stating that through investigation of the claim, the Division determined

17   that a person other than John Miller appeared to have obtained John Miller's identifying information

18   and created the unemployment claim without John Miller's knowledge.  The letter stated that the

19   unemployment claim showed hallmarks of having been involved in a large identity theft ring and that

20   the circumstances indicated that John Miller was not involved in the filing of the unemployment claim

21   and was a victim of identity theft. See Exhibit E, *State of Nevada Department of Rehabilitation and*

22   *Training Letter.*

23        26.    Plaintiff is informed and believes that the Tribe's actions in causing him to be terminated

24   were malicious and intentional and in retaliation for the workplace harassment complaint previously

25   filed by Plaintiff.

26

27

                                                                                 Page 6 of  8

27.     On or about May 2, 2016, Plaintiff filed a Federal Tort Claim against the Tribe and the Department of the Interior based on wrongful termination. See Exhibit F, *Plaintiff's Federal Tort Claim*.

28.     On or about September 8, 2016, the United States Department of the Interior issued a letter to Plaintiff denying his claim and informing him of his right to file suit in the United States District Court. See Exhibit G, *United States Department of Interior Letter to Plaintiff Informing of Right to Sue*.

29.     The BIA was informed of the wrongful termination of Plaintiff on several occasions, but has refused, and continues to refuse, to intervene and enforce Plaintiff's rights under the U.S. Constitution, under the Contract, under BIA and Tribal policies, or under Chapter 1 of the U.S. Code relating to the Bureau of Indian Affairs, Indian Country Law Enforcement provisions

30.     The BIA and the Tribe knew or should have known through a reasonable investigation that the Tribe wrongfully terminated Plaintiff, in violation of his rights as a law enforcement employee under the Contract.

31.     Defendant was negligent in its failure and refusal to intervene against the Tribe's wrongful actions.

32.     As a direct and proximate result of Plaintiff's wrongful termination from employment, Plaintiff has suffered, is now suffering, and will continue to suffer irreparable injury and damages from Defendant's actions.

33.     As a further direct and proximate result of Defendant's acts and omissions as set forth herein above, Plaintiff has suffered tremendous anxiety, sleeplessness and fear regarding his loss of employment and its long-term effect on his family.

34.     Plaintiff was unable to secure employment as a law enforcement officer with other agencies due to the damage done to his reputation as a result of the wrongful termination by the Tribe, as an agent of Defendant.

35.     Plaintiff's civil rights were further violated when he was denied accrued but unpaid benefits at the time of his termination, in an amount according to proof.

36.     As a consequence of Defendant's wrongful termination of Plaintiff, Plaintiff has been damaged in lost wages in an amount within this Court's jurisdiction, according to proof.

37.     As a further consequence of Defendant's wrongful termination of Plaintiff, Plaintiff has suffered additional damages in an amount according to proof.

WHEREFORE, Plaintiff prays for judgment against the United States of America as follows:

1.     General damages in an amount according to proof;

2.     Special damages in an amount according to proof;

3.     Punitive damages;

4.     Prejudgement interest;

5.     Costs of suit; and

5.     Such other and further relief as the Court considers proper.

DATED: 2/22/17

Scott W. Souers
Nevada State Bar Number 13405
WILLIAM B. CHERRY & ASSOCIATES
2269 James Avenue
South Lake Tahoe, CA 96150
Telephone: (530) 543-1890
Attorney for John Miller

Page 8 of 8

## INDEX OF EXHIBITS

**EXHIBIT A**:   P.L. 93-638 CONTRACT

**EXHIBIT B**:   B.I.A. OFFICE OF JUSTICE SERVICES LAW ENFORCEMENT HANDBOOK, RULES AND PROCEDURES

**EXHIBIT C**:   RSIC LETTER TO PLAINTIFF

**EXHIBIT D**:    PLAINTIFF'S APPEAL OF TERMINATION

**EXHIBIT E**:   STATE OF NEVADA DEPARTMENT OF REHABILITATION AND TRAINING LETTER

**EXHIBIT F**:    PLAINTIFF'S FEDERAL TORT CLAIM

**EXHIBIT G**:    UNITED STATES DEPARTMENT OF INTERIOR LETTER TO PLAINTIFF INFORMING OF RIGHT TO FILE SUIT

**EXHIBIT A**:    P.L. 93-638 CONTRACT

ATTACHMENT 2

# DEPARTMENT OF THE INTERIOR

# BUREAU OF INDIAN AFFAIRS

# PHOENIX AREA OFFICE

# WESTERN NEVADA AGENCY

## PUBLIC LAW 93-638, AS AMENDED

## SECTION 108 MODEL CONTRACT

# ANNUAL FUNDING AGREEMENT

WITH THE

## Reno-Sparks Indian Colony

## CONTRACT NO.   CTH61T65351

# INDEX OF CONTRACT PROVISIONS

## SECTION A
### Definition of Terms

Sec. 1.   Definitions ...................................   4

## SECTION B
### Program and Budget

Sec. 1.   Program(s) ......................................   9
Sec. 2.   Contract Budget .................................   9
Sec. 3.   Contract Amount .................................   9
Sec. 4.   Contract Support Funds ..........................   9

## SECTION C
### Statement of Work

Sec. 1.   Scope of Bureau Program(s) to be Performed .......   11
Sec. 2.   Statement of Work ...............................   12
Sec. 3.   Contract Term ...................................   27
Sec. 4.   Non-Contracted Portion of Bureau of Indian Affairs
          Program(s) ......................................   27

## SECTION D
### Performance

Sec. 1.   Reporting Requirement ...........................   28
Sec. 2.   Audit Requirement ...............................   30
Sec. 3.   Monitoring and Records Review ...................   31
Sec. 4.   Examination of Records ..........................   33
Sec. 5.   Mature Contract .................................   37
Sec. 6.   Drivers License Requirement for Non-Federal

Personnel ........................................ 37
Sec. 7.   Effect on Existing Rights ..................... 37
Sec. 8.   Applicable Federal Regulations ............... 37
Sec. 9.   Time-frames for Notices .................... 37

# SECTION E
## Administration Data

Sec.  1.   Awarding Official's Representative .............. 39
Sec.  2.   Contract Payment ........................... 39
Sec.  3.   Submission of Invoices ..................... 40
Sec.  4.   Contract Revision or Amendment ............. 41
Sec.  5.   Negotiated Indirect Cost Rate(s) ........... 41
Sec.  6.   Billings for Indirect Cost ................. 42
Sec.  7.   Disputes ................................... 43
Sec.  8.   Payment of Interest on Contractor's Claim .. 45
Sec.  9.   Retrocession ............................... 46
Sec. 10.   Reassumption ............................... 46
Sec. 11.   Pre-Contract Costs ......................... 46

# SECTION F
## Special Requirements

Sec. 1.   Management Systems ...................... 47
Sec. 2.   Certification of Finance System .......... 47
Sec. 3.   Recordkeeping ............................ 47
Sec. 4.   Privacy Act Requirements ................. 48
Sec. 5.   Freedom of Information ................... 48
Sec. 6.   Tort Claims .............................. 48

# SECTION G
## Other Attachments

# Section A

## Definition of Terms

Sec. 1.   **Definitions**.  The following terms shall have the meanings set forth below throughout this contract:

1.  **Act**. Means Public Law 93-638. The Indian Self-Determination and Education Assistance Act of 1975, as amended (25 U.S.C. 450, 88 Stat. 2203).

2.  **Annual Financial Audit**. Means an organization-wide audit as required by Public Law 98-502, The Single Audit Act of 1984, as implemented through Office of Management and Budget (OMB) Circular A-128.

3.  **Approving Official**. Means Bureau line officers (i.e., Area Directors, Agency Superintendents, etc.).

4.  **Awarding Official**.  Means any person, other than an Approving Official, who has the delegated authority to award, modify and administer all non-procurement and non-construction self-determination contracts as defined in 25 USC Section 450b(j), as amended, and make decisions and issue findings and determinations with respect thereto.  The Awarding Official may be other than a warranted contracting officer.

5.  **Awarding Official's Representative (AOR)**.  Means the authorized representative of a Awarding Official acting within the limits of his authority.

6.  **Subordinate Awarding Official's Representative (SAOR)**.  Means the authorized representative of a Awarding Official acting within the limits of his authority that assists the AOR.

7.  **Cognizant Audit Agency**. Means the Department of the Interior, Office of the Inspector General.

8.  **Construction Contract**. Means a fixed-price or cost-reimbursement self-determination contract for a

construction project, except that such term does not include any contract:

a.    That is limited to providing planning services and construction management services (or a combination of such services);

b.    For the Housing Improvement Program or Roads Maintenance Program of the Bureau of Indian Affairs administered by the Secretary of the Interior; or

c.    For the Health Facility Maintenance and Improvement Program administered by the Secretary of Health and Human Services.

9.    **Construction Program**. Means programs for the planning, design, construction, repair, improvement, and expansion of buildings or facilities, including, but not limited to, housing, law enforcement and detention facilities, sanitation and water systems, roads, schools, administration and health facilities, irrigation and agricultural work, and water conservation, flood control, or port facilities.

10.   **Contract**. Means a self-determination contract (or grant or cooperative agreement utilized in lieu of a contract under section 9 of the Act) entered into under title I of the Act between a tribal organization and the Secretary for planning, conduct and administration of programs or services which are otherwise provided to Indian tribes and their members pursuant to Federal law: *Provided,* That except as provided in the last proviso in section 105(a) of this Act, no contract (or grant or cooperative agreement utilized under section 9 of this Act) entered into under title I of this Act shall be construed to be a procurement contract.

11.   **Contractor**. Means the recipient of a contract.

12.   **Contractor Modification**. A written change to the contract document which has been mutually agreed to by the Awarding Official and the Contractor.

13.   **Contract Records**. Records maintained to support activity under the contract. Contract records shall include, but not be limited to, the following:

a. The contract award documents;

b. Any and all modifications to the contract;

c. Financial records; and

d. Records created or maintained as a result of the contract.

14. **Days**. Means, unless otherwise specified in this contract, calendar days.

15. **Declination**. Means written notification by a Bureau Approving Official not to enter into a self-determination contract.

16. **Indian Tribe**. Means any Indian Tribe, Band, Nation, Rancheria, Colony, or Community, including any Alaska Native Village or regional or village corporation as defined in or established pursuant to the Alaska Native Claims Settlement Act (85 Stat. 688) which is federally recognized as eligible by the U. S. Government through the Secretary for the Special programs and services provided by the Secretary to Indians because of their status as Indians.

17. **Indian**. Means a person who is a member of an Indian tribe.

18. **Indirect Costs**. Means costs incurred for a common or joint purpose benefiting more than one cost objective, or which are not readily assignable to a specific cost objective.

19. **Indirect Cost Rate**. Means the rate arrived at through negotiation between an Indian tribe or tribal organization and the appropriate Federal agency (Office of the Inspector General).

20. **Mature Contract**. Means a contract that has been continuously operated by a tribal organization for three or more years, and for which there are no significant and material audit exceptions in the most recent annual financial audit of the tribal organization. A mature contract may be for a definite or an indefinite term as requested by the

tribe or, to the extent not limited by tribal resolution, by the tribal organization.

21. **Program Records**. Records created or maintained to support activity within the contracted program. Program records shall include, but not be limited to, the following:

   a. Application for assistance under the specific program;

   b. Case files, student files, etc;

   c. Correspondence;

   d. Financial records; and,

   e. Any other records established under the P. L. 93-638 contract.

22. **Reassumption**. Means the taking back of a program or function by the Secretary.

23. **Recontracting**. Means the renewal of a contract with a tribal organization for the same program.

24. **Retrocession**. Means the return of a program or function to the Secretary where a tribe determines that it no longer desires to operate the program or function under a contract.

25. **Secretary**. Means the Secretary, the Under Secretary, and Assistant Secretary, or any other head or assistant head of the Department of the Interior or his authorized representative(s); and, the term "his duly authorized representative" means any person or board (other than the Awarding Official) authorized to act for the Secretary.

26. **Subcontracts**. Except as otherwise provided in this contract, the term "subcontracts" includes, but is not limited to, purchase orders and changes and modifications to purchase orders under this contract.

27. **Term Contract**. Means a contract (other than a mature contract) which is for a specific period of time, not to exceed three years unless otherwise agreed to by the Secretary and the Contractor. The

term may not be longer than that provided by any
provided by any applicable tribal resolution which
limits the period of the Contractor's authority.

28.   **Tribal Organization**. Means the recognized governing
body   of   any   Indian   tribe;   or   any   legally
established organization of Indians or tribes which
is controlled, sanctioned, or chartered by such
governing body or bodies or which is democratically
elected  by  the  adult  members  of  the  Indian
community to be served by such organization and
which includes the maximum participation of Indians
in all phases of its activities.

29.   **Tribal Resolution**. Means the formal manner in which
the tribal organization expresses its legislative
will in accordance with its organic documents.  In
the absences of such organic document, a written
expression adopted pursuant to tribal practices
will be acceptable.

# Section B

## Program and Budget

Sec. 1.  <u>Program</u>(s). The Contractor shall perform that portion of the Bureau of Indian Affairs'Law Enforcement Services Program described herein in accordance with the terms, provisions and conditions of this contract.

Sec. 2.  <u>Contract Budget</u>. The budget for the services provided under this contract reflects the agreements reached during contract negotiations. The contract budget includes both direct and indirect costs.

1. The Contractor shall request prior approval for budget revisions whenever:

    a. The budget revision results from changes in the scope or objective of the program;

    b. The revision requires additional funding;

    c. The revision causes a change in the amount of indirect cost for the contract; or,

    d. The revision pertains to the addition of items requiring approval of the Bureau of Indian Affairs.

2. All other budget revisions do not require approval.

3. <u>Budget categories</u>:

| | | |
|---|---|---|
| 39420 | Law Enforcement | $100,700.00 |
| | TOTAL | $100,700.00 |

Sec. 3.  <u>Contract Amount</u>. Amount of Funding to be Provided by the Bureau of Indian Affairs under this Agreement for Fiscal Year 1998 is: $100,700.

Sec. 4.  <u>Contract Support Funds</u>. Contract Support Funds shall be provided by the Bureau of Indian Affairs, subject to the availability of funding, in accordance with the Indirect Cost Negotiation Agreement between the Contractor and the Office of the Inspector General, and in accordance with

Western Nevada Agency
Section 108 Contract
Annual Funding Agreement
No. CTH61T65351                        9

Bureau of Indian Affairs policies and procedures pertaining to the distribution of Contract Support Funds.

# SECTION C

## Statement of Work

Sec. 1.    <u>Scope of Bureau Program(s) to be Performed</u>.

    1.   <u>Purpose</u>.  To state the terms conditions, and work to be performed under the contract and the rights and responsibilities of each of the parties, to enable the Contractor to acquire and utilize all resources made available by the Bureau of Indian Affairs (BIA) for the delivery of services and programs specified herein, pursuant to the P.L. 93-638, as amended, and other applicable Federal laws.

       a.   The Contractor shall obtain from the BIA all such funds and other resources made available for the benefit of the tribe for all programs to be operated and services to be delivered by the Contractor through this contract on behalf of the BIA, except for "Trust" and executive functions of the BIA which are considered non-contractible.

       b.   The BIA shall transfer to the Contractor all such funds and other resources made available for the benefit of the Tribe through this contract in the most expeditious manner authorized by law, and shall provide technical support and assistance at the request of the Contractor and as provided herein.

       c.   The Contractor shall exercise full discretion over the funds made available subject only to the provisions of this contract and Federal law.

    2.   <u>Fair and Uniform Services</u>.  The Contractor agrees that any services or assistance provided to Indians under the contract shall be provided in a fair and uniform manner.

Sec. 2.    <u>Statement of Work</u>.  The Contractor shall administer programs under this agreement in accordance with its own laws and policies which are incorporated herein by

Western Nevada Agency
Section 108 Contract
Annual Funding Agreement
No. CTH61T65351          11

reference.   The provisions of applicable Federal Regulations shall apply, unless such regulations have been waived by the Secretary.   Such regulations are incorporated in this agreement by reference.

1. **Program(s) to be Performed by Contractor.   Law Enforcement Services**   A program function to maintain security on Indian communities through effective crime prevention and law enforcement. The program provide for costs necessary to carry out police activities. Includes the costs of uniformed police officers, whether Federal, Tribal or other investigative and special officer's and others authorized to carry on enforcement activities. This contract does not include investigative functions and costs of permanent facility construction. The detention services function is contracted separately between the Bureau and a City or County Government through Detention Agreements.

2. **Plan of Operation.   Statement of Work** The Contractor shall provide all necessary qualified and licensed personnel, equipment, materials and services to perform all tribal law services on the Reno-Sparks Indian Colony, with the exception of federal violation (major crimes). The investigation of major crimes shall not be contracted and shall continue to be performed by the Bureau, as provided in the "Non-Contracted Portion of Bureau Program" section.   Respective special U.S. Attorney guidelines for the investigation of major crimes shall be followed, where applicable.

   a. Services shall be provided in accordance with defined authority, procedures and guidelines contained in the Reno-Sparks Tribal Law and Order Code, the Reno-Sparks Indian Colony Tribal Constitution, 25 CFR, court decisions and other applicable rules, regulations, ordinances and statutes.

   b. The Contractor shall obtain all necessary licenses, permits, and approval required by local, State and Federal statutes to perform under this contract.

Western Nevada Agency
Section 108 Contract
Annual Funding Agreement
No. CTH61T65351                    12

c.  The Contractor shall be responsible for the investigation of all offenses enumerated in the Tribal Law and Order Code, United States Codes or 25 CFR as applicable.

d.  In addition to Paragraph c., above, of this contract, the Contractor shall assist the Bureau of Indian Affairs, other Federal and State law enforcement officials in the investigation of State or Federal offenses that occur on the Reservation.

e.  The Contractor shall be responsible for the following patrol and protective services on the Reservation:

i.  Maintaining continual law enforcement and prevention services on the Reservation twenty-four (24) hours per day, seven (7) days per week. This also includes police services in and around Federal facilities, occupied and operated by Bureau of Indian Affairs personnel, located on reservations, such as school buildings, offices, residences, warehouses and in general all Federal facilities and property.

ii.  Enforcement of all tribal criminal and traffic laws, United States Codes or 25 CFR as applicable, including all tribal ordinances.

iii.  Enforcement of applicable game and fish laws, and ordinances.

iv.  The protection of all private, public and government property on the Reservation.

v.  The implementation of programs to prevent crime and delinquency.

vi.  Answering all citizen complaints or any other law enforcement services agreed

upon the Contractor and Contracting Office.

   vii. Patrol services on and off roadways and in the Indian communities within the boundaries of the Reservation.

  viii. Service of all warrants and other court processes without undue delay, as directed by Indian, State and Federal Courts.

    ix. Writing case reports; preparing cases for and testifying in court.

  f.  The contractor shall assure that each law enforcement officer be specifically identified as such and shall be individually authorized to make arrests and carry firearms. Only employees assigned duties as law enforcement officers and qualified under "Special Performance Standards" of this contract may be authorized to carry firearms or make arrests.

  g.  Uniforms, when worn, shall positively identify the wearer as a law enforcement officer. Badge, name plate and tribal patch shall be visible at all times. Uniforms of all enforcement personnel shall be plainly distinguishable from the uniforms of any nonenforcement personnel working on the reservation. Each officer shall be issued a standard identification card bearing a photograph of the officer.

  h.  The Contractor shall assure that all police vehicles are equipped with a two-way radio, emergency lights, sirens, safety screens, fire extinguisher, flashlight, emergency flares, manila ropes 3/4" - 125', blankets, first aid kit, and shovel. the Contractor shall require that all vehicles are in good condition and an operator/maintenance record is kept current.

i.   The Contractor should provide all uniformed enforcement officers with the following items and assure they are in good condition:

   i.   Approved firearm and ammunition.
   ii.  Belt, holster, handcuff case and cartridge holder.
   iii. Handcuff with keys.
   iv.  Minimum of two complete uniforms, including hat/helmet.
   v.   Hat and breast badge.

j.   **Special Performance Standards**  The Contractor shall perform the contracted law enforcement program in accordance with the qualifications, training, code of conduct, inspection and evaluation, and other standards applicable to Bureau law enforcement personnel as follows:

   i.   Salaries paid law enforcement officers by the Contractor may be in accordance with the tribal salary classification, wage scales and personnel policies.

   ii.  In addition to tribal personnel employment standards, the Contractor shall require the following for each law enforcement position:

      (1)  For positions requiring the operation of a Government furnished motor vehicle, employees must possess a valid State motor vehicle operator's license or obtain one within thirty (30) days after entry on duty and have a satisfactory driving record.

      (2)  Employee candidates must present evidence of ability to discharge the duties of the position. Commissioned law enforcement officer candidates, in addition to other qualifications, shall demonstrate the traits and characteristics important to succeed

in police work. Among these are alertness, ability to work in stress situations, ability in oral expression, tact, integrity, capacity for effective public relations, practical intelligence and goo judgement. Candidates must be honest and trustworthy; have integrity, sound judgement, temperate habits; and have a satisfactory work record. Applicants who do not have these qualities shall not be appointed to commissioned law enforcement positions.

(3) Prior to employment of any commissioned law enforcement officer, a full field background investigation shall be completed by the Contractor. Such investigation shall include, but is not limited to, local, State, and Federal criminal history checks.

Background checks/clearances through fingerprint charts (FD-258) must be conducted through the Assistant Director, Identification Division, Federal Bureau of Investigation, Washington, D.C. 20537. Check/clearances through the National Crime Information Center (NCIC), state criminal history centers and local police and court records shall also be conducted.

All background checks/clearances shall be recorded, documented and keep on file for each commissioned officer at the Contractor's police headquarters.

Careful review and documentation shall be made on each officer's family data, education, employment,

Western Nevada Agency
Section 108 Contract
Annual Funding Agreement
No. CTH61T65351                    16

medical and military history, previous residences, organizations and affiliations, personal references, credit record and police record, including drivers license history and status.

Background reviews may be conducted either by a written questionnaire or by personal interview with present and past supervisors and associates who have personal knowledge of the applicant's service record and character.

The Contractor shall update background investigations every five (5) years on all commissioned officers.

(4)   Any person who has been convicted of a felony is not eligible for employment. Also any person who has been convicted of a misdemeanor within a period of one year, immediately preceding his/her appointment shall not be eligible for commissioned law enforcement officer employment.

(5)   Persons appointed to commissioned law enforcement positions shall be at least 21 years of age.

(6)   Applicants for commissioned law enforcement officer positions must be physically able to perform efficiently the duties of the position. For most positions, applicants shall have binocular vision correctable 20/20 (Snellen). Uncorrected vision shall test at least 20/70 (Snellen) in each eye. Near vision corrected or uncorrected shall be sufficient to read Yaeger Type 2 at 14 inches. Ability to

distinguish basic colors is essential. Ability to hear the conversational voice, without the use of a hearing aid is required. Persons with an amputation of arm, hand, leg or foot shall not be employed. Applicants shall possess emotional and mental stability. Any physical condition which would cause the employee to be a hazard to himself/herself or to others shall disqualify                    for appointment/employment.

Fitness for duty examinations shall be ordered for any employee in question either by the Contractor or the Awarding Official. In addition, any <u>annual</u> medical examination shall be completed for each commissioned officer to ensure fitness for duty. Medical certificates shall be placed in individual official personnel folders.

(7)   A medical certificate shall be completed by an examining physician prior to employment of any candidate for a commissioned law enforcement position.

iii.  The Contractor shall adhere to the general requirements of tribal personnel system and policies for officer annual performance evaluation/appraisal. If the tribal personnel system does not contain provisions for performance evaluation/appraisal the following shall be used:

The immediate supervisor for each commissioned law enforcement officer shall complete a performance evaluation report for the officer annually. Each officer shall be evaluated according to standards consistent with the officer's

position description. Evaluation criteria
may include, but is not limited to: (1)
investigations, (2) arrests, (3) court
appearances, (4) crime prevention, (5)
knowledge of law, (6) firearms, (7)
patrol, (8) physical fitness, (9) public
relations, (10) report writing, (11)
execution of legal documents, (12) care
and maintenance of equipment other than
firearms, (13) overall performance.
Performance ratings shall be documented,
and placed in individual official
personnel folders.

iv.   The Contractor shall adhere to the
general requirements of tribal
procedures, systems and policies for
reviewing citizen complaints. If the
Contractor does not have established
provisions for citizens complaints
investigations, the following shall be
used:

The chief contract law enforcement
officer shall acknowledge in writing to
the complainant, receipt on any complaint
of misconduct made against a construct
police officer. After appropriate
investigation into the allegation(s), the
chief contract law enforcement officer
shall notify, in writing, the complaint
with final disposition. Disciplinary
action(s) shall be conducted in
accordance with tribal personnel
policies/procedures and documented in
individual official personnel folders.
Unfounded/exonerated dispositions shall
also be documented. If the chief contract
law enforcement officer is accused of
misconduct, his immediate supervisor or
other appropriate tribal government
official(s) shall be notified in writing.

v.    The Contractor shall adhere to the
general requirements of tribal personnel
systems and policies prior to taking any

adverse action against contract employees. If the tribal personnel system does not contain provisions for adverse actions, the following (1. though 6.) shall be followed:

(1) Notify the employee of the contemplated action and give a full explanation of the reason(s) such action is contemplated.

(2) Provide the employee with a written statement of any specific violation of rules, regulations, or statutes the contractor alleges the employee has committed and the names of all persons upon whose testimony the allegation(s) are based.

(3) Set a hearing date not less than fifteen (15) days after the employee has been given the written statement of allegations(s).

(4) Provide the employee and the employee's counsel at the hearing with an opportunity to confront the cross-examine each adverse witness.

(5) Provide the employee and the employee's counsel at the hearing with an opportunity to delineate issues, to present factual contentions in an orderly manner and to generally protect the employee's interest.

(6) Reconsider the decision to take the adverse action based solely on the evidence given at the hearing and provide the employee at the time the decision is announced with a written statement of the reasons for the decision and the evidence relied upon in reaching the decision.

vi.  The Contractor shall assure that each officer is qualified in the field of law enforcement the has a working knowledge of arrest procedures, rules of evidence, crime scene search, preservation of evidence, writing reports, testifying in court and related police functions.

vii. Each law enforcement officer must have attained a score of seventy (70) percent or better on an approved firearms an qualification course within the previous six (6) months to be qualified to carry a firearm. Whenever an officer's firearms qualification lapses, the officer shall return all weapons issued to him/her. The following courses are approved firearms qualifications courses:

(1) The National Rifle Association national Police Course.

(2) The National Rifle Association 25-Yard Course.

(3) The National Rifle Association Practical Pistol Course.

(4) The Federal Bureau of Investigation Practical Pistol Course.

(5) Federal Law Enforcement Training Center, Practical Police Course.

A firearm may be discharged only when in the considered judgement of the officer, there is imminent danger of loss of life or serious bodily injury to the officer or to another person. The weapon may be fired only for the purpose of rendering the person at whom it is fired, incapable of continuing the activity prompting the officer to shoot. The firing of warning shots is prohibited. This policy does not apply to the use of firearms to

participate in official marksmanship training or to kill a dangerous or seriously injured animal.

Except in firearms training, each time a firearm is used for law enforcement purposes, a report shall be filed with the superior of the officer who used the weapon. Whenever use of a weapon results in serious injury or death or any person, the officer firing the weapon shall be placed on administrative leave, or be reassigned to strictly administrative duties pending a thorough investigation of all circumstances surrounding the incident.

Law Enforcement Officers shall be issued the standard Police 38 caliber special revolver and ammunition, 357 caliber magnum revolver and ammunition or 9mm caliber handgun and ammunition.

The barrel length may be not more than 6 inches nor less than 4 inches for uniformed personnel, and not less than 2 inches for plainclothes personnel. Only standard load ammunition may be used. The Assistant Secretary for Indian Affairs may grant a written waiver to permit law enforcement officers to carry hand guns not authorized by this paragraph.

The Contractor shall specify the type of firearms, ammunition and auxiliary equipment to be used by law enforcement officers.

viii. Newly employed patrol officers shall successfully complete within their first year of service the approved Basic Police Training Course conducted at the Indian Police Academy or a similar course substantially meeting or exceeding the level of training provided by the Indian Police Academy and approved by the

Assistant Secretary for Indian Affairs. An officer who fails to complete the training required by this paragraph shall be discharged or transferred to a position not involving law enforcement duties Transfer may result in demotion.

ix. Prior to, or within one year after, promotion or appointment to a supervisory enforcement position an employee shall complete the approved Supervisory Enforcement Officer Training Course conducted at the Indian Police Academy or a similar course substantially meeting or exceeding the level of training provided by the Indian Police Academy and approved by the Assistant Secretary for Indian Affairs. An officer who is serving in a supervisory position and fails to complete the training required in this paragraph shall be transferred to a non-supervisory position. Transfer may result in demotion.

x. Prior to, or within one year after appointment to a criminal investigator position, an officer shall successfully complete the Criminal Investigator Training Course conducted at the Indian Police Academy or a similar course substantially meeting or exceeding the level of training provided by the Indian Police Academy and approved by the Assistant Secretary for Indian Affairs. An officer who is serving, in a criminal investigator position and fails to complete the training required in this paragraph shall be transferred to a non-criminal investigator position. Transfer may result in demotion.

xi. Prior to, or within one year, after promotion or appointment to a supervisory criminal investigator position, an officer shall Successfully complete the Executive Management Course of Training

conducted at the Indian Police Academy or a similar course substantially meeting or exceeding the level of training provided by the Indian Police Academy and approved by the Assistant Secretary for Indian Affairs. An officer who is serving in a supervisory criminal investigator position an fails to complete the training required in this paragraph shall be transferred to a non-supervisory criminal investigator position. Transfer may result in a demotion.

xii.  Each law enforcement officer shall receive a minimum of forty (40) hours of local in-service training annually to meet training needs determined by the tribe and to keep abreast with developments in the field of law enforcement.

xiii. Prior to, to within six (6) months after, promotion or appointment to a position involving detention/jail duties, an employee shall successfully complete a Detention/Jail Operations and Management Training Curse approved by the Assistant Secretary for Indian Affairs. An employee who is serving in a position involving detention/jail duties and fails to complete the training required by this paragraph shall be transferred to a position not involving detention/jail or law enforcement duties or discharged. Transfer may result in demotion.

CERTIFICATES OF SATISFACTORY COMPLETION OF EACH OF THE ABOVE (vii. THROUGH xiii.) SHALL BE MAINTAINED IN INDIVIDUAL OFFICIAL PERSONNEL FOLDERS.

xiv.  The Contractor shall require each law enforcement officer it employs to adhere to a law enforcement code of conduct prescribed by the Contractor. The code shall establish specific rules concerning

conflicts of interest, employee conduct both on and off duty, impartiality and thoroughness in performance of duty, and acceptance of gifts or favors. A code of con duct shall be signed by all commissioned police officers and placed in official individual personnel files.

xv.  The Contractor shall permit the inspection and evaluation of the contract law enforcement programs by the Bureau of Indian Affairs Inspection and Evaluation Unit in accordance with 68 BIAM, Supplement 1, Release 5.

xvi. In addition to prescribed Tribal reporting guidelines, when a contract law enforcement officer receives an oral or written allegation that a law enforcement officer employed under this contract has violated the civil rights of any person, the receiving officer shall prepare a written report of the allegation and transmit it through the chain of command to the chief contract law enforcement officer within seven (7) days of receipt of the allegation.

The chief law enforcement officer shall take the following actions no later than seven (7) days after being notified of the allegation:

(1) Submit a written notification to the Federal Bureau of Investigation, the Agency Superintendent or Awarding Official's Representative, and the Tribal Council. The notice to the Federal Bureau of Investigation shall state whether an investigation is being conducted and shall cite any relevant provisions of the tribal code. The highest ranking BIA law enforcement officer assigned to the Agency shall be notified. The Agency will notify the area Special

Officer in writing. If there is no Bureau law enforcement officer at the agency, the Area Special Officer shall be notified in writing by the contractor.

(2)   If the chief law enforcement officer is accused of a civil rights violation, the report of the allegation shall be transmitted by the chief law enforcement officer directly to the Agency Superintendent who shall take the actions required by paragraph A. of this section. If there is no Agency Superintendent, the report of the allegation shall be transmitted directly to the Area Special Officer, who shall take the actions required in paragraph A. of this section.

Upon immediate completion of all actions required by paragraphs (1) and (2) of this section, a copy of all documents concerning the allegation shall be transmitted to the Chief, Division of Law Enforcement Services, in the Central Office.

xvii. The Contractor shall be responsible for maintaining the following police records and shall have them available for inspection:

(1)   Officer logs.
(2)   Case Reports, including arrest, investigation and incident records.
(3)   Juvenile records.
(4)   Personal arrest and disposition records.
(5)   Evidence records.
(6)   Payroll records of all employees.

(7)   Reports of all traffic accidents investigated.
(8)   Individual background investigation records.
(9)   Training records.
(10)  Code of Conduct.
(11)  Government furnished property inventory list.
(12)  Employee performance appraisal.

Sec. 3.   **Contract Term**.  This contract shall be for an **INDEFINITE** term commencing **the date of award.**

Sec. 4.   **Non-Contracted Portions of the Bureau of Indian Affairs Program(s)**.  The Government, through the Bureau of Indian Affairs, shall:

1.   **Technical Assistance.**  Provide technical assistance and guidance, as needed, to the Contractor.  The Awarding Official and/or his authorized representative will be available to provide assistance to the Contractor as needed, or upon written request of the Contractor.

2.   **Monitoring**.  The Awarding Official and/or his authorized representative will monitor Contractor performance under this contract.  This monitoring function will include, but not be limited to, the following:

(a)  Periodic on-site visits, as needed and/or requested by the Contractor.

(b)  Official Monitoring Sessions, these shall be scheduled in advance of the visit.

3.   Investigate all major crimes/incidents on the Reservation.

4.   Provide detention services through County or City jail facilities.

# SECTION D

## Performance

Sec. 1.   <u>Reporting Requirement</u>.  The Contractor shall submit the following reports:

    1.   <u>Monthly Reports</u>

        a.   A monthly narrative summation shall be prepared and submitted within five (5) working days of each month giving an account of prior months operational and management highlights, as well as deficiencies. Problems confronting the development of viable and realistic law enforcement and detention services programs and appropriate recommendations shall be included. Noteworthy news type information of general and historical interest shall also be included. Reports are to reflect the true status of programs regardless of conditions existing at the end of the report period.

        b.   <u>Suicide or Attempted Suicide Report</u> - A monthly report entitled "Suicide or Attempted Suicide" shall be submitted within five (5) working days of each month and will contain the following information for the prior month in order as listed:

           i.   Race;
           ii.   Age;
           iii.   Sex;
           iv.   Marital Status;
           v.   Degree of Indian Blood;
           vi.   Tribal affiliation;
           vii.   Place of incident (e.g., home, jail, etc.);
           viii.   Suicide or attempt;
           ix.   Reason;
           x.   Method;
           xi.   Previous attempts;
           xii.   Disposition of attempts;
           xiii.   Brief social and family history;
           xiv.   Kind of suicide prevention program in operation;

xv. Resources utilized to help individuals
(if attempt: are services still being
offered or utilized); and

xvi. Other comments.

The Bureau shall provide this form as a part
of the contract

2. **Quarterly Financial Status Report (SF-269A)**. These
reports shall detail funds expended to date of
report, balance remaining, and status of payments.
These reports shall be submitted quarterly, in
accord with the fiscal year, January 15, April 15,
July 15, October 15, etc., and/or annual/final.

3. **Annual Narrative Report**. Provide a brief annual
narrative report. This report shall be submitted
within ninety (90) days after the end of each
calendar year and upon contract completion. The
report shall include, but not be limited to, the
following:

a. **Narrative Section**. Discuss progress toward
accomplishment of the goals and objectives
envisioned in the contract, comment on
problems encountered, etc.

b. **Statistical Section**. Include any and all
statistical information as may be required to
support the Narrative Section.

c. **Financial Section (Financial Status Report -
SF-269A)**. Report on funding issues, total
funds expended, balance remaining, status of
payments. Comment on funding problems,
budgeting problems, etc.

4. **Submission of Reports**.

a. When the Contractor is the governing body of
the Indian Tribe that requested the contract,
the report shall be submitted directly to the
Awarding Official.

b. When the Contractor is a tribal organization
other than the governing body of the Tribe,
the tribal governing body that requested the
contract shall submit the report. However, at
the option of the Tribe, the Contractor shall

Western Nevada Agency
Section 108 Contract
Annual Funding Agreement
No. CTH61T65351                29

prepare the report and submit it to the Tribe for review and approval prior to the tribe submitting the report to the Awarding Official.

c. When the contract benefits more than one tribe, the Contractor shall prepare the report and submit it to each of the tribes. Each of the tribes will endorse and make any comments they consider applicable before submitting the report to the Awarding Official.

4. **Single Audit Report.** For each fiscal year during which the Contractor receives or expends funds pursuant to this contract, the Contractor shall submit to the Secretary a single-agency audit report required by Chapter 75 of Title 31, United States Code.

**Sec. 2.** **Audit Requirement.**

1. The contractor agrees to arrange for, participate fully in, and respond promptly and fully to the recommendations of, an annual single organization-wide audit as prescribed by the Single Audit Act of 1984 (P.L. 98-502) and the Single Audit Act Amendments of 1996, as implemented by Office of Management and Budget (OMB) Circular A-133 issued under the authority of section 503, 1111, and 7501 et seq. of title 31, United States Code. The costs of such audit are allowable charges only if made in accordance with OMB Circular A-133 provisions. Small and minority business audit firms shall be afforded maximum practicable opportunity to participate in contracts awarded by the contractor to fulfill the requirements herein. The preference requirements of section 7(b), Public Law 93-638, shall apply and are to be enforced.

2. If the contractor fails to comply with the requirement for obtaining audits in accordance with the Single Audit Act of 1984 (P.L. 98-502) as amended, the Bureau of Indian Affairs may take one or more of the following actions, as appropriate in the circumstances:

a. Temporarily withhold cash payments, indirect costs and/or contract support funds pending correction of the deficiency by the contractor

Western Nevada Agency
Section 108 Contract
Annual Funding Agreement
No. CTH61T65351                    30

or more severe enforcement action by the Bureau;

b.   Disallow (that is, deny use of funds) all or part of the cost of the activity or action not in compliance;

c.   Wholly or partly suspend the current contract for the contractor's program; or,

d.   Take other remedies that may be legally available.

3.   The contractor may appeal the BIA decision for sanctions under the Disputes clause of the contract.

4.   The Contractor shall submit one (1) Reporting Package of the final audit report within thirty (30) days after issuance to: Federal Audit Clearinghouse, Bureau of the Census, 1201 E. 10th Street, Jeffersonville, IN 47132. The Contractor should also send one (1) additional copy of the report to the Federal Clearinghouse for each federal funding agency for which one or more findings occurred in an audited program. The contractor shall also make copies of the final audit report available to the BIA and the public, upon request, within thirty (30) days of issuance.

Sec. 3.   <u>Monitoring and Records Review</u>.

1.   The Contractor shall maintain books, records, documents, and other evidence and accounting procedures and practices, sufficient to reflect properly all direct and indirect costs of whatever nature claimed to have been incurred and anticipated to be incurred for the performance of this contract. The foregoing constitute "records" for the purposes of this clause.

2.   The Contractor's facilities, or such part thereof as may be engaged in the performance of this contract, and his records shall be subject at all reasonable times to inspection and audit by the Awarding Official or his authorized representatives.

3.   The Contractor shall preserve and make available his records:

   a.   Until the expiration of three years from the date of final payment under this contract, or of the time period for the particular records specified in 41 CFR Part 1-20, whichever expires earlier; and,

   b.   For such longer period, if any, as is required by applicable statute, or by other clauses of this contract, or by 3(b)(1) or (2) below:

      i.   If the contract is completely or partially canceled, the records relating to the work terminated shall be preserved and made available for a period of three years from the date of any resulting final settlement.

      ii.   Records which relate to (a) appeals under the "Disputes" clause of this contract, (b) litigation or the settlement of claims arising out of the performance of this contract, or (c) costs and expenses of this contract as to which exception has been taken by the Awarding Official or any of his duly authorized representatives, shall be retained until such appeals, litigation, claims or exceptions have been disposed of.

4.   The Contractor shall insert the substance of this clause, including the whole of this paragraph 4, in each subcontract hereunder that is not firm-fixed-price or fixed-price with escalation. When so inserted, changes shall be made to designate the higher-tier subcontractor at the level involved in place of the Contractor; to add "of the Government prime contract" after "Awarding Official", and to substitute "the Government prime contract" in place of "this contract" in (b) of paragraph 3(b)(2) above.

Sec. 4.   <u>Examination of Records</u>.

   1.   <u>Examination of Records</u>.

[This clause is applicable if the contract amount does not exceed $10,000.]

a.   The Contractor agrees to maintain books, records, documents, and other evidence pertaining to the costs and expense of this contract (hereinafter collectively called records) to the extent and in such detail as will properly reflect all net costs, direct and indirect, of labor, materials, equipment, supplies and services, and other costs of whatever nature for which reimbursement is claimed under the provisions of this contract.

b.   The Contractor agrees to make available at the office of the Contractor at all reasonable times during a period of three years, after final payment under this contract, all records specified in paragraph (a) above for examination and audit by designated representative of the Comptroller General, the Secretary of Interior or the Awarding Official.

c.   The Contractor further agrees that records which relate to claims, litigation, or to any costs or expenses of this contract to which exception has been taken by the Comptroller General, the Secretary of Interior or the Awarding Official or any of their duly authorized representatives shall be retained by the Contractor until such appeals, litigation or exceptions have been disposed of.

d.   The provisions of this clause shall be applicable to and included in any negotiated subcontract.

2.   <u>Examination of Records</u>.

[This clause is applicable if the contract amount exceeds $10,000.]

a.   The Contractor agrees to maintain books, records, documents, and other evidence pertaining to the costs and expenses of this contract (hereinafter collectively called records) to the extent and in such detail as

will properly reflect all net costs, direct and indirect, of labor, materials, equipment, supplies and services, and other costs and expenses of whatever nature for which reimbursement is claimed under the provisions of this contract.

b.  The Contractor agrees to make available at the office of the Contractor at all reasonable times during the period set forth in subparagraph (d) below any of the records for inspection, audit or reproduction by any authorized representative of the Comptroller General, the Secretary of Interior and the Awarding Official.

c.  If the Comptroller General or any of his duty authorized representatives determines that his audit of the amounts reimbursed under this contract as transportation charges will be made at a place other than the office of the Contractor, the Contractor agrees to deliver, with the reimbursement voucher covering such charges or as may be otherwise specified within two years after reimbursement of charges covered by any such voucher, to such representatives as may be designated for that purpose through the Awarding Official, such documentary evidence in support of transportation costs as may be required by the Comptroller General or any of his duty authorized representatives.

d.  Except for documentary evidence delivered to the Government pursuant to subparagraph (c) above, the Contractor shall preserve and make available his records:

   i.  Until expiration of three years after final payment under this contract; and,

   ii. For such longer period, if any, as is required by applicable statues, by any other clause of this contract, or by (i) or (ii) below:

      (1) If this contract is completely or partially terminated, the records relating to the work terminated

shall be preserved and made available for a period of three years from the date of any resulting settlement.

(2) Records which relate to:

(a) Appeals under Disputes clause of this contract;

(b) Litigation or the settlement of claims arising out of the performance of this contract; or

(c) Costs and expenses of this contract to which exception has been taken by the Comptroller General, Secretary of the Interior or the Awarding Official, or any of their duly authorized representatives, shall be retained by the Contractor until such appeals, litigation, claims or exceptions have been disposed of.

e. Except for documentary evidence delivered pursuant to subparagraph (c), above, and the records described in subparagraph(d)(2)(ii), above, the Contractor may in fulfillment of his obligation to retain his records as required by this clause substitute photographs, micro-photographs, or other authentic reproductions of such records, after the expiration of two years following the last days of the month of reimbursement to the Contractor of the invoice or voucher to which such records relate, unless a shorter period is authorized by the Awarding Official with the concurrence of the Comptroller General or his duly authorized representative.

f. The provisions of the paragraph (1), including this subparagraph (f) shall be applicable to and included in each subcontract hereunder which is on a cost, cost-plus-a-fixed-fee, time-and-material or labor-hour basis.

i.  The Contractor further agrees to include in each of his subcontracts hereunder, other than those set forth in paragraph 2(f) above, a provision to the effect that the subcontractor agrees that the Comptroller General, the Secretary of the Interior, and the Awarding Official, or any of their duly authorized representatives shall, until the expiration of three years after final payment under the subcontract, have access to and the right to examine any directly pertinent books, documents, papers, and records of such subcontractor, involving transactions related to the subcontract. The term "subcontract" as used in this paragraph (1) only excludes:

(1)  Purchase orders not exceeding $10,000; and,

(2)  Subcontracts or purchase orders for public utility services at rates established for uniform applicability to the general public.

Sec. 5.   <u>Mature Contracts</u>.

1.  This contract may be terminated through either:

a.  Retrocession as provided in P.L. 93-638, as amended, in section 105(e); or,

b.  Program reassumption as provided in P.L. 93-638, as amended, in section 109.

2.  This contract will be modified to incorporate provisions of regulations promulgated to implement P.L. 93-638, as amended.

Sec. 6.   <u>Drivers License Requirements for Non-Federal Personnel</u>.

The contractor is responsible for motor vehicle operator licensing, Equipment Operator testing, licensing and physical examinations.

Sec. 7.   <u>Effect on Existing Rights</u>.

Western Nevada Agency
Section 108 Contract
Annual Funding Agreement
No. CTH61T65351                36

1.  Nothing in the contract shall be construed as:

    a.  Affecting, modifying, diminishing, or otherwise impairing the sovereign immunity from suit enjoyed by an Indian tribe; or,

    b.  Authorizing or requiring the termination of any existing trust responsibility of the United States with respect to the Indian people.

Sec. 8.   **Applicable Federal Regulations**.   The regulations promulgated to implement P.L. 93-638, as amended, shall apply to this agreement.

Sec. 9.   **Time-frames For Notices**. The following shall constitute "reasonable" notice as defined in the Section 108 Model Contract:
Section (b) (5) Limitation of costs. Reasonable notice that activity required under this Contract will be greater than then the funds awarded under this contract shall be defined as 30 calendar days.

Section (b) (7) (B) Recordkeeping System.   Reasonable advance request shall be defined as 30 calendar days, unless there is a documented reason to review the records with less notice.

Section (b) (7) (C) Responsibilities of Contractor. Reasonable advanced notice shall be defined as 15 working days.

Western Nevada Agency
Section 108 Contract
Annual Funding Agreement
No. CTH61T65351                    37

# SECTION E

## Administration Data

Sec. 1.   <u>Awarding Official's Representative</u>.

Mr. Jack Spencer, Acting Captain of Police, Western Nevada Agency, is designated as the authorized representative of the Awarding Official for this contract.

Sec. 2.   <u>Contract Payment</u>.   For performing this contract, the Contractor shall be reimbursed for its allowable direct and indirect costs, not to exceed the total budgeted amount of the contract. The total budget amount of this contract is stated on the signature page of this agreement identifying line item number, accounting and appropriation data and amount for each. Changes in amounts will be stated on agreement amendments, attached to this agreement.

1.   Contract payments shall be made to the Contractor through the Bureau of Indian Affairs P-638 Automated Clearing House (ACH) Payment System.

2.   Notwithstanding any other provision of law, Contract payments shall be made in advance on a quarterly, semi-annual, or lump sum basis. Each quarterly payment shall be made on the first day of each quarter of each fiscal year, the first semi-annual payment shall be made on the first day of the first quarter of the contract year, the final semi-annual payment shall be made on the first day of the third quarter of the contract year, the lump sum payment shall be made on the first day of the first quarter of the contract year, except that in any case in which the contract year coincides with the Federal fiscal year, payment for the first quarter shall be made not later than the date that is ten (10) calendar days after the date on which the Office of Management and Budget apportions the appropriations for the fiscal year for the programs, services, functions, and activities subject to this contract.

**Check one of the following:**

( )   Quarterly Payments.

( )   Semi-Annual Payments.

( )   Annual Payments.

(xx) Other Payment Methods. The contractor may request payment as needed by utilizing the P-638 Payment Request Form.

Sec. 3.  **Submission of Invoices.**  The Contractor shall use the S.F. 269A - Financial Status Report as its invoice document.  The Contractor shall submit such invoice to the Awarding Official's Representative on a quarterly basis in accordance with the schedule established for submission of the Quarterly Financial Status Reports.

1.   At any time or times prior to final payment under this contract, the Awarding Official may cause to be made, such audit of the invoices or vouchers and statements of costs as shall be deemed necessary. Each payment made before that time shall be subject to reduction to the extent that amounts included in the related invoice or vouchers and statement of cost are found by the Awarding Official not to constitute allowable cost, and shall also be subject to reduction for overpayment or to increase for underpayment on preceding invoices or vouchers.

2.   On receipt and approval of the voucher or invoice designated by the Contractor as the "final voucher" or "final invoice" and statement of costs, which shall be submitted by the Contractor as promptly as may be practicable following completion of the work under this contract, but no later than ninety (90) days or such longer period as the Awarding Official may in his discretion, approve in writing from the date of such completion, and following compliance by the Contractor with all provisions of this contract; the Government shall, as promptly as may be practicable, pay to the Contractor any balance of allowable cost.

3.   Any cost incurred by the Contractor under the terms of this contract which would constitute allowable cost under the provisions of this clause shall be included in determining the amount payable under this contract; notwithstanding any provisions

contained elsewhere in this contract or other documents incorporated in this contract by reference, designating services to be performed or materials to be furnished by the Contractor at its expense or without cost to the Government.

Sec. 4.    <u>Contract Revision or Amendment</u>.

1.    This contract may be revised or amended as required to carry out the purpose of the program, project or function being contracted.   The Contractor shall submit proposed revisions through the Awarding Official's Representative to the Awarding Official. The Contractor (if other than the tribal governing body) shall also send copies of the proposed revision to the designated representative of the tribal governing body at the same time as they are sent to the Awarding Official.    The Awarding Official shall process and review the proposed revision in accordance with Section (e)(2) of the Section 108 Model Agreement.

2.    When the Awarding Official recommends declination of a Contractor's request to amend the contract, the matter shall be resolved as prescribed in P.L. 93-638, as amended.

Sec. 5.    <u>Negotiated Indirect Cost Rates</u>.

1.    The allowable indirect costs under this contract shall be obtained by applying negotiated indirect cost rates to bases agreed upon by the parties, as specified below.

2.    Negotiation of indirect cost rates by the Contractor and the cognizant audit agency shall be undertaken as promptly as practicable after receipt of the Contractor's indirect cost proposal.

3.    Allowability of cost and acceptability of cost allocation methods shall be determined in accordance with OMB Circular A-87.

4.    The results of each negotiation shall be set forth in an Indirect Cost Negotiation Agreement, such agreement shall become a part of this contract by reference.   The agreement shall specify:

a.    The agreed indirect cost rate(s);

b.  The base to which the rate(s) apply;

c.  The periods for which the rate(s) apply; and,

d.  The specific items treated as exclusions or any changes in the items previously agreed to be treated as exclusions.

5.  The Contractor is to be reimbursed for all allocable and allowable indirect costs incurred in performance of this contract, subject to any statutory limitations applicable.

6.  Any failure by the parties to agree on any indirect cost rate(s) or applicability of the rate(s) to the bases under this provision shall be considered a dispute concerning a question of fact for decision by the Awarding Official within the meaning of the clause of this contract entitled "Disputes".

Sec. 6.    <u>Billings for Indirect Cost</u>.  The contractor shall bill for Indirect Cost earned on his voucher\invoice showing the following, for the period covered by the voucher\invoice:

1.  Total direct cost expenditures.

2.  Less Exclusions.

3.  Times Indirect Cost Rate.

4.  Indirect Cost earned for the period covered.

(1) - (2) X (3) = (4).

Sec. 7.    <u>Disputes</u>.

1.  This contract is subject to the Contract Disputes Act of 1978 (41 USC 601-613) (the Act).

2.  Except as provided in the Act, all disputes arising under or relating to this contract shall be resolved under this clause.

3.  "Claim", as used in this clause, means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the

Western Nevada Agency
Section 108 Contract
Annual Funding Agreement
No. CTH61T65351                    41

adjustment or interpretation of contract terms, or other relief arising under or relating to this contract. A claim arising under a contract, unlike a claim relating to that contract, is a claim that can be resolved under a contract clause that provides for the relief sought by the claimant. However, a written demand or written assertion by the Contractor seeking the payment of money exceeding $50,000 is not a claim under the Act until certified as required by subparagraph 4(b), below. A voucher, invoice, or other routine request for payment that is not in dispute when submitted is not a claim under the Act. The submission may be converted to a claim under the Act, by complying with the submission and certification requirements of this clause, if it is disputed either as to liability or amount or is not acted upon in a reasonable time.

4.   a.   A claim by the Contractor shall be made in writing and submitted to the Awarding Official for a written decision. A claim by the Government against the Contract shall be subject to a written decision by the Awarding Official.

   b.   For Contractor claims exceeding $50,000, the Contractor shall submit with the claim a certification that:

      i.   The claim is made in good faith;
      ii.  Supporting data are accurate and complete to the best of the Contractor's knowledge and belief; and,

      iii. The amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable.

   c.   1.   If the Contractor is an individual, the certification shall be executed by that individual.

        2.   If the Contractor is not an individual, the certification shall be executed by:

(1) A senior company official in charge at the Contractor's plant or location involved; or

(2) An officer or general partner of the Contractor having overall responsibility for the conduct of the Contractor's affairs.

5. For Contractor claims of **$50,000 or less**, the Awarding Official must, if requested in writing by the Contractor, render a decision within 60 days of the request.  For Contractor-certified claims over **$50,000**, the Awarding Official must, within 60 days, decide the claim or notify the Contractor of the date by which the decision will be made.

6. The Awarding Official's decision shall be final unless the Contractor appeals or files a suit as provided in the Act.

7. The Government shall pay interest on the amount found due and unpaid from (1) the date the Awarding Official receives the claim (properly certified if required), or (2) the date payment otherwise would be due, if that date is later, until the date of payment.  Simple interest on claims shall be paid at the rate, fixed by the Secretary of the Treasury as provided in the Act, which is applicable to the period during which the Awarding Official receives the claim and then at the rate applicable for each 6-month period as fixed by the Treasury Secretary during the pendency of the claim.

8. The Contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under the contract, and comply with any decision of the Awarding Official.

Sec. 8.  <u>Payment of Interest on Contractor's Claim</u>.

1. If an appeal is filed by the Contractor from a final decision of the Awarding Official under the disputes clause of this contract, denying a claim arising under the contract, simple interest on the amount of the claim finally determined owed by the Government shall be payable to the Contractor. Such interest shall be at the rate determined by

the Secretary of the Treasury pursuant to Public Law 92-41, 85 Stat. 97, from the date the Contractor furnishes to the Awarding Official his written appeal under the disputes clause of this contract, to the date of:

a.    A final Judgement by a court of competent jurisdiction; or,

b.    Mailing to the Contractor of a supplemental agreement for execution either confirming completed negotiations between the parties or carrying out a decision of a board of contract appeals.

2.    Notwithstanding 1, above:

a.    Interest shall be applied only from the date payment was due, if such date is later than the filing of appeal; and,

b.    Interest shall not be paid for any period of time that the Awarding Official determines the Contractor has unduly delayed in pursuing his remedies before a board of contract appeals or a court of competent jurisdiction.

Sec. 9.    **Retrocession.**  The Contractor agrees to comply with the provisions of section 105(e) of the Act, as amended, and be guided by the procedures in 25 CFR 900, Subpart P in the event of retrocession.

Sec. 10.   **Reassumption.**

The Contractor agrees to comply with the provisions of section 109 of the Act, as amended, and be guided by the procedures in 25 CFR 900, Subpart P in the event of reassumption.

Sec. 11.   **Pre-Contract Costs.**

Any costs the Contractor incurs prior to the award or effective date of this contract may be reimbursable, if such costs are determined by the Awarding or Contacting Officer, to be allocable, allowable, reasonable and necessary to delivery of program services. The Contractor is advised that incurrance of pre-contract costs are made at its own risk.

# SECTION F

## Special Requirements

Sec. 1    <u>Management Systems</u>.    Provide copies of the most recent versions of the following management system Policies and Procedures Manuals in accordance with 25 CFR Subpart F, "Standards for Tribal or Tribal Organization Management Systems":

    1.    <u>Financial Management System</u>.

        (XX) Previously submitted and on file at the Bureau of Indian Affairs.

        ( ) Attached, see attachment "_".

    2.    <u>Procurement Management System</u>.

        (XX) Previously submitted and on file at the Bureau of Indian Affairs.

        ( ) Attached, see attachment "_".

    3.    <u>Property Management System</u>.

        (XX) Previously submitted and on file at the Bureau of Indian Affairs.

        ( ) Attached, see attachment "_".

Sec. 2    <u>Finance System Certification</u>.    The contractor stated in the application, "The Reno-Sparks Indian Colony of Nevada hereby certified the minimum procurement, property and financial management standards set forth in 25 CFR Subpart F will be met."

    Management systems will be evaluated by an independent auditor through the annual single audit report required by the Act and OMB Circular A-128.

Sect. 3    <u>Recordkeeping</u>.    The Contractor agrees to keep such records as required pursuant to Sec. 108.1(b)(7)(7)(A) of the Act, as amended, to make reports required by Sec. 5(a)(1) and (2), of the Act, as amended, and to make such information and reports available to the Indian clients as required by Sec. 5(c), of the Act, as amended.    The

Contractor shall be required to maintain a record-keeping system which will allow for the maintenance of records to facilitate retrocession or reassumption. Such a records system, as a minimum, shall:

1. Provide for the creation, maintenance and safeguarding of records of lasting value, including those involving individual rights, such as permanent student records and transcripts.

2. Provide for orderly retirement of records used or created under the contract. Such records shall be returned to the Bureau for disposition according to the General Records Schedules and the Bureau Records Control Schedule.

Sec. 4.   **Privacy Act Requirements.** Section 108(b) of the Indian Self-Determination Act states that records of the tribal government or tribal organizations shall not be considered Federal records for the purposes of the Privacy Act.

Sec. 5.   **Freedom of Information.** Access to records maintained by the Secretary is governed by the Freedom of Information Act (5 U.S.C. 552) and other applicable Federal law. Except for previously provided copies of tribal records that the Secretary demonstrates are clearly required to be maintained as part of the record keeping systems of the DHHS or the DOI, or both, records of the contractors (including archived records) shall not be considered Federal records for the purpose of the Freedom of Information Act. The Freedom of Information Act does not apply to records maintained solely by Indian tribes and tribal organizations.

Sec. 6.   **Tort Claims.**

**General**

1. For the purpose of Federal Tort Claims Act Coverage, the Contractor and its employees (including individuals performing personal services contracts with the Contractor to provide health care services) are deemed to be employees of the Federal government while performing work under this contract. This status is not changed by the source of funds used by the contractor to pay the employee's salary and benefits unless the employee receives additional compensation for performing

covered services from anyone other than the Contractor.

2.   The Contractor shall designate an individual to serve as a tribal tort claims liaison. The liaison shall assist the Bureau in preparing a comprehensive, accurate and unbiased report on incidents so that claims may be properly evaluated in accordance with 25 CFR 900 Subpart M, Federal Tort Claims Act Coverage General Provisions. The Contractor shall notify the Awarding Official in writing who has been designated as liaison.

3.   The Contractor shall notify the Awarding Official immediately in writing of any tort claim (including any proceeding before an administrative agency or court) filed against the Contractor or any of its employees that relates to performance of a self-determination contract or subcontract.

**Action on approved claims**

1.   Any award, compromise, or settlement in an amount of $2,500 or less made pursuant to the provisions of section 2672 of Title 28, U. S. Code, shall be paid by the Contractor out of the funds available under the contract and shall be considered an allowable costs under the contract. When a claimant is represented by an attorney, the payment shall designate both the claimant and his attorney as payees. The payment shall be delivered to the attorney, whose address shall appear on the voucher.

2.   The Bureau shall arrange for the payment of an award, compromise, or settlement in excess of $2,500.

Western Nevada Agency
Section 108 Contract
Annual Funding Agreement
No. CTH61T65351                    47

Annual Funding Agreement - CY 2005                    Reno-Sparks Indian Colony

# AGREEMENT NO. CTH61T65351
# Award


DATED THIS 16 DAY OF FEBRUARY 2005


RENO-SPARKS INDIAN COLONY


BY: _Arlan Melendez_ DATE 2-16-05
    Mr. Arlan Melendez, Chairman
    Reno-Sparks Indian Colony


United States of America
Department of the Interior


BY: _Carolyn Richards_ DATE 03/03/2005
    Carolyn Richards
    Awarding Official
    BIA-2001-L2-000003


ACCOUNTING:
         KLH012/20052006/37730/252I    $193,204.00

         Total                          $193,204.00

**EXHIBIT B**:    B.I.A. OFFICE OF JUSTICE SERVICES LAW
ENFORCEMENT HANDBOOK, RULES AND PROCEDURES

 **BIA-OFFICE OF JUSTICE SERVICES**
**\*LAW ENFORCEMENT HANDBOOK\*** 

| Effective: 07/01/2008 | Revised: |
|---|---|
| CALEA Standard(s)–1.3.5 | |

## RULES AND PROCEDURES

### 4-48-01    ESTABLISHMENT AND PURPOSE OF PROFESSIONAL STANDARDS DIVISION

A. Department of Interior Executive Order 3178, issued March 16, 1994 established the Internal Affairs Division (IAD) within the Office of Justice Services (OJS).  IAD investigates allegations of misconduct against OJS employees to determine their validity.  IAD is now known as the Professional Standards Division-(PSD)

B. Applicability
All investigations and disciplinary actions are governed by this procedure, including but not limited to, applicable orders, rules, regulations, Code of Conduct, and appropriate tribal, local, state, and federal laws, rules and regulations.

C. Purpose
The purpose of PSD is to ensure that the professional standards of OJS are maintained through the internal system whereby objectivity, fairness and justice are ensured by an impartial investigation and review of the allegations of misconduct against OJS employees.  This system provides citizens with an equitable and effective avenue for redress of their legitimate grievances against OJS employees.  PSD readily accepts all complaints of misconduct and fairly and objectively investigates these complaints.  OJS employees determined to be guilty of misconduct will be appropriately disciplined, and a copy of the disciplinary actions taken will be provided to the PSD.  PSD also provides OJS employees due process to identify unfounded and unsubstantiated allegations.

D. Because of the potential liability associated with BIA, P.L. 93-638 contracted programs and Tribal programs receiving federal funding, the Office of Justice Services (OJS) has an obligation to provide for audits and inspections of the programs it operates and funds.  PSD will be alert for the discovery of training deficiencies and the need for new policies and policy changes.  This will be done through investigations and audits of OJS and tribal law enforcement programs.

 **BIA-OFFICE OF JUSTICE SERVICES**
**\*LAW ENFORCEMENT HANDBOOK\*** 

| | |
|---|---|
| Effective: 07/01/2008 | Revised: |
| CALEA Standard(s)--1.3.5 | |

E. Areas of PSD Responsibility

Special Agents assigned to the PSD will investigate without bias all allegations of misconduct assigned to them. Agents will conduct fair, objective, and impartial investigations and audits without fear of reprisals from supervisors, managers or the subjects of investigation from the affected district. Any acts or threats of reprisal will be immediately reported to the Associate Director, PSD for appropriate action. PSD acts on behalf of and reports to the Deputy Bureau Director, OJS, as the investigative body with the following areas of responsibility.

1. Maintain a record of allegations (complaints) of alleged or suspected misconduct against OJS employees as well as self-governance and tribal law enforcement employees.
2. Investigate the above allegations.
3. Inform complainants, employees accused, and the employee's supervisors of the results of the investigation.
4. Maintain a record of disciplinary actions take against employees deemed to have engaged in misconduct.
5. Maintain the confidentiality of PSD investigations and records.
6. When a training deficiency is discovered, PSD will notify the employee's supervisor, and if appropriate, the Deputy Bureau Director, OJS, and the Deputy Chief, Indian Police Academy.
7. When a policy change or the need for a new policy is noted, PSD will notify the Deputy Bureau Director, OJS.
8. Production of an annual summary that is made available to the public of the complaints received and investigated by the PSD, and their final dispositions.

F. OJS employees are subject to the following standards of conduct.

1. Employee Responsibilities and Conduct for the Department of the Interior (DOI), 43 Code of Federal Regulations 20.735.
2. Employee Responsibilities and Conduct, 44 BIAM, Chapter 735
3. Law Enforcement Code of Conduct, 446 DOI Manual, Chapter 2, Appendix 1,
4. Standards of Ethical Conduct for Employees of the Executive Branch, 5 Code of Federal Regulations, Section 2635.
5. Ethics and Conduct, found in this handbook, the Law Enforcement Code of Conduct, and the Law Enforcement Code of Ethics.
6. Discipline and Adverse Actions, Departmental Manual 370 DM 752
7. Applicable State, County, Municipal and Tribal Laws.

G. Professional Standards Division Location and Contact Information:
The PSD may be contacted at 1001 Indian School Rd. NW, Albuquerque, New Mexico 87104 (505)563-3800 or (505)563-3089 (fax).



BIA-OFFICE OF JUSTICE SERVICES
*LAW ENFORCEMENT HANDBOOK*



| Effective: 07/01/2008     Revised: |
|---|
| CALEA Standard(s)--1.3.5 |

H. PSD Investigation of Tribal Programs

PSD will investigate all allegations of misconduct and perform audits of 638 contract programs in accordance with 25 CFR part 12.

1. 25 CFR part 12.53 states - The Deputy Bureau Director, OJS maintains an internal affairs component that investigates all allegations of misconduct by BIA officers, and any officer receiving funding and/or authority from the BIA.  All allegations of misconduct must be thoroughly investigated and appropriate actions taken when warranted.  Any person having knowledge of officer misconduct must report that information to the officer's supervisor.

2. 25 CFR part 12.12 states:
The regulations in this part are not intended to discourage contracting of Indian country law enforcement programs under the Indian Self-determination and Education Assistance Act (Pub. L. 93-638, as amended, 25 U.S.C.  450). The Deputy Commissioner of Indian Affairs will ensure minimum standards are maintained in high risk activities where the Federal government retains liability and the responsibility for settling tort claims arise from contracted law enforcement programs.  It is not fair to law abiding citizens of Indian country to have anything less than professional law enforcement in their community.  Indian country law enforcement programs that receive Federal funding and/or commissioning will be subject to periodic inspection or evaluation to provide technical assistance, to ensure compliance with minimum Federal standards, and to identify necessary changes or improvements to BIA policies.

3. 25 CFR part 12.13 states:
If a program fails to comply with this section, BIA law enforcement commissions may be revoked, law enforcement contracts may be cancelled, and the program may no longer be eligible for tribal shares allocated from the law enforcement budgets.

I. Lack of Criminal Charges Do not Preclude Administrative Actions
The lack of criminal charge against an employee, and/or acquittal on a criminal charge does not prevent the law enforcement agency from taking administrative action against an employee.  PSD will not initiate an administrative investigation until criminal actions are adjudicated or prosecution is declined.  However, a preliminary investigation not involving contact with the subject of the investigation may be initiated.



**BIA-OFFICE OF JUSTICE SERVICES**
**\*LAW ENFORCEMENT HANDBOOK\***



Effective: 07/01/2008     Revised:
CALEA Standard(s)--1.3.5

4-48-02   RESPONSIBILITY FOR INVESTIGATION OF COMPLAINTS

A. District SAC's, Chiefs' of Police and supervisors are required to report all allegations of misconduct as defined above to PSD within 24 hours of occurrence.  PSD will review all allegations to determine the appropriate classification and will investigate or refer allegations accordingly.

B. The appropriate law enforcement agency and/or PSD will investigate allegations of criminal misconduct.

C. PSD will review all allegations and either investigate themselves or refer the investigation to the District SAC or Agency Chief of Police.  The employee's chain of command may investigate as follows:

1. Line supervisors can investigate Class III and IV offenses.
2. PSD will investigate Class I and II offenses and any others as determined by a PSD supervisor.
3. PSD will review all allegations and completed investigations.
4. Allegations of civil rights violations will be referred to the FBI for investigation
5. Complainants will be notified by mail regarding verification of receipt of their complaint, status reports, and notification of the results of the investigation.  Notification will not be made to anonymous complainants.

D. District SAC's, Chiefs' of Police and supervisors who fail to report allegations of misconduct will face disciplinary action.

E. Frequently, by the time an allegation of criminal conduct reaches PSD, a law enforcement agency, such as a County Sheriff's Department, or a City Police Department has already initiated a criminal investigation.

1. On a case by case basis, PSD may or may not become involved in an on-going criminal investigation.
2. PSD will monitor the progress of all such criminal investigations.
3. PSD may use any information gathered during a criminal investigation in an internal administrative investigation.
4. At its discretion, PSD may conduct administrative investigations concurrently with or after a criminal investigation has concluded.
5. If an accused employee refuses to answer questions voluntarily, PSD will not compel a statement unless the prosecuting attorney has concurred or declined prosecution.

  

BIA-OFFICE OF JUSTICE SERVICES
*LAW ENFORCEMENT HANDBOOK*

| Effective: 07/01/2008     Revised: |
| --- |
| CALEA Standard(s)—1.3.5 |

F. 25 Code of Federal Regulations requires that all allegations of Civil Rights violations be reported to the FBI.

Only the FBI is authorized to conduct a full criminal Civil Rights investigation, but this does not preclude the BIA from conducting a simultaneous or subsequent internal administrative investigation concerning all allegations of use of excessive force and brutality.

4-48-03   AUTHORITY FOR PSD ACTIONS

A. Internal inquiries are performed under the authority of the Deputy Bureau Director, Office of Justice Services, with the management responsibility assigned to the program administrator or supervisor at the branch, section, unit district or agency level.   The final authority to exonerate, declare unfounded, not sustain, or to sustain any complaint rests solely with the Deputy Bureau Director, Office of Justice Services.

B. Formal discipline, when appropriate, is proposed by the affected employee's or law enforcement officer's immediate supervisor and approved by the supervisor's immediate supervisor, consistent with the applicable personnel management guidelines.

C. Immediate supervisors have the authority to issue informal personnel actions, when appropriate.

D. PSD has the authority to re-investigate a matter believed to be incomplete with the concurrence of the Deputy Bureau Director, OJS.

4-48-04   REPORTING OF COMPLAINTS:

A. Employees will assist persons who wish to make a compliant against a law enforcement employee in a professional manner.

  1. Information regarding procedures for the public to register complaints against the organization or its employees will be made available at every District and Agency office.
  2. Complaints may be received personally, in writing, via telephone, and/or anonymously.  Complaints from citizens who wish their names be held in confidence will be accepted for investigation.
  3. When the complainant is intoxicated or under the influence of drugs while making the complaint, The supervisor will arrange for the complainant to be interviewed at the earliest opportunity once he/she is sober.

 

BIA-OFFICE OF JUSTICE SERVICES
*LAW ENFORCEMENT HANDBOOK*

| Effective: 07/01/2008        Revised: |
| --- |
| CALEA Standard(s)–1.3.5 |

B. When employees who are not supervisors receive a complaint against OJS or any OJS employee, including citizen complaints, the employee will immediately notify his/her supervisor. When the applicable supervisor or commander is not on duty, the complainant should be referred to the appropriate on-duty supervisor, special agent in charge, or chief of police. If the complainant refuses such referrals, all available information should be recorded by the receiving personnel and forwarded to the applicable District Supervisor, Special Agent in Charge, or Chief of Police who will forward a copy of each complaint to the PSD. If the employee fears reprisal or lack of cooperation from the supervisor, he/she may notify PSD directly. PSD can be notified directly regarding complaints against supervisors or managers.

C. When District SAC's, Chiefs' of Police or supervisors become aware of alleged misconduct by a law enforcement employee he/she will promptly:

1. Take action to prevent aggravation of the incident.
2. Ensure that physical evidence is preserved
3. Ensure that injured parties receive appropriate medical treatment and that photographs are taken of visible injuries.
4. Notify the appropriate law enforcement agency responsible for the investigation if the alleged misconduct is criminal,.
5. Determine whether the accused employee will be on administrative leave pending the outcome of an investigation for very serious incidents. The employee must be placed on administrative leave for Class I and Class II allegations.
6. Notify PSD, including the following information:
   a. Name, date of birth, rank (job title), and location assigned of the accused employee.
   b. If known, name, date of birth, address and telephone number of the complainant.
   c. A summary of the incident(s) of alleged misconduct.
   d. Any official reports normally prepared concerning the incident.
   e. When feasible, a brief written statement signed by the complainant, summarizing the incident and the alleged misconduct.

D. The District SAC, Chief of Police or supervisor may attempt to resolve a complaint by an explanation of BIA policies and procedures, where applicable. Attempts to resolve complaints will be noted on an official complaint form. However, the complaint will be forwarded to PSD for review.

E. The District SAC, Chief of Police or supervisor will advise the complainant of the BIA's procedures for the processing and investigation of citizen complaints.




BIA-OFFICE OF JUSTICE SERVICES
*LAW ENFORCEMENT HANDBOOK*

| Effective: 07/01/2008     Revised: | |
| --- | --- |
| CALEA Standard(s)--1.3.5 | |

4-48-05   EMPLOYEE RIGHTS DURING AN INTERNAL INVESTIGATION

A. Prior to an interview or special examination, the PSD supervisor will provide the employee under investigation with confidential written notification of the allegation. This notification will include a copy of the original complaint or a summary adequately listing the relevant facts, and the employee's rights and responsibilities during the investigation.

B. All interviews will be conducted while the employee is on duty, unless the seriousness of the investigation is such that an immediate interview is required.

C. The interview will be held at the employee's work area, or at a location agreeable to both parties.

 Investigators will not make promises or offer rewards as an inducement to answer any questions.

D. Accused employees or their supervisors may contact a PSD supervisor to ascertain the status of the investigation of a complaint filed against them.

4-48-06   INVESTIGATION

A. The objective of the investigation is to determine the truth.    PSD investigations will be objective, fair, and thorough.

 1. A proper investigation demands that the investigator keep an open mind at all times and gather all the facts.
 2. The accused employee will be given ample opportunity to deny or justify an alleged action.

B. PSD special agents will not conduct investigations of employees to whom they are related or with whom they have, or have had, a close association.

C. On initiating the investigation, the special agent will:

 1. Review all pertinent documents including but not limited to prior complaints, administrative documents, training records, etc.
 2. Compare the date the incident occurred with the date reported and document the reason for any delays in reporting.
 3. Obtain all related medical records as soon as possible in cases in which the medical condition of a witness, complainant, or accused employee is a factor.
 4. Obtain a signed medical consent form as early in the investigation as possible. The patient must sign a medical release before physicians or medical facilities can release information from medical records.



**BIA-OFFICE OF JUSTICE SERVICES**
***LAW ENFORCEMENT HANDBOOK***



| | |
|---|---|
| Effective: 07/01/2008 | Revised: |
| CALEA Standard(s)—1.3.5 | |

D. Investigators will conduct an interview with the accused employee. An accused employee has the right, if he/she wishes, to be accompanied by an attorney, union representative, supervisor or other personal representative during any interview concerning allegations of misconduct.

E. The employee's representative is limited to acting as an observer of the interview, except when the interview focuses on, or leads to, evidence of potential criminal activity by the employee. Should this occur, the employee's legal representative will be permitted to advise and confer with the employee.

F. Interviews will be recorded by PSD. The employee will be advised that the interview is being recorded.

G. PSD is not required to advise an accused employee of his constitutional "Miranda rights" unless:

    1. The employee is in custody.
    2. The interviewing investigator realizes that the employee will not be allowed to leave freely at the conclusion of the interview. At this point during the interview, the employee is effectively in custody and must be advised of his/her rights.

H. At the beginning of the interview, the investigator will provide the accused employee with the appropriate "Warning and Assurance" form. The circumstances of each investigation and the discretion of the investigator dictates which form the employee will be given.

    1. Warning and Assurance to Employee Requested to Provide Information on a Voluntary Basis. The employee is advised that:
        a. He/she has the right to remain silent and that he/she can not be disciplined for exercising this right.
        b. His/her voluntary statements can be used against him/her in criminal or administrative disciplinary proceedings.
        c. False statements could subject the employee to disciplinary action including dismissal.
        d. An employee who is provided the "voluntary" interview form and declines to answer questions may later be provided the "required" interview form at the discretion of the interviewer.

 BIA-OFFICE OF JUSTICE SERVICES
*LAW ENFORCEMENT HANDBOOK* 

| Effective: 07/01/2008       Revised: |
| --- |
| CALEA Standard(s)--1.3.5 |

2. Warning and Assurance to Employee Required to Provide     Information. The employee is advised that:
   a. He/she is required to fully and truthfully answer all questions and that refusal to do so, or providing false statements can result in administrative disciplinary action, including dismissal.
   b. Since his statements are compelled, they, nor any information or evidence gained by reason for those statements, can not be used against the employee in any criminal proceeding, except if an employee knowingly and willfully provides false statement or information, he/she may be criminally prosecuted for that action

I. When an employee admits to any act of misconduct, the investigator will obtain a brief written statement of the misconduct signed by the employee.

J. In accordance with criminal law and/or administrative regulations, an employee may be required to:

1. Submit to a physical line up,
2. Submit a full financial disclosure statement,
3. Have photographs taken.

K. Investigators may request that the employee:

1. Submit to breath, blood, urine or other necessary medical or laboratory examinations.
2. Submit to tests using instruments for the detection of deception.

L. No employee who is the subject of a criminal investigation will be required by OJS to answer questions or submit to examinations or tests in violation of his/her constitutional rights.

M. Investigations of complaints will be completed within 90 days. Investigations continuing over 90 days must be approved by a PSD supervisor. Regular status reports will be filed with PSD every 30 days.

4-48-07    SUPERVISORY DUTIES AND RESPONSIBILITIES

A. The first-line supervisor has primary responsibility for maintaining and reinforcing officer conformance with the standards of conduct.

B. Supervisors will familiarize themselves with the officers in their unit, and closely observe their general conduct and appearance on a daily basis.

C. Supervisors will remain alert for indications of behavioral problems or changes that may affect officer's normal job performance. Such information should be documented by the supervisor.

 

BIA-OFFICE OF JUSTICE SERVICES
*LAW ENFORCEMENT HANDBOOK*

| Effective: 07/01/2008 | Revised: |
| --- | --- |
| CALEA Standard(s)--1.3.5 | |

D. When a supervisor perceives that an officer may be having or causing problems, the supervisor will assess the situation and determine the most appropriate action.

E. A supervisor may recommend additional training to refresh and reinforce an officer's skills.

F. The supervisor may use counseling to:

1. Determine the extent of any personal or job problems that may be affecting performance, and to offer assistance and guidance.
2. Discuss minor and infrequent rule violations, and to discuss the substance and importance of the rules with the officer.

G. The supervisor will document all instances of counseling or additional training used to modify an officer's behavior.

4-48-08   INITIAL INVESTIGATION BY SUPERVISOR

A. Upon becoming aware or receiving notification of potential rules violations by an officer under his/her command, the supervisor will begin an immediate investigation of such allegations.

B. The supervisor's investigation will be limited to questioning the officer, witnesses and complainants, and securing all relevant evidence.

Property belonging to the law enforcement agency is subject to inspection where the employer has a reasonable suspicion that evidence of work-related misconduct will be found therein. Property includes, but is not limited to, vehicles, desks, files, storage lockers and any other relevant government property.

C. Upon completion of the investigation, the supervisor will forward to the Professional Standards Division through the chain of command:

1. A report of the alleged violation.
2. All documents and evidence relating to the investigation.

   BIA-OFFICE OF JUSTICE SERVICES
*LAW ENFORCEMENT HANDBOOK*   

| Effective: 07/01/2008   Revised: |
| --- |
| CALEA Standard(s)–1.3.5 |

4-48-09   CONCLUSION OF INTERNAL AFFAIRS INVESTIGATIONS

A. After a thorough, impartial investigation of a particular misconduct allegation has been completed, the responsible investigator will review all the evidence and circumstances and reach one of the four following conclusions:

1. Unfounded:
The investigation revealed conclusively that the alleged act(s) did not occur.
2. Exonerated:
The investigation revealed that the alleged act(s) did occur, but the employee's actions were justified, lawful, and proper.
3. Not sustained:
The investigation failed to disclose sufficient information to clearly prove or disprove the allegation.
4. Sustained:
The investigation revealed sufficient evidence to justify a reasonable conclusion that the accused employee committed the misconduct alleged.
5. Policy or Training Failure:
The allegation is true, but employee's action was not inconsistent with policy and/or training and there is an indication of a need for policy review and revision and/or a need for training.

B. When a misconduct allegation is sustained, PSD will recommend that appropriate disciplinary action be taken against the employee.

C. The investigation may conclude that the officer's actions were not appropriate, but were the result of properly following faulty policy or poor training (insufficient or improper). The investigator will identify the policy or training deficiency in a written memo to PSD. Necessary changes will be made to the policy and/or training program in concert with IPA. When retraining is indicated, the officer's supervisor will coordinate retraining of the officer through IPA.

4-48-10   REPORTS OF INTERNAL AFFAIRS INVESTIGATIONS

A. The PSD supervisor will provide a copy of a completed PSD investigation following PSD's internal approval process to the appropriate Chief of Police or supervisor whose responsibility is to ensure that:

1. The report is forwarded down the accused employee's chain of command to the employee's immediate supervisor.
2. When an allegation is sustained, take appropriate disciplinary action against the guilty employee.

   BIA-OFFICE OF JUSTICE SERVICES
\*LAW ENFORCEMENT HANDBOOK\*   

| Effective: 07/01/2008     Revised: |
| --- |
| CALEA Standard(s)--1.3.5 |

    3. The PSD report and contents remain confidential and that access is limited to officials in the employee's chain of command, Personnel Manager, Security Manager, and when appropriate, Tribal officials.
    4. Case file reports will be returned to PSD when all administrative actions are completed.

B. PSD will retain a copy of all reports.

C. PSD will provide written notification to the accused employee of the completion and results of the investigation.

D. PSD or the investigating supervisor will provide written notification informing the complainant of the receipt of the complaint, periodic status reports and notification of the results of the investigation.   Periodic updates may be accomplished by telephone.

    1. If the allegation was deemed unfounded, exonerated, or not sustained, the letter will briefly explain why.
    2. If the allegation was deemed sustained, the letter will note that the appropriate disciplinary action has been recommended.  The specifics of the discipline will not be disclosed.

E. All PSD records and reports are confidential documents, which are kept secured and held separately from other law enforcement and personnel records.

4-48-11    DISCIPLINARY AND ADVERSE ACTIONS AS A RESULT OF PSD INVESTIGATION

A. When disciplinary action is taken against an employee as the result of a PSD investigation, it will be taken only for such cause as will promote the efficiency of the law enforcement agency and will be carried out in accordance with applicable federal or tribal code, and/or applicable personnel management regulations.

B. The employee's immediately supervisor will provide a copy of the proposed and actual disciplinary action to the PSD within 30 days of the receipt of the PSD Findings Report.

C. Supervisors and Chiefs of Police who fail to take appropriate disciplinary action against an employee will themselves face disciplinary action.

D. The supervisor will use an employee's prior record, including past misconduct and disciplinary actions, in determining the appropriate discipline to be imposed, but may not use this information as substantive evidence in determining the employee's guilt in the present misconduct allegation.



BIA-OFFICE OF JUSTICE SERVICES
*LAW ENFORCEMENT HANDBOOK*



| Effective: 07/01/2008        Revised: |
| --- |
| CALEA Standard(s)--1.3.5 |

E. Employees may not be disciplined for allegations deemed unfounded, exonerated, or not sustained, and information from these investigations may not be placed in the employee's personnel file.

F. Consistent with the requirements of applicable code and regulations, disciplinary actions may be recommended/ taken based on substantial evidence as defined in this section. Consistent with the requirements of applicable code and regulations, adverse actions may be recommended/taken based on a preponderance of evidence as defined in this section.

G. An employee may be disciplined for violations of a criminal law even though the officer has not been, or has never charged with a substantive criminal offense. Also, acquittal on a criminal charge does not prevent the BIA from recommending and taking appropriate administrative action against an employee.

## 4-48-12   OFF-DUTY MISCONDUCT

Law Enforcement employees are held to a higher standard of conduct than other citizens, including public employees.  An employee may not engage in conduct that adversely affects BIA law enforcement.  Off duty misconduct, even non-criminal acts, can adversely affect the employee, and/or BIA law enforcement, and could warrant disciplinary action.

 BIA-OFFICE OF JUSTICE SERVICES
*LAW ENFORCEMENT HANDBOOK* 

| Effective: 07/01/2008          Revised: |
| --- |
| CALEA Standard(s)– |

## 4-51   RECORDS MANAGEMENT

### POLICY

Each law enforcement agency is responsible for maintaining strict control measures over records and will receive, retain, and distribute reports and other records according to applicable records and disposition schedules and laws.

### RULES AND PROCEDURES

#### 4-51-01   GENERAL

   A.  Records Management System

      1.  Each agency will maintain a records management system that collects, retrieves, stores, updates, and purges information created by the agency.
      2.  The system may be either manual or automated or a combination of both.
      3.  The system will provide for a master name index file which includes the names of persons identified in field and accident reports, based on legal requirements.

   B.  Freedom of Information Act

      To protect both the individual's right to privacy and the public's right to know, all law enforcement agency personnel will comply with the provisions of the Freedom of Information Act as set forth in federal or tribal regulations. Each agency will maintain copies of the referenced codes, regulations, and handbooks in the area records are kept.

   C.  Custodian of Records

      Each Agency will identify, by title, the person responsible for records and informational function, and a telephone number for that person. This may be a law enforcement assistant, a sworn officer, or another identified civilian employee. This individual will be considered the Custodian of Records. In any case, the Chief of Police has the ultimate responsibility for ensuring the integrity of all agency records.

   D.  Additional information regarding records may be found in 69 BIAM.

Proofread by: _____
                   Verna J. Nuño, Tribal Council Secretary

## RENO SPARKS TRIBAL COUNCIL MEETING
## ECONOMIC DEVELOPMENT
Conference Room – 34 Reservation Road
6:30 p.m.

**September 28, 2011**

I.  **CALL MEETING TO ORDER** – A Special Meeting of the Reno Sparks Tribal Council
    was held on September 28, 2011 with Chairman Arlan D. Melendez presiding.  The
    meeting was called to order at 7:25 p.m.

II. **ROLL CALL** – Secretary Verna J. Nuño took roll, and the following Tribal Council
    Members were present:  Chairman Arlan D. Melendez, Secretary Verna J. Nuño,
    Treasurer Jacqueline Quoetone, Council Member Joanne Bill, Council Member
    Brian Melendez, Council Member Kevin Eben, and Council Member Francis T.
    Dressler.  Absent: Vice Chairman Nathaniel D. Hunkup.  Chairman Melendez
    declared a quorum was present to conduct business.

III. **CONSENT AGENDA**
    A.  Gene Sanders, Finance Controller, requested approval to increase the FY2011 Tribal
        Budget to increase the SUTA line items. The increase from 1.5% to 2.10% occurred
        after the FY2011 Enterprise Budgets were enacted and Finance did not receive
        notification until after the first quarter tax reports were due.  The total increase will
        be $ 6,049.59.
    B.  Dr. Babak Nayeri, Clinic Director, requested approval to authorize the RSIC Public
        Works Department to finish shelled space at the Reno Sparks Tribal Health Center.
    C.  Chairman Melendez requested approval of a political contribution of $ 1,000 to
        support an event on September 29, 2011 in Las Vegas, Nevada for John Oceguera,
        Candidate for United States Congress, from 5:30 p.m. – 7:30 p.m.  Amount will be
        charged to the Tribal Council budget.
    D.  Chairman Melendez requested approval for Ernie Adler, RSIC State Lobbyist, to
        travel to Las Vegas, Nevada on September 29, 2011 to attend the John Oceguera,
        Candidate for United States Congress fundraising event.
    E.  Chairman Melendez requested approval to travel to Las Vegas, Nevada on
        September 29, 2011 to attend the John Oceguera, Candidate for United States
        Congress fundraising event.  Travel cost will be charged to the Chairman's budget.
    F.  Chairman Melendez requested approval of the 2011 Political Contributions List
        recommended by Ernie Adler, RSIC State Lobbyist, in the amount of $4,500.  Memo
        from Mr. Adler attached.
    G.  Steve Stout, Finance/Procurement, requested approval to purchase a Public Works
        vehicle 2012, GMC, TK 30743, one ton truck to be funded by the 2011 Vehicle CIP.
        Purchase price $ 30,513.75.

1

Proofread by: _____
Verna J. Nuño, Tribal Council Secretary

H. Steve Stout, Finance/Procurement, requested approval to purchase a Public Works vehicle Ford, F 250, ¾ ton truck to be funded by 2011 Vehicle CIP. Purchase price $ 32,168.00.

I. Steve Stout, Finance/Procurement, requested approval to purchase a Public Works Ford, Super Duty, F 450 12 Ft. Dump Truck, to be funded by 2011 Vehicle CIP. Purchase price $ 45,251.25.

J. Steve Stout, Finance/Procurement, requested approval to purchase a RSIC Motor Pool vehicle 2011/2012 Toyota Prius to be funded by 2011 Vehicle CIP. Purchase price $ 24,494.06.

K. Steve Stout, Finance/Procurement, requested approval to purchase a Tribal Court 2012 Ford Escape SUV to be funded by the FTA ARRA Tribal Transit Grant and BIA IRR Grant. Purchase price $ 23,345.00.

L. Steve Stout, Finance/Procurement, requested approval to purchase two Recreation vehicles 2012 GMC TG 23406, 12 passenger vans to be funded by the FTA ARRA Tribal Transit Grant. Purchase price $ 45,916.30.

M. Steve Stout, Finance/Procurement, requested approval to purchase two RSIC Clinic vehicles 2011/2012 Toyota Prius to be funded by FTA ARRA Tribal Transit Grant. Purchase price $ 48,988.12.

N. Steve Stout, Finance/Procurement, requested approval to purchase one Senior vehicle 2012 Toyota Sienna, to be funded by the FTA ARRA Tribal Transit Grant. Purchase price $ 27,175 including needed step-side cost.

O. Steve Stout, Finance/Procurement, requested approval to purchase two Recreation vehicles 2012 GMC TG 23406, 12 passenger vans to be funded by the FTA ARRA Tribal Transit Grant. Purchase price $ 45,916.30.

P. Steve Stout, Finance/Procurement, requested approval to purchase two Tribal Court vehicles 2012 Chevy Traverse vans, to be funded by a BIA grant. Purchase price $ 47,916.

Q. Rod Ariwite, Tribal Administrator, requested approval of travel/training for the Law & Order Committee members, Jane Smith, Lolita Thomas, Albert Hernandez, and Marla Dressler to attend, "Emerging Issues in Tribal Civil and Criminal Jurisdiction Conference" in San Diego, CA on October 10-11, 2011.

R. Chairman Melendez requested approval to attend the Inter-Tribal Council of Nevada 46th Annual Convention to be held on November 14-17, 2011 at Circus Circus Casino in Reno, Nevada. Deadline for early rate registration is October 14, 2011.

S. Victoria Oldenburg, Staff Attorney, requested approval to attend the Inter-Tribal Council of Nevada's 46th Annual Convention and banquet on November 14-17, 2011. Budget 100-120-020-7530 (Travel-Other) $ 199.00 Total Cost Early Bird Registration.

T. Steve Stout, Finance/Procurement, requested approval to purchase two Education vehicles 2012 GMC TG 23406, 12 passenger vans to be funded by the FTA ARRA Tribal Transit Grant. Purchase price $ 45,916.30.

**Council Member Eben made a motion to approve the Consent Agenda with the change in Item # 14 from two to one van for $ 27,175, and the addition of Item #19 for purchase of Education vans. Council Member Melendez seconded the motion. Vote: 3 for, 1 against, and 4 abstentions (Motion passed).**

2

Proofread by: _____
                   Verna J. Nuño, Tribal Council Secretary

IV.   APPROVAL OF AGENDA – Additional action items submitted for consideration were:
       1) Chairman Melendez requested approval for political contributions for an event to
       be held in Reno for candidates Marcus Conklin, Marilyn Kirpatrick, and Debbie
       Smith;  2) Chairman Melendez requested approval to travel to Las Vegas, Nevada to
       participate on a panel to discuss mining and the successful deterrent of the Oil Dri
       Mining issue; 3) Winston Sam, Secretary Election Board, requested a budget
       increase of $5,046;  4)  Savita Shukla, CFO, requested approval of a resolution for
       total amount and management of the 2011 Christmas distribution;  5) Rod Ariwite,
       Tribal Administrator, requested approval of a budget modification to DOJ
       correctional facility grant; and,  6) Steve Stout, Procurement, requested approval of
       selected architect design firm for the Regional Correction Facility to be built in
       coordination with the Fallon Paiute Shoshone Tribe. **Council Member Eben made
       a motion to approve the agenda with additions. Secretary Nuño seconded the
       motion. Vote:  6 for, 0 against, and 2 abstentions (Motion passed).**

V.    NEW BUSINESS
       A.  Scott Nebesky, Planning Director, requested endorsement of RSIC's Comprehensive
            Energy Audit Report and direction to staff regarding implementation of the report's
            recommendations, after a presentation to the Tribal Council from Pacific West and
            Planning staff about the results and recommendation of the completed audit.  Council
            requested a presentation also be made to the community.  **Council Member Eben
            made a motion to approve consideration of the Comprehensive Energy Audit
            Report and direct staff to implement the recommendations after a presentation
            from Pacific West.  Council Member Yarrow seconded the motion. Vote:   6 for,
            0 against, and 2 abstentions (Motion passed).**

       B.  Todd Kirsten, Community Member, requested financial support to attend the summit
            and conference being sponsored by Nike N7 in Beaverton, Oregon on October 28,
            29, and 30, 2011.  Kirsten explained that Nike N7 is founded on a commitment to
            bring sport and all of its benefits to Native American and Aboriginal communities in
            the USA and Canada.  Recreation Manager Jean Wadsworth recommended that two
            Recreation staff also be provided opportunity to attend the training.  **Council
            Member Dressler made a motion to approve the financial support request to
            attend the Nike N7 conference to include Todd Kristen, Andrew Dunn,
            Manager Wadsworth, and one recreation staff to be funded by a Tribal source
            of funds.  Secretary Nuño seconded the motion.  Vote: 3 for, 0 against, and 5
            abstentions (Motion passed).**

       C.  Nida Harjo, Acting Chief of Police, requested approval to temporarily adopt the BIA
            2nd Edition Handbook until the Police Department can develop and implement an
            RSIC law enforcement handbook.  Acting Chief Harjo noted that all law
            enforcement employees have access to the handbook and it's supporting documents
            at this time.  **Council Member Eben made a motion to approve the temporary**

3

adoption of the BIA handbook for use by the RSIC Police Department. **Council Member Yarrow seconded the motion. Vote:  5 for, 0 against, and 2 abstentions (Motion passed). (One out of room)**

D. Victoria Oldenburg, Staff Attorney requested approval of a resolution approving HUD Section 184 Loan Guarantee Program and Section 184 Residential Lease. Attorney Oldenburg withdrew her request for approval of the Residential Lease because it was not complete.  After much discussion and community input regarding the implications of the 184 loan program for the RSIC, Attorney Oldenburg suggested that because of the many unanswered questions raised about the implementation of the loan program, that the requested draft resolution be revised to state that the Tribal Council supports looking into the program and direct the Housing Director to also look into the possibility of the Tribe obtaining HUD approval for participation. **Council Member Eben made a motion to approve Resolution 2011-RS-42 to look into the HUD Section 184 Loan Guarantee Program and that the Housing Board is included in any discussions and decisions regarding the loan program.  Secretary Nuño seconded the motion. Vote:  3 for, 2 against, and 3 abstentions (Motion passed).**

E. Brian Melendez, RSIC Enrolled Member, requested approval of Land Lease Agreement in Hungry Valley community to be used as a future home site. Melendez informed the Council that he had contacted various Tribal programs to identify a site and the process required.  The Housing Department located a site at the North end of Fancy Dance Drive that requires minimal utility construction and hook-up as well as earthwork.  Melendez stated he intends to obtain private financing to construct the house.  After much input from the community, it was consensus of the Council that more planning must occur to determine where future housing should be located not only for HUD homes, but also alternative housing needs.  **Council Member Eben made a motion to approve the Land Lease Agreement in the Hungry Valley community to be used as a future home site.  Secretary Nuño seconded the motion.  Vote:  5 for, 0 against, and 2 abstentions (Motion passed). (One at podium)**

F. Steve Moran, Business Enterprise/Economic Development Director requested approval of a resolution to approve amendment to Special Attorney Contract with Lionel Sawyer to extend the term of the contract for one year from July 15, 2011. This attorney specializes in financial contracts and would assist the Tribe in implementing AB299-Restitution Center Project.  Moran went over the reasons why the project has been delayed, and that the extension will also require an increase to the contract which is the next action item. **Council Member Melendez made a motion to approve Resolution 2011-RS-43 to approve amended contract with Lionel Sawyer.  Secretary Nuño seconded the motion.  Vote:  4 for, 1 against, and 1 abstention (Motion passed).  (Two out of room)**

G. Steve Moran requested approval of budget modification #2 to the Capital Budget for Restitution Center/Land Exchange (310.310.023 account) to increase by $ 20,000 to

4

**EXHIBIT C**:   RSIC LETTER TO PLAINTIFF



August 25, 2014

**RENO-SPARKS**
INDIAN COLONY
HUMAN RESOURCES
98 COLONY ROAD
RENO, NEVADA
89502
OFFICE (775) 768-1303
FAX (775) 785-8778

John Miller
3150 Bristle Drive
Sparks, MN.  89434

DearMr. Miller:

Adecision has been made to terminate your employment with Reno-Sparks Indian Colony (RSIC) effective immediately, August 22, 2014.

You are terminated for cause because you reported a fraudulent unemployment claim to the State of Nevada Unemployment Office on August 14, 2014.   This is a clear violation of RSIC Human Resources Policy 164-202, *Code of Ethics*, and grounds for immediate termination pursuant to RSIC Human Resources Policy 164.901, *Disciplinary Actions*.

Terminated  employees are required to return all Tribal equipment upon termination. Please be advised that RSIC considers refusal to return company property to be theft.

As a terminated employee, there are a number of issues you will need to be aware of. Your health benefits will end at midnight Friday, August 25, 2014. You will receive information in the mail in the next few weeks on continuation under COBRA of any health care benefits in which you are enrolled. Any questions regarding your health benefits and transition to COBRA can be addressed to the RSIC Human Resource Benefits Coordinator.

I wish to bring to your attention that as a terminated employee you have the right to appeal this determination pursuant to RSIC Human Resources Policy and Procedure 164-902, *Appeals Process,* (enclosed).   Please contact the Human Resource Department for further information regarding your appeal rights.

To ensure you receive documents and notices from the RSIC, please contact us if your address changes. If you have any questions, please call the Human Resource Director at 775-785-1303.

Regards,

*Ssd-* For Chief Bill

Darrell Bill, Chief of Police

Cc:  HRD

**EXHIBIT D**:    PLAINTIFF'S APPEAL OF TERMINATION

# Reno-Sparks Indian Colony
## Notice of Appeal

September 2, 2014

*RE: Appeal of termination regarding employment of John Miller, pursuant to Human Resources policy 164.902, titled Appeals Process.*

**Statement of Facts:**

On August 25, 2014 I, John Miller, was terminated from employment as a Police Officer for the Reno-Sparks Indian Colony for an alleged violation regarding code of ethics. The termination was handed down by Sergeant Lance Avansino and Sergeant Joel Zuniga however; the termination letter was signed by Chief of Police Darrell Bill. According to Chief Darrell Bill on August 14, 2014 I allegedly filed a fraudulent unemployment claim through the Department of Training, Employment and Rehabilitation in regards to unemployment benefits.

**Reason for Appeal:**

Based on the statement of facts I provided above, I file my appeal based on the following information:

*Human Resources Policy 164.901, Disciplinary Actions, Supervisor's Responsibility* states, "Before being subjected to any discipline, an employee will be given an opportunity to relate his or her version of the incident or problem and provide an explanation or justification to the supervisor." Chief Bill has violated this policy in regards to my termination. This Human Resources policy is clearly established to afford the employee the opportunity to advise administration their side of the story and to clear up any misunderstanding. However, administration failed to provide me with this right and terminated me without giving me proper due process prior to disciplinary action being taken.

*Human Resources Policy 164.901, Disciplinary Actions* states, "Depending upon the circumstances, employees who commit alleged acts of violence, flagrant misconduct, prohibited conduct, or serious safety violations may be suspended from one to ten days at the time of the incident pending a management investigation and review of the matter. Employees who are cleared of such charges shall be reinstated with full back pay with no loss of benefits or seniority. Employees who are not cleared of such charges may be terminated without delay. The RSIC Tribal Police will conduct investigations of alleged criminal conduct." However, I was never afforded the right of a management review. The RSIC Tribal Police Department found me guilty and terminated me for code ethics without any proof of evidence or any information to support the allegations.

*Presumption of Innocence:* Is the principle that one is considered innocent until proven guilty. However, this concept has not been applied to my termination. RSIC Tribal Police allege that I submitted a fraudulent unemployment claim to the State of Nevada which is categorized as a felony in the State of Nevada. Yet, I have not been notified that there is an investigation into the matter nor have any criminal charges been filed.

The most common type of unemployment fraud are persons who are already receiving monetary benefits for the state and continue doing so after they find new employment. It is common knowledge that to file an unemployment claim I would have to validate my last employer. This would require the State of Nevada confirming with the RSIC that I am no longer employed by the RSIC and the reason for termination to award benefits. The type of fraud I am being accused of is impossible, unless someone in Human Resources was willing to lie for me, which is ludicrous. Therefore, to say that I filed an unemployment claim while having full knowledge that my employer would be contacted to verify and that I would be accused of a possible felony is ridiculous. The RSIC Tribal Police Department would know its ridiculous too, if they had done their due diligence and conducted a proper investigation into the matter.

**Resolution:**

Based on the information above I request that I be reinstated with back pay provided. The RSIC Tribal Police Department have alleged a violation in regards to code of ethics, but have failed to complete a thorough investigation into the matter and have failed to show any substantiated evidence to support their claim.

The RSIC Tribal Police Department has failed to afford me the right of due process, a fair and unbiased investigation to substantiate the allegations and the right "I am innocent until proven guilty."

_____                    _____
John Miller                                                          Date

**EXHIBIT E**:    STATE OF NEVADA DEPARTMENT OF REHABILITATION
AND TRAINING LETTER

EMPLOYMENT SECURITY
DIVISION

Office of the Administrator



**DETR**
Nevada Department of Employment,
Training and Rehabilitation

BRIAN SANDOVAL
Governor

DON SODERBERG
Director

RENEE L. OLSON
Administrator

John Miller
3150 Bristol Branch Dr.
Sparks, NV  89434

December 17, 2015

SSN Last 4:  3038

Dear Mr. Miller:

In August, 2014 an unemployment insurance claim was initiated under your Social Security Number and name.  You have denied filing this claim for benefits.

The claim was made effective August 10, 2014 and was filed via internet.  Through investigation of this claim, the Division determined that a person other than yourself appears to have obtained your personal identifying information and created this claim without your knowledge.

This claim shows hallmarks of having been involved in a large identity theft ring having roots in Florida.  While the person or persons who filed the claim have not been apprehended and prosecuted and therefore there is no firm proof of identity theft, the circumstances indicate that you were not involved in filing this claim and are a victim of identity theft in this instance.

The Division is assisting Federal Agencies in investigating the claim for benefits filed under your name and Social Security Number as well as multiple others similarly situated.

Sincerely,

*Scott Kennedy*

Scott Kennedy
Chief of UI Operations
Nevada Employment Security Division

SK/sz

**EXHIBIT F**:    PLAINTIFF'S FEDERAL TORT CLAIM

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit to Appropriate Federal Agency: | 2. Name, address of claimant, and claimant's personal representative if any. (See instructions on reverse.) Number, Street, City, State and Zip code. |
|---|---|
| Department of the Interior Reno-Sparks Indian Colony | John Miller 3150 Bristle Branch Dr. Sparks, NV 89434 |

| 3. TYPE OF EMPLOYMENT | 4. DATE OF BIRTH | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT | 7. TIME (A.M. OR P.M.) |
|---|---|---|---|---|
| ☐ MILITARY  ☒ CIVILIAN | 03/14/1987 | Single | 08/25/2014 | 2:00 P.M. |

8. BASIS OF CLAIM (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary).

On 8/25/2014 at about 2:00 P.M. I was terminated from the Reno-Sparks Indian Colony (RSIC) Police Department as a Police Officer for an alleged ethcis violation. In June of 2013, I was hired as a Police Officer for the RSIC. During my employment, I was the victim of continous employment harrasment by Chief of Police Darrell Bill and Sergeant Lance Avansino. In June of 2014, I filed a workplace harrassment complaint to former Tribal Administrator Gerald Smith. In August of 2014, I was the victim of identity theft and my personal information was used in an attempt to obtain unemployment benifits. (See attached page)

| 9. | PROPERTY DAMAGE |
|---|---|

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

None

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED. (See instructions on reverse side).

None

| 10. | PERSONAL INJURY/WRONGFUL DEATH |
|---|---|

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT.

Respondant Superior - Loss of wages, loss of benifits, loss of opportunity for career, loss of opportunity for promotion and signficant harm to employement reputation.
Intentional Infliction of Emotional Distress - Failure to provide due process in the form of an Internal Affairs Investigation, which should be afforded pursuant to Bureau of Indian Affairs Policies and Procedures.

| 11. | WITNESSES | |
|---|---|---|
| NAME | ADDRESS (Number, Street, City, State, and Zip Code) | |
| Lance Avansino | 405 Golden Lane Reno, NV 89502 | |

| 12. (See instructions on reverse). | AMOUNT OF CLAIM (in dollars) | | |
|---|---|---|---|
| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights). |
| None | $750,000.00 | None | $750,000.00 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side). | 13b. PHONE NUMBER OF PERSON SIGNING FORM | 14. DATE OF SIGNATURE |
|---|---|---|
| | | |

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729). | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.) |

## INSURANCE COVERAGE

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of the vehicle or property.

15. Do you carry accident insurance? ☐ Yes   If yes, give name and address of insurance company (Number, Street, City, State, and Zip Code) and policy number.   ☒ No

16. Have you filed a claim with your insurance carrier in this instance, and if so, is it full coverage or deductible? ☐ Yes ☒ No   17. If deductible, state amount.
None

18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim? (It is necessary that you ascertain these facts.)
None

19. Do you carry public liability and property damage insurance? ☐ Yes   If yes, give name and address of insurance carrier (Number, Street, City, State, and Zip Code).   ☒ No

## INSTRUCTIONS

Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident. If the incident involves more than one claimant, each claimant should submit a separate claim form.

### Complete all items - Insert the word NONE where applicable.

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY

Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid. A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.

If instruction is needed in completing this form, the agency listed in item #1 on the reverse side may be contacted. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplementing regulations. If more than one agency is involved, please state each agency.

The claim may be filled by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item number 12 of this form.

DAMAGES IN A SUM CERTAIN FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN TWO YEARS AFTER THE CLAIM ACCRUES.

The amount claimed should be substantiated by competent evidence as follows:

(a) In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of the injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

(b) In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

(c) In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

(d) Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.
   A. Authority: The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B. Principal Purpose: The information requested is to be used in evaluating claims.
C. Routine Use: See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D. Effect of Failure to Respond: Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid."

## PAPERWORK REDUCTION ACT NOTICE

This notice is solely for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501. Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention: Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, DC 20530 or to the Office of Management and Budget. Do not mail completed form(s) to these addresses.

STANDARD FORM 95 REV. (2/2007) BACK

Continuing statement for Basis of Claim:


Using my victimization of a crime, the RSIC terminated my employment claiming I committed an ethics violation because an unemployment claim was filed, while I was still employed full-time. The RSIC failed to provide me with an Internal Affairs investigation, which is guaranteed to me by department policy and procedures. This investigation would have lead to my innocents and would have allowed me to maintain my employment reputation and financial stability. However, because I was considered a "problem child" my due process was ripped from me and I was punished for being the victim of a crime. In December of 2015 the State of Nevada issued me a letter advising me that I was the victim of identity theft.


_____

John Miller

**EXHIBIT G**:   UNITED STATES DEPARTMENT OF INTERIOR LETTER TO
PLAINTIFF INFORMING OF RIGHT TO FILE SUIT



# United States Department of the Interior

### OFFICE OF THE SOLICITOR
SUITE 6201, FEDERAL BUILDING
125 SOUTH STATE STREET
SALT LAKE CITY, UTAH  84138

September 8, 2016

BIA C FTCA
CERTIFIED MAIL - RETURN RECEIPT REQUESTED

John Miller
3150 Bristle Branch Dr.
Sparks, Nevada 89434

Re:   Administrative Determination, T-Sal-714

Dear Mr. Miller,

By Standard Form 95, dated May 2, 2016, you filed a Federal Tort Claim, T-Sal-714, in the amount of $750,000.00 for a personnel claim regarding prior employment with Reno-Sparks Indian Colony. Your claim has been referred to this office for determination under the Federal Tort Claims Act, 28 U.S.C. §§ 2671-80 (1994), which authorizes the administrative settlement of claims for money damages against the United States for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of an employee of the agency while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

We have carefully reviewed the administrative record in this matter and find no evidence of negligent or wrongful act by the United States. Accordingly, your claim must be denied. If you are dissatisfied with this determination, you are entitled to resubmit this claim together with new evidence for reconsideration within 6 months from the date of the mailing of this determination, or you may, within the same period, file suit in the United States District Court.

Should you have any questions regarding this determination, please feel free to contact Grant Vaughn at 801-239-0542.

Sincerely,

Grant Vaughn
Attorney-Adviser

Cc: BIA