1  Scott W. Souers, Esq.
   NV Bar No.13405
2  ALLING & JILLSON, LTD.
   Post Office Box 3390
3  Lake Tahoe, NV 89449-3390
   Ph. (775) 588-6676 ✦ Fx. (775) 588-4970
4  ssouers@ajattorneys.com
   Attorneys for Plaintiff
5

6                    UNITED STATES DISTRICT COURT
                         DISTRICT OF NEVADA
7

8

9  JOHN MILLER                          Case No.: 3:17-cv-00121-MMD-WGC
                   Plaintiff,
10
   v.                                   SECOND AMENDED COMPLAINT FOR
11                                       DAMAGES
   UNITED STATES OF AMERICA and
12 DOES 1-25
                   Defendants.
13 _____/

14 Plaintiff JOHN MILLER alleges:

15                    <u>**JURISDICTION AND PARTIES**</u>

16      1.      This action arises under the Federal Tort Claims Act, Sections 2671 through 2680 of

17 Title 28 of the United States Code (28 U.S.C.A.§§ 2671-2680). This court is vested with jurisdiction

18 pursuant to Section 1346(b) of Title 28 of the United States Code (28 U.S.C.A. § 1346(b)).

19      2.      Plaintiff JOHN MILLER ("MILLER") resides in Reno, Nevada, which is within the

20 Northern District of the State of Nevada. The acts and omissions that form the basis of this lawsuit

21 occurred in Washoe County, State of Nevada, which is within the District of Nevada.

22      3.      The Bureau of Indian Affairs in the Department of Interior ("BIA") is the interested

23 agency of Defendant United States of America ("DEFENDANT").

24      4.      The true names and capacities, whether individual, corporate, associate, or otherwise

25 of Defendant Does 1 through 25, are unknown to Plaintiff. Plaintiff sues these Defendants by those

26 fictitious names and requests permission to amend this Second Amended Complaint to show the true

27 names and capacities of these Defendants when they are ascertained. Plaintiff further alleges that

28 the Defendants described as Does 1 through 25 are negligently, intentionally, or in some other

                              Page 1 of 19

1    manner are directly and proximately responsible for the damages alleged in this Second Amended

2    Complaint, together with the named Defendants.

3                                        **GENERAL ALLEGATIONS**

4            5.      MILLER is informed and believes, and based on that information and belief alleges,

5    that at all times mentioned herein, the Reno Sparks Indian Colony's ("Tribe") law enforcement

6    personnel and administration were employed by DEFENDANT and were at all times mentioned

7    herein acting within the scope of their employment, and that all of the Defendants were the aides,

8    servants, employees, or partners of each of the remaining Defendants and that they were at all times

9    mentioned herein acting within the purpose, course, and scope of that agency, employment, or

10   partnership and with the consent, permission, and ratification of the remaining Defendants.

11           6.      MILLER was a law enforcement officer employed by the Tribe from on or about June

12   27, 2013, until he was terminated on or about August 22, 2014.

13           7.      The Tribe's letter offering employment states that MILLER would undergo a new hire

14   introductory period of 90 days, and upon successful completion of the probationary period he would

15   be reclassified as a regular, full-time, non-exempt employee.

16           8.      MILLER completed his 90 day introductory probationary period and was accordingly

17   reclassified as a regular, full-time, non-exempt employee.

18           9.      As a regular, full-time, non-exempt employee, MILLER had established contractual

19   rights of continued employment with the Tribe.

20                              *Public Law 93-638 Self Determination Contract*

21           10.     On or about March 3, 2005, DEFENDANT entered into a P.L. 93-638 self-

22   determination contract (the "Contract") with the Tribe in which, among other agreements,

23   DEFENDANT agreed to provide monies for law enforcement and investigative services to the Tribe

24   and to monitor the Tribe's use of said funds in accordance with the Contract and applicable law. *See*

25   **Exhibit 1**, *P.L. 93-638* Contract, at pp.12, 31.

26           11.     The Contract was ratified by the Tribe and the BIA on a multi-year basis, and at all

27   times relevant to this Second Amended Complaint, remains in full force and effect.

28           12.     By the terms of the Contract, DEFENDANT is the Tribe's employer of law

enforcement personnel and administration and is charged with the duty of monitoring the Tribe's actions to ensure compliance with all laws and the Contract.

13.    Section F.6(1) of the Contract states: "For the purpose of Federal Tort Claims Act Coverage, the Contractor (Tribe) and its employees ... are deemed to be employees of the Federal government while performing work under this contract." *See* **Exhibit 1**, at pp.46-47.

14.    Section C.2(2)(j)(v) of the Contract states: "The Contractor shall adhere to the general requirements of tribal personnel systems and policies prior to taking any adverse action against contract employees. If the tribal personnel system does not contain provisions for adverse actions, the following (1. through 6.) shall be followed." Subsection (3) requires that the Contractor set a hearing date not less than fifteen days after the employee has been given a written statement of allegations; subsection (4) requires that the Contractor provide the employee and the employee's counsel at the hearing with an opportunity to confront each adverse witness; subsection (5) requires that the Contractor provide the employee and the employee's counsel at the hearing with an opportunity to delineate issues, to present factual contentions in an orderly manner and to generally protect the employee's interest; subsection (6) requires that the Contractor reconsider the decision to take the adverse action based solely on evidence given at a hearing and provide the employee at the time the decision is announced with a written statement of the reasons for the decision and the evidence relied upon in reaching the decision. See **Exhibit 1**, at pp. 19-20.

### *BIA Office of Justice Services Law Enforcement Handbook*

15.    BIA Office of Justice Services Law Enforcement Handbook, Rules and Procedures ("BIA Handbook") § 4-48-01(D) provides that "[b]ecause of the potential liability associated with BIA, P.L. 93-638 contracted programs and Tribal programs receiving federal funding, the Office of Justice Services (OJS) has an obligation to provide for audits and inspections of the programs it operates and funds." Subsection (E) provides that "[s]pecial agents assigned to the PSD [professional standards division] will investigate without bias all allegations of misconduct assigned to them. Agents will conduct fair, objective, and impartial investigations and audits . . ." Subsection H provides that "PSD will investigate all allegations of misconduct and perform audits of 638 contract programs in accordance with 25 CFR part 12." 25 CFR part 12.53 states that "[t]he Deputy

Bureau Director, OJS maintains an internal affairs component that investigates all allegations of misconduct by BIA officers, and any officer receiving funding and/or authority from the BIA. All allegations of misconduct must be thoroughly investigated and appropriate actions taken when warranted. Any person having knowledge of officer misconduct must report that information to the officer's supervisor." *See* **Exhibit 2**, BIA Office of Justice Services Law Enforcement Handbook, Rules and Procedures, at § 4-48-01(D).

16. BIA Handbook § 4-48-05, "Employee Rights During an Internal Investigation" provides that District SAC's, Chiefs of Police and supervisors are required to report all allegations of misconduct as defined above to PSD within 24 hours of occurrence. PSD will review all allegations to determine the appropriate classification and will investigate or refer allegations accordingly." *See* **Exhibit 2**, at § 4-48-05.

17. BIA Handbook § 4-48-05 requires that "[p]rior to an interview or special examination, the PSD supervisor will provide the employee under investigation with confidential written notification of the allegation. This notification will include a copy of the original complaint or a summary adequately listing the relevant facts, and the employee's rights and responsibilities during the investigation." *See* **Exhibit 2**, at § 4-48-05.

18. BIA Handbook § 4-48-06 "Investigation" states that "[t]he objective of the investigation is to determine the truth. PSD investigations will be objective, fair, and thorough." Subsection D provides that "[i]nvestigators will conduct an interview with the accused employee. An accused employee has the right . . . to be accompanied by an attorney, union representative, supervisor or other personal representative during any interview concerning allegations of misconduct." *See* **Exhibit 2,** at § 4-48-06.

19. BIA Handbook § 4-48-09 "Conclusion of Internal Affairs Investigations" mandates that "[a[fter a thorough, impartial investigation of a particular misconduct allegation has been completed, the responsible investigator will review all the evidence and circumstances and reach one of the five following conclusions: (1) Unfounded . . . (2) Exonerated . . . (3) Not sustained . . . (4) Sustained . . . (5) Policy or Training Failure . . ." *See* **Exhibit 2**, at § 4-48-09.

20. On or around September 28, 2011, the Tribe's Council implemented the BIA

1   Handbook as the policies and procedures for the Tribe's Police Department.

2   *Tribe's Employee Handbook*

3   21.   MILLER received and signed an employee handbook from the Tribe ("Tribe

4   Employee Handbook") on or about June 27, 2013.[1]

5   22.   Tribe Employee Handbook § 164.902 describes the appeals process that Tribe

6   employees must follow if the Tribe subjected them to disciplinary action. *See* **Exhibit 3**, Reno-

7   Sparks Indian Colony, Human Resources Policies and Procedures, Policy Number 164.902.

8   23.   The Tribe Employee Handbook did not provide employees with rights provided by

9   the Contract, including, but not limited to: right to a hearing date set within 15 days of the allegation;

10   the opportunity to confront witnesses and present factual contentions at hearing with counsel present;

11   and the requirement that the Tribe reconsider its decision to take adverse action.

12   24.   The Tribe Employee Handbook did not provide employees with rights provided by

13   the BIA Handbook, including, but not limited to: the requirement that a special agent be assigned

14   to investigate the allegation of misconduct; the requirement that a fair, objective, and thorough

15   investigation be conducted; the requirement that the Chief of Police report the allegation of

16   misconduct to PSD within 24 hours; the right to provide the employee under investigation with

17   confidential, written, notification of the allegation including a copy of the original complaint or a

18   summary listing all relevant facts and the employee's rights and responsibilities prior to interviewing

19   the employee.

20   25.   The Tribe Employee Handbook merely allowed for a two-step appeals process in

21   which the employee could appeal the disciplinary action by filing an appeal with the employee's

22   supervisor, and if the employee wished to pursue their appeal after meeting with the supervisor, the

23   employee could present a written request to the Appeals Chairperson to empanel an Appeals

24   Committee, who could decide whether to interview the employee before approving or disapproving

25   the disciplinary action.

26   26.   Section 164.209(C) of the Tribe Employee Handbook states that "the Appeals

27

28   ───────────────────────

[1]The Tribe has revised its employee handbook since terminating MILLER. References to the "Tribe Employee Handbook" relates to the handbook in effect during MILLER's employment with the Tribe.

Page 5 of 19

Committee's task is hear the appeals and insure that both parties have equal opportunity to present their case consistent with this policy." *See* **Exhibit 3**.

27.    Section 164.209 (C)(5) of the Tribe Employee Handbook states that "the Appeals Committee will review documentation and if deemed necessary interview [the] employee, supervisor or other interested witnesses and/or subject matter experts." *See* **Exhibit 3**.

28.    Section 164.209 of the current version of the Tribe's employee handbook ("Revised Tribe Employee Handbook") provides policies pertaining to workplace discrimination and harassment, which include maintaining a workplace environment free of all forms of discrimination and harassment by any employee. *See* **Exhibit 4**, Revised Tribe Employee Handbook, at § 164.209.

29.    Revised Tribe Employee Handbook §164.215 encourages employees to report workplace harassment and violations of the Tribe's code of ethics, and promises to prevent retaliation against any employee who reports such occurrences in good faith. *See* **Exhibit 4**, Revised Tribe Employee Handbook, at § 164.215.

***Workplace Discrimination and Harassment; Retaliation***

30.    From around January 2014, until he was terminated, MILLER's colleagues and superiors subjected him to workplace discrimination and harassment regarding his race, sex, perceived sexual orientation, and temporary physical disabilities.

31.    In or around January 2014, Sergeant Avansino told MILLER that he was "the wrong color of skin" and would not issue equipment that had been issued to other officers because of his color of skin. *See* **Exhibit 5,** Witness Statement from Kameron Lane Crawford.

32.    On numerous occasions, Sergeant Avansino placed a background image on the monitor of MILLER's work computer that displayed a pattern of "Chicago L.G.P.A. Gay Officer's Action League" logos. *See* **Exhibit 6,** Picture of Computer Background Image.

33.    On or around April 21, 2014, and again on May 31, 2014, MILLER complained of workplace discrimination and harassment to the Tribe's Chief of Police, Darrell Bill ("Mr. Bill").

34.    On or around June 26, 2014, Sergeant Avansino informed MILLER that he was reinstating MILLER on probation and extending his probation until December 27, 2014.

35.    When MILLER was hired, he accepted an offer of employment that included a 90 day

period of introductory probation, which he had successfully completed on or around September 27, 2013.

36.    MILLER scheduled an appointment to meet with Mr. Bill on July 14, 2014, at 2:00 p.m. to discuss MILLER's complaints of Sergeant Avansino's workplace discrimination and harassment and probation reinstatement.

37.    MILLER appeared at Mr. Bill's office at the scheduled appointment time, but Mr. Bill did not come to the appointment.

38.    On or around July 17, 2014, MILLER submitted a written claim to Tribal Administrator Gerald Smith describing the workplace discrimination and harassment to which he had been subjected. *See* **Exhibit 7**, Tribe Workplace Harassment Claim.

39.    On or around July 17, 2014, MILLER appealed Sergeant Avansino's decision to reinstate his probation.

40.    The Tribe denied MILLER's request to appeal Sergeant Avansino's decision to reinstate his probation.

### *Miller's Termination*

41.    On or around August 25, 2014, the Tribe mailed a letter to MILLER declaring that he was terminated for cause because he had allegedly reported a fraudulent unemployment claim to the State of Nevada Unemployment Office on August 14, 2014.

42.    The Tribe's termination letter stated that the alleged report of the fraudulent unemployment claim was a "clear violation" of the Tribe's Human Resources Policy §164-202, *Code of Ethics*, and grounds for immediate termination pursuant to RSIC Human Resources Policy §164.901, *Disciplinary Actions*. See **Exhibit 8**, RSIC Letter to Plaintiff.

43.    MILLER was the victim of identity theft. He informed the Tribe that he had not filed the unemployment claim and invoked his rights to defend himself against the allegation to prove that he had not filed the unemployment claim.

44.    The Tribe failed to follow the disciplinary processes mandated by the Contract, the BIA Handbook, and the Tribe Employee Handbook prior to terminating MILLER.

45.    The Tribe immediately terminated MILLER without placing him on administrative

leave, without investigating or interviewing him, and without holding a hearing at which he could cross-examine witnesses and provide his own evidence with the assistance of counsel.

46.     On or about September 2, 2014, MILLER appealed the termination with the Tribe and cited § 164.901 of the Tribe Employee Manual.[2] MILLER's appeal requested that he be reinstated. *See* **Exhibit 9**, MILLER's Appeal of Termination.

47.     On September 5, 2014, MILLER met with Mr. Bill, Sergeant Avansino[3], and Sergeant Zuniga in response to MILLER's appeal of his termination.

48.     Sergeant Avansino drafted an "Appeals Meeting Summary", which concludes by stating that "Chief Bill explained to MILLER he was free to contact H.R. to continue with his Appeal." *See* **Exhibit 10**, Appeals Meeting Summary.

49.     On or around September 11, 2014, MILLER requested that the Tribe empanel an Appeals Committee pursuant to the Tribe's Employee Handbook § 164.902. *See* **Exhibit 11**, Appeals Committee Request.

50.     MILLER's request for an Appeals Committee cited to the BIA Handbook to argue that the Tribe failed to meet various procedural requirements prior to terminating him, including: reporting the allegation of MILLER's unemployment claim to the Professional Standards Division within 24 hours of occurrence; providing him with a confidential statement of the allegation including a copy of the original complaint or summary listing the relevant facts and employee's rights and responsibilities during the investigation; and conducting an objective, fair, and thorough investigation. *See* **Exhibit 11**.

51.     After receiving MILLER's Request for Appeals Committee, the Tribe continued to fail to meet the BIA Handbook's procedural requirements, including the requirement to interview

---

[2]Section 164.901 of The Revised Tribe Employee Handbook provides employees with an opportunity to relate their version of an incident and provide an explanation or justification to the supervisor *before* being subjected to any disciplinary action. Section 164.901 also provides that employees who commit flagrant misconduct or prohibited conduct may be suspended from one to ten days at the time of the incident pending a management investigation and review of the matter; employees who are cleared of such charges shall be reinstated with full back pay and with no loss of benefits or seniority.

[3]Sergeant Avansino is the same Tribe employee against whom MILLER had complained of workplace discrimination and harassment.

---

the accused employee prior to termination.

52.    On October 2, 2014, the Tribe issued a letter to MILLER ("Appeals Committee Letter") that states the Tribe reviewed various documents, including the BIA Office of Justice Services Law Enforcement Handbook, § 4-48.6, which requires the Tribe to interview the accused employee prior to termination. *See* **Exhibit 12**, Appeals Committee Letter.

53.    The Appeals Committee Letter explained that the Appeals Committee was upholding the termination, and that the decision was final and binding.

### *EEOC Claim*

54.    On or around June 24, 2015, MILLER filed a Charge of Discrimination with the Nevada Equal Rights Commission ("EEOC Claim").

55.    MILLER's EEOC Claim reported that the Tribe had discriminated against him on the basis of his race, a temporary disability, and his sex.  MILLER's EEOC Claim further alleged that the Tribe had retaliated against him for engaging in protected activity. *See* **Exhibit 13**, EEOC Claim.

56.    On September 18, 2015, The U.S. Equal Employment Opportunity Commission ("EEOC") issued a Dismissal and Notice of Rights in response to MILLER's EEOC Claim ("Dismissal of EEOC Claim"). *See* **Exhibit 14**, Dismissal of EEOC Claim.

57.    The Dismissal of EEOC Claim dismissed MILLER's EEOC Claim based on "No jurisdiction governed Indian Tribal Council."

58.    On or about December 17, 2015, the State of Nevada Department of Rehabilitation and Training issued a letter ("NDRT Exoneration Letter") stating that through investigation of MILLER's alleged unemployment claim, the Division determined that a person other than MILLER appeared to have obtained MILLER's identifying information and created the unemployment claim without MILLER's knowledge. *See* **Exhibit 15**, NDRT Exoneration Letter.

59.    MILLER is informed and believes that the Tribe's actions in terminating him were illegal, malicious, intentional, and in retaliation for the workplace harassment complaint he had filed with the Tribe.

### *Federal Tort Claim*

60.    On or around May 2, 2016, MILLER filed a Federal Tort Claim against the Tribe and

1  the Department of the Interior based on wrongful termination. *See* **Exhibit 16**, Plaintiff's Federal Tort

2  Claim.

3       61.    On or about September 8, 2016, the United States Department of the Interior issued

4  a letter to MILLER denying his claim and informing him of his right to file suit in the United States

5  District Court. *See* **Exhibit 17**, United States Department of Interior Letter to Plaintiff Informing of

6  Right to Sue.

7       62.    Plaintiff filed his Complaint with this Court on February 24, 2017.

8  **I.**   **FIRST CAUSE OF ACTION FOR FOR WRONGFUL TERMINATION BY**
     **RETALIATORY DISCHARGE UNDER THE FEDERAL TORT CLAIMS ACT**

9

10       63.    MILLER realleges and incorporates by reference all preceding and succeeding

11  paragraphs as if set forth in full.

12       64.    The elements for retaliatory discharge in Nevada are: (1) employee is engaged in

13  protected activity while employed; (2) employee suffered an adverse employment action by the

14  employer; (3) the protected activity was a motivating factor in the adverse employment action; (4) the

15  employee suffered causation and damages as a result of the adverse employment action. *D'Angelo*

16  *v. Gardner*, 107 Nev. 704, 819 P.2d 206 (1991).

17       65.    "A tortious discharge may arise . . . when . . . the discharge is in retaliation for the

18  employee's actions that 'are consistent with or supportive of sound public policy and the common

19  good." *Jackson v. Universal Health Servs., Inc.*, No. 2:13-cv001666-GMN-NJK, 2014 WL 4635873,

20  at *4 (D. Nev. Sept. 15, 2014) (quoting *D'Angelo v. Gardner,* 107 Nev. 704, 718 (Nev. 1991)).

21       **1.**   ***Nevada Statutes Protecting Employees against Discrimination for Opposing***
       ***Unlawful Employment Practices***

22       66.    Nevada Revised Statute (NRS)§613.340 provides: "It is an unlawful employment

23  practice for an employer to discriminate against any of his or her employees. . . because the employee

24  . . . has opposed any practice made an unlawful employment practice by NRS 613.310 to 613.435 .

25  . . ."

26       67.    NRS §613.330(a) states that it is an unlawful employment practice for an employer

27  to: "discriminate against any person with respect to the person's conditions or privileges of

28  ///

SECOND AMENDED COMPLAINT

1 | employment, because of his or her race, color, religion, sex, sexual orientation, gender identity or

2 | expression, age, disability, or national origin."

3 |      68.    NRS §613.330(b) states that it is an unlawful employment practice for an employer

4 | to "limit, segregate, or classify an employee in a way which would deprive or tend to deprive the

5 | employee of employment opportunities or otherwise adversely affect his or her status as an employee,

6 | because of his race, color, religion, sex, sexual orientation, gender identity or expression, age,

7 | disability, or national origin."

8 |      69.    Section 164.215 of the Revised Tribe Employee Handbook, protects tribal employees

9 | by encouraging them to report workplace harassment. *See* **Exhibit 4**, at §164.215.

10 |      70.    Section 164.209 of the Revised Tribe Employee Handbook, "Discrimination and

11 | Harassment" protects tribal employees against discrimination and workplace harassment. *See* **Exhibit**

12 | **4**, at §164.209.

13 |     **2.**    ***Public Policy and the Common Good***

14 |      71.    "The public policy of this state favors safe and healthy employment practices and the

15 | protection of the safety and health of workers on the job. Dismissal of an employee for seeking a safe

16 | and healthy working environment is contrary to the public policy of [Nevada]." *D'Angelo*, 819 P.2d

17 | at 216.

18 |      72.    "Racial discrimination in employment is on an equal footing with …other declared

19 | violations of public policy." *Chavez v. Sievers*, 118 Nev. 288, 298, 43 P.3d 1022, 1029 (2002).

20 |      73.    Racial discrimination is "obnoxious to the interests of the state and contrary to public

21 | policy and sound morality…" *Keshe v. CVS Pharmacy Inc.*, No. 214CV08418CASMANX, 2016 WL

22 | 1367702, at *6 (C.D. Cal. Apr. 5, 2016), aff'd sub nom. *Keshe v. CVS Pharmacy*, 711 F. App'x 396

23 | (9th Cir. 2017).

24 |      74.    Nevada recognizes a public policy of protecting an employee who reports illegal

25 | activity. *Wiltsie v. Baby Grand Corp.*, 105 Nev. 291, 293, 774 P.2d 432, 433 (1989).

26 |      75.    "So long as employees' actions … seek to further the public good, the decision to

27 | expose illegal or unsafe practices should be encouraged." *Id.* at 434, citing *Wagner v. City of Globe*,

28 | 150 Ariz. 82, 722 P.2d 250, 257 (1986).

SECOND AMENDED COMPLAINT

76.     Nevada courts recognize the public policy of employees exposing any illegal employment practice, such as racial and sexual orientation discrimination, which creates an unhealthy workplace. When an employer dismisses an employee for the employee's performing a public policy-favored action, then an action for tortious discharge arises. *Bigelow v. Bullard,* 111 Nev. 1178, 1185, 901 P.2d 630, 634 (1995).

**3.     *The Tribe Discharged Miller in Retaliation for his Actions that were Consistent with or Supportive of Sound Public Policy and the Common Good.***

77.     MILLER objected to workplace discrimination and harassment by reporting his superiors' conduct to the Tribe on two occasions in the Spring of 2014 and by filing a complaint with the Tribe on or around July 17, 2014.

78.     MILLER's objections constitute protected activity under NRS section 613.330(a) and (b), which protect against retaliation.

79.     MILLER suffered an adverse employment action in retaliation for objecting to workplace discrimination and harassment when the Tribe wrongfully attempted to extend MILLER's probation after he had successfully completed his 90 day probationary period and had already become a contracted employee.

80.     MILLER further suffered an adverse employment action in retaliation for objecting to workplace discrimination and harassment when the Tribe terminated him on August 22, 2014.

81.     MILLER's protected activity, objecting to workplace discrimination and harassment, was a motivating factor in the adverse employment action since the Tribe placed MILLER on probation and subsequently terminated him based on his workplace discrimination and harassment claims.

82.     MILLER's objecting to workplace discrimination and harassment to the Tribe was consistent with and supportive of sound public policy and the common good since he sought to eliminate racial and sexual-orientation discrimination and harassment from his workplace, a public entity, thereby creating a more healthy and safe work environment for all tribal employees.

83.     MILLER's reporting workplace discrimination and harassment to the Tribal authorities was also consistent with and supportive of sound public policy and the common good since he reported conduct that was obnoxious to the interests of the United States, the state, the Tribe, and the

1   Tribe's employees, and contrary to public policy and sound morality.

2        84.    MILLER's objecting to workplace discrimination and harassment was also consistent

3   with and supportive of sound public policy and the common good since he sought to expose his

4   superiors' practice of racial and sexual-orientation discrimination in violation of NRS §613.330(a)

5   and (b) in order to prevent such future illegal conduct by his superiors against other employees.

6        85.    MILLER suffered causation and damages as a result of the adverse employment action

7   by having his employment terminated, losing income and benefits on which he and his family relied,

8   and losing the ability to procure equal employment due to having to disclose the involuntary

9   termination to prospective employers.

10        86.    MILLER suffered additional damages as a result of the wrongful termination,

11   explained in MILLER's Damages, section III (4) below.

12   **II.**   **SECOND CAUSE OF ACTION FOR WRONGFUL TERMINATION IN BAD FAITH UNDER THE FEDERAL TORT CLAIMS ACT**

13
14        87.    MILLER realleges and incorporates by reference all preceding and succeeding

15   paragraphs as if set forth in full.

16        88.    The elements for Wrongful Termination in Bad Faith in Nevada are: (1) employer and

17   employee entered into an employment contract; (2) employee established contractual rights of

18   continued employment and developed a relationship of trust, reliance and dependency with employer;

19   and (3) employer, acting in bad faith, discharges the employee. *D'Angelo,* 819 P.2d at 211.

20        89.    MILLER entered into an employment contract when he became employed by the Tribe

21   on or around June 27, 2013.

22        90.    After successfully completing his 90 day introductory probationary period, MILLER

23   established contractual rights of continued employment and developed a relationship of trust, reliance

24   and dependency with the Tribe based on his role as a permanently employed police officer for the

25   Tribe.

26        91.    In reliance on the employment relationship he had developed with the Tribe, MILLER

27   reported his superiors' conduct of workplace discrimination and harassment to the Tribe.

28        92.    The Tribe acted in bad faith when it breached the employment contract by terminating

1   MILLER for reporting his superiors' conduct of workplace discrimination and harassment.

2        93.    MILLER suffered damages as a result of the wrongful termination, explained in detail

3   in MILLER's Damages, section III (4) below.

4   **III.   THIRD CAUSE OF ACTION FOR WRONGFUL TERMINATION / TORTIOUS**
        **DISCHARGE UNDER THE FEDERAL TORT CLAIMS ACT**

5

6        94.    MILLER realleges and incorporates by reference all preceding and succeeding

7   paragraphs as if set forth in full.

8        95.    The element for wrongful termination / tortious discharge in Nevada is: (1) employer

9   improperly dismissed employee for reasons that violate public policy. *Wayment v. Holmes*, 112 Nev.

10  232, 912 P.2d 816 (1996).

11       96.    "It is precisely in such cases, i.e., where no comprehensive statutory remedy exists,

12  that courts have been willing to create public policy tort liability." *D'Angelo*, 819 P.2d at 218, citing

13  *Wehr v. Burroughs Corp.*, 438 F. Supp. 1052, 1055 (E.D. Pa. 1977), aff'd, 619 F. 2d 276 (3d Cir.

14  1980).

15         **1.**   *Miller's Termination Violated the Public Policy of Protecting Employees who
            Object to and Expose Illegal Conduct or Practices of Employers or Superiors.*

16       97.    As discussed above in MILLER's First Cause of Action for Wrongful Termination by

17  Retaliatory Discharge, public policy prohibits employers from terminating employees who object to

18  and report illegal conduct, such as discrimination and harassment based on race or sexual orientation.

19       98.    For the reasons explained above in MILLER's First Cause of Action for Wrongful

20  Termination by Retaliatory Discharge, the Tribe wrongfully terminated MILLER in violation of

21  public policy since it terminated him based on his objecting to and reporting workplace discrimination

22  and harassment.

23         **2.**   *Public Policy Requires that Employers Abide by their Employee
            Handbooks' Due Process Provisions Prior to Terminating Employees.*

24

25       99.    Employee handbooks guarantee due process rights to employees, which employees

26  must rely on to defend themselves when facing wrongful discipline or termination. Public policy

27  prohibits employers who intend to discharge employees for illegitimate reasons from bypassing their

28  own due process requirements expressed in employee handbooks.

100.    It is against public policy for an employer to terminate an employee without meeting due process requirements expressly provided in employee handbooks; such practice is inconsistent with and not supportive of the public good since employee handbooks provide protection against employers' wrongful acts.

101.    MILLER objected to and reported workplace discrimination and harassment to the Tribe, a public entity, who wrongfully reinstated MILLER on probation and then terminated him, allegedly based on a false allegation that he had filed a fraudulent unemployment claim while employed.

102.    MILLER insisted he was innocent and sought to challenge the Tribe's discipline and termination to prove to the Tribe he had not filed an unemployment claim.

103.    The Tribe denied MILLER his procedural rights as provided by the Contract, BIA Handbook and Tribe Employee Handbook.

104.    MILLER informed the Tribe of its failure to provide him with his procedural rights on several occasions, but the Tribe continued to refuse to enforce his procedural rights under the Contract, BIA Handbook, and Tribe Employee Handbook.

105.    The Tribe knew or should have known through a reasonable investigation, as promised by the Contract, BIA Handbook and Tribe Employee Handbook, that MILLER had not filed a fraudulent unemployment claim and that it had wrongfully terminated MILLER in violation of his rights as a law enforcement officer under the Contract, the BIA Handbook, and the Tribe Employee Handbook.

106.    The Tribe knowingly and intentionally failed and refused to enforce the procedures expressed in the Contract,  BIA Handbook, and the Tribe Employee Handbook to claim it did not know MILLER was the victim of identity theft, rather than acknowledging that it was terminating MILLER for reporting workplace discrimination and harassment.

107.    It is against sound public policy and the common good for public entity employers to ignore obligations imposed by their contracts and handbooks before terminating an employee in order to claim they did not have knowledge of an employee's defenses against wrongful termination.

108.    The Tribe's discharging MILLER after it refused to follow the due process provisions

SECOND AMENDED COMPLAINT

of the Contract, BIA Handbook, and Tribe Employee Handbook violated public policy since the Tribe intentionally ignored its obligations as an employer in order to claim it did not have knowledge of MILLER's defense that he was the victim of identity theft.

109.    MILLER suffered damages as a result of the wrongful termination, explained in detail in MILLER's Damages, section III (4) below.

**3.     *Public Policy Requires that Employers Protect Employees from the Effects of Crime Rather than Terminating Employees who are Victims of Crime.***

110.    Sound public policy and the public good require that employers protect employees from effects of crime and do not discipline or terminate employees for being victims of crime.

111.    It is a violation of public policy for an employer to accuse an employee of committing a crime, and terminate the employee based on committing the alleged crime, when the employee was in fact the victim of the crime.

112.    It is a further violation of public policy for an employer to deny an employee his due process rights, expressed in an employee handbook, when the employee insists he is the victim of the crime of which the employer has accused him and the employee is demanding his procedural rights to prove his innocence.

113.    MILLER was the victim of identity theft; the perpetrator of the crime used MILLER's identity to file a fraudulent unemployment claim.

114.    The Tribe allegedly terminated MILLER based on its accusation that MILLER had filed the fraudulent unemployment claim while he was an employee of the Tribe.

115.    MILLER insisted he had not filed the unemployment claim and invoked his due process rights pursuant to the Contract, BIA Handbook, and Tribe Employee Handbook.

116.    The Tribe refused to provide MILLER with his rights under the Contract, BIA Handbook, and Tribe Employee Handbook and affirmed its decision to terminate MILLER without investigating the unemployment claim or allowing MILLER to defend against the Tribe's accusation.

117.    The Tribe would have discovered that MILLER was the victim of identity theft had

SECOND AMENDED COMPLAINT

it not refused MILLER his due process rights, but instead the Tribe terminated MILLER for being the victim of identity theft.

118.    The Tribe failed to protect MILLER against the effect of his being victimized by identity theft, and instead used the crime as an alleged basis to terminate MILLER.

119.    The Tribe wrongfully terminated MILLER in violation of public policy since it failed to protect him from the effects of crime and terminated him based on allegations he had committed a crime, when he in fact was the victim of the crime.

**4.    *MILLER's Damages Under All Causes of Action for Wrongful Termination***

120.    As a direct and proximate result of the Tribe's wrongful termination from employment, MILLER has suffered, is now suffering, and will continue to suffer irreparable injury and damages from the Tribe's actions.

121.    As a further direct and proximate result of the Tribe's wrongful termination, MILLER has suffered tremendous anxiety, sleeplessness and fear regarding his loss of employment and its long-term effect on him and his family.

122.    As a further direct and proximate result of the Tribe's wrongful termination, for a period of time MILLER was unable to secure employment as a law enforcement officer with other agencies due to the damage done to his reputation as a result of the wrongful termination.

123.    As a further direct and proximate result of the Tribe's wrongful termination, MILLER continues to suffer from the effects of having to disclose to potential employers that he was terminated from prior employment for allegedly filing a fraudulent unemployment claim.

124.    As a further direct and proximate result of the Tribe's wrongful termination, MILLER was denied accrued but unpaid benefits at the time of his termination, in an amount according to proof.

125.    As a further direct and proximate result of the Tribe's wrongful termination, MILLER lost all benefits and future benefits associated with his employment at the Tribe.

126.    As a further direct and proximate result of the Tribe's wrongful termination, MILLER has been damaged in lost wages in an amount within this Court's jurisdiction, according to proof.

127.    As a further direct and proximate result of the Tribe's wrongful termination, MILLER

---

has suffered additional damages in an amount according to proof.

IV.  **MILLER HAS EXHAUSTED HIS ADMINISTRATIVE REMEDIES**

128.  On May 2, 2016, MILLER filed a Federal Tort Claim for Wrongful Termination against the Tribe and the Department of the Interior. MILLER filed his claim with the United States Department of the Interior.

129.  On or about September 8, 2016, the United States Department of the Interior issued a letter denying the claim and informing MILLER of his right to file suit in the United States District Court.

130.  MILLER's federal tort claim satisfied the requirement under 28 U.S.C. § 2675(a) that a claim must be presented to the appropriate Federal Agency and must be finally denied in writing before instituting an action against the United States for money damages.

131.  On June 19, 2015, Plaintiff filed his EEOC Claim with the Nevada Equal Rights Commission alleging workplace discrimination, harassment, and retaliation, which was denied.

V.  **DEFENDANT UNITED STATES IS VICARIOUSLY LIABLE UNDER RESPONDEAT SUPERIOR**

132.  Pursuant to Section F.6(1) of the Contract, DEFENDANT is the employer of the Tribe and all of the Tribe's law enforcement personnel and administration.

133.  As the employer of the Tribe and all of the Tribe's law enforcement personnel and administration, DEFENDANT is vicariously liable for the Tribe's tortious conduct and breach of contract under respondeat superior.

134.  "The Ninth Circuit has repeatedly allowed federal district courts to hear federal question claims against tribal members when the tribal member has exhausted his administrative remedies." *Hall* v. *United States of America,* Nev. Dist. Case Number CV-N-02-0578-HDM (RAM), at p. 7 (2004) *citing e.g. Arizona Public Service Co. v. Aspaas,* 77 F.3d 1128 (9th Cir. 1995); *Stock West, Inc. v. Confederated Tribes of the Coleville Reservation*, 873 F.2d 1221 (9th Cir. 1989).

WHEREFORE, Plaintiff prays for judgment against DEFENDANT as follows:

1.  General damages in an amount according to proof;

2.  Special damages in an amount according to proof;

3.  Punitive damages;

SECOND AMENDED COMPLAINT

4.      Prejudgement interest;

5.      Costs of suit; and

6.      Such other and further relief as the Court considers proper.

ALLING & JILLSON, LTD.

DATED: April 4, 2018

SCOTT W. SQUERS, ESQ., SBN#13405
Attorneys for Plaintiffs
*ssouers@ajattorneys.com*

SECOND AMENDED COMPLAINT

# John Miller v. United States of America

**Case No.** 3:17-cv-00121-MMD-WGC

## INDEX OF EXHIBITS TO SECOND AMENDED COMPLAINT

| Exhibit | Exhibit Description |
| --- | --- |
| 1 | Public Law 93-638 Contract |
| 2 | BIA Office of Justice Services Law Enforcement Handbook, Rules and Procedures |
| 3 | Reno-Sparks Indian Colony, Human Resources Policies and Procedures, Policy Number 164.902 |
| 4 | Revised RSIC Tribe Employee Handbook |
| 5 | Witness Statement from Kameron Lane Crawford |
| 6 | Picture of Computer Background Image |
| 7 | Tribe Workplace Harassment Claim |
| 8 | RSIC Letter to Plaintiff |
| 9 | Plaintiff's Appeal of Termination |
| 10 | RSIC Appeals Meeting Summary |
| 11 | RSIC Appeals Committee Request |
| 12 | Appeals Committee Letter |
| 13 | EEOC Claim |
| 14 | Dismissal of EEOC Claim |
| 15 | Nevada Department of Rehabilitation and Training Letter |
| 16 | Plaintiff's Federal Tort Claim |
| 17 | United States Department of Interior Letter to Plaintiff Informing of Right to Sue |

## CERTIFICATE OF SERVICE

Pursuant to *Federal Rules of Civil Procedure 5(b)*, I certify that I served a true and correct copy of the SECOND AMENDED COMPLAINT, INDEX OF EXHIBITS, and EXHIBITS 1-17, by electronic filing via the courts CM/ECF system, on the 4th day of April, 2018 to:

Holly A. Vance, Assistant U.S. Attorney
U.S. Attorney's Office
100 W. Liberty Street, Suite 600
Reno, NV 89501
(775) 784-5438
Attorneys for Defendant
 Holly.A.Vance@usdoj.gov

ROB HYMAN for:
ALLING & JILLSON, LTD.

Alling & Jillson, Ltd.
Post Office Box 3390 ◊ 276 Kingsbury Grade
Lake Tahoe, Nevada 89449
PH (775) 588-6676 ◊ FX (775)588-4970

Certificate of Service