DAYLE ELIESON
United States Attorney
HOLLY A. VANCE
Assistant United States Attorney
United States Attorney's Office
100 W. Liberty Street, Suite 600
Reno, NV 89501
(775) 784-5438
Holly.A.Vance@usdoj.gov

Attorneys for Defendant
United States of America

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| JOHN MILLER, | Case No. 3:17-cv-00121-MMD-WGC |
| Plaintiff, | |
| v. | **MOTION TO DISMISS** |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

COMES NOW Defendant United States of America ("United States") and hereby moves to dismiss Plaintiff's second amended complaint for lack of subject matter jurisdiction and failure to state claims for relief. (ECF No. 32). This motion is brought pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6).

**BACKGROUND**

Plaintiff John Miller ("Plaintiff") served as a law enforcement officer with the Reno-Sparks Indian Colony ("Tribe") from June 27, 2013 until his termination on or about August 22, 2014. (ECF No. 32 ¶ 6). According to Plaintiff, he was an employee of the United States during his tenure with the Tribe. (*Id.* at ¶¶ 5, 12). On August 25, 2014, the Tribe terminated Plaintiff for an ethics violation because, while employed with the Tribe, Plaintiff filed an unemployment claim with the State of Nevada. (*Id.* ¶¶ 41-42). The ethics claim was proven to be unfounded, however, after Plaintiff was terminated. (*Id.* ¶ 58).

1

## "638" CONTRACTS

In 1975, the Indian Self-Determination and Education Assistance Act ("ISDEAA") created a system by which tribes could take over the administration of programs operated by the United States Bureau of Indian Affairs ("BIA"). *Los Coyotes Band of Cahuilla & Cupeno Indians v. Jewell*, 729 F.3d 1025, 1033 (9th Cir. 2013). Under the ISDEAA, a tribe that receives a particular service from the BIA may enter into a contract with the government to take over and operate the program as a contractor and receive the money that the BIA would have otherwise spent on the program. *Id.;* 25 U.S.C. § 5321(a)(2) (formerly cited as 450f(a)(2)). These contracts are entitled "638" contracts in reference to the ISDEAA's public law number. *See* ISDEAA, Pub. L. 93-638, 88 Stat. 2203 (Jan. 4, 1975). At the time of Plaintiff's termination, the Tribe and United States were under a "638" contract for tribal law enforcement services. (ECF No. 32 ¶¶ 10-14).

## PROCEDURAL HISTORY

On February 24, 2017, Plaintiff filed suit against the United States, asserting two claims under the Federal Tort Claims Act ("FTCA"): (1) Plaintiff was discharged in retaliation for reporting "workplace harassment." (ECF No. 1 ¶ 26); and (2) the BIA was negligent in failing to "intervene against" Plaintiff's discharge. (ECF No. 1 ¶¶ 29, 31). Defendant United States subsequently moved to dismiss that complaint. (ECF No. 9).

On January 5, 2018, Plaintiff moved to amend his complaint to assert five FTCA claims against the United States: wrongful termination by breach of employment contract; wrongful termination by retaliatory discharge; wrongful termination in bad faith; wrongful termination/tortious discharge; and breach of contract. (ECF Nos. 24, 24-1 ¶¶ 62-131). The Court denied Plaintiff's motion to amend, granted Plaintiff leave to file a second amended complaint and denied the United States' motion to dismiss as moot. (ECF No. 29).

On April 4, 2018, Plaintiff filed a second amended complaint asserting three FTCA claims: wrongful termination by retaliatory discharge; wrongful termination in bad faith; and wrongful termination/tortious discharge. (ECF No. 32 ¶¶ 63-127). The retaliatory and tortious discharge claims allege that the Tribe extended Plaintiff's probation and terminated him in

2

retaliation for Plaintiff's reports of "workplace discrimination and harassment" to tribal authorities. (ECF NO. 32 ¶¶ 79-81, 98). The tortious discharge claim further alleges that the extension of probation and discharge violated three public policies: "protecting employees who object to and expose illegal conduct or practices of employers or superiors" (ECF No. 32 ¶ 97); requiring employers to "abide by their employee handbooks' due process provisions prior to terminating employees" (ECF No. 32 ¶ 99); and protecting employees from the effects of crime. (ECF No. 32 ¶ 110).[1] Plaintiff's claim for bad faith discharge alleges that the Tribe acted in bad faith when it breached its employment agreement with Plaintiff by terminating him for reporting workplace misconduct. (ECF No. 32 ¶¶ 88-92).

# ARGUMENT

**A.     Plaintiff is a whistleblower who did not report the alleged workplace misconduct outside the Tribe. For that reason, his tortious and retaliatory discharge claims fail.**

In suing for retaliatory and tortious discharge, Plaintiff identifies himself as a whistleblower. (ECF No. 32 ¶¶ 76, 82-84, 97-98). He claims he reported the workplace misconduct to his superiors to further the public policy of the "common good" by "expos[ing]" workplace misconduct and "prevent[ing]" it from re-occurring against others, thereby "creating" a "safe work environment for all tribal employees":

> [Plaintiff's] objecting to workplace discrimination and harassment to the Tribe was consistent with and supportive of sound public policy and the common good since he sought to eliminate racial and sexual-orientation discrimination and harassment from his workplace, a public entity, thereby creating a more healthy and safe work environment for all tribal employees.

> [Plaintiff's] reporting workplace discrimination and harassment to the Tribal authorities was also consistent with and supportive of sound public policy and the common good since he reported conduct that was obnoxious to the interests of the United States, the state, the Tribe, and the Tribe's employees, and contrary to public policy and sound morality.

---

[1] While Plaintiff asserts "retaliatory" and "tortious" discharge as separate claims, in fact, retaliatory discharge is a type of tortious discharge. *See Jackson v. Universal Health Services, Inc.*, 2014 WL 4635873, at *4 (D. Nev. Sept. 15, 2014) ("A tortious discharge may arise [when] the employer terminates an employee for reasons which violate public policy or the discharge is in retaliation for the employee's actions that 'are consistent with or supportive of sound public policy and the common good.'").

> [Plaintiff's] objecting to workplace discrimination and harassment was also consistent with and supportive of sound public policy and the common good since he sought to expose his superiors' practice of racial and sexual-orientation discrimination in violation of NRS § 613.330(a) and (b) in order to prevent such future illegal conduct by his superiors against other employees.

(ECF No. 32 ¶¶ 82-84); *see also* ECF No. 32 ¶ 76 ("Nevada courts recognize the public policy of employees exposing any illegal employment practice, such as racial and sexual orientation discrimination, which creates an unhealthy workplace. When an employer dismisses an employee for the employee's performing a public policy-favored action, then an action for tortious discharge arises.").

Plaintiff bolsters his whistleblower allegations by citing whistleblower cases and other whistleblower authorities. For example, he cites the Tribe's whistleblower policy, "Section 164.215 of the Revised Tribe Employee Handbook," to support his claim that he was retaliated against for opposing unlawful employment practices. (ECF No. 32 ¶ 69). Section 164.215, entitled "Whistleblower Policy," specifically provides:

> To encourage Reno-Sparks Indian Colony (RSIC) directors, officers, employees and associates to report suspected waste, fraud, abuse, mismanagement, violations of law, and violations of the RSIC Code of Ethics, and to prevent retaliation against those who report such occurrences in good faith. The Whistleblower Policy is further intended to encourage the reporting and resolution of such issues within RSIC prior to seeking resolution outside RSIC.

(ECF No. 32-4 p. 6). Plaintiff's reliance on the Tribe's whistleblower policy as a basis for his claim that he was retaliated against for reporting misconduct demonstrates that Plaintiff is characterizing himself as a whistleblower.

Plaintiff also cites *Wagner v. City of Globe*, 722 P.2d 250, 257 (Ariz. 1986), a whistleblower case, to support his claim that his report of misconduct furthered the public policy of the "public good." Quoting from *Wagner*, Plaintiff states: "So long as employees' actions…seek to further the public good, the decision to expose illegal or unsafe practices should be encouraged." (ECF No. 32 ¶ 75). As in *Wagner*, Plaintiff sought to further the public good by exposing unsafe workplace practices and thus, like the plaintiff in *Wagner*, Plaintiff is characterizing himself as a whistleblower.

In short, Plaintiff's description of himself as a whistleblower and his citation to, and reliance on, whistleblower authorities, demonstrate unequivocally that he is characterizing himself as a whistleblower. To assert claims for retaliatory and tortious discharge as a whistleblower, however, Plaintiff was required to report his complaints to someone outside the Tribe. *See Biesler v. Prof'l Sys. Corp.*, 321 F. Supp. 2d 1165, 1170 (D. Nev. 2004) ("Plaintiff's internal reporting of Defendant's alleged illegal activity cannot support a tortious discharge claim under Nevada law."); *Jackson v. Universal Health Servs.*, 2014 WL 4635873, at *5 (D. Nev. Sept. 15, 2014) ("because internal reporting to an employer is not entitled to public policy protection, Plaintiff's tortious discharge claim based on her internal complaining about DSH's policies must fail").

Here, Plaintiff did not report the alleged workplace misconduct to anyone outside the Tribe: "[Plaintiff] objected to the workplace discrimination and harassment by reporting his superiors' conduct to the Tribe on two occasions in the Spring of 2014 and by filing a complaint with the Tribe on or around July 17, 2014." (ECF No. 32 ¶ 77). Plaintiff's failure to report the alleged misconduct outside the Tribe precludes him from suing for retaliatory and tortious discharge. Accordingly, those claims should be dismissed. *See* Fed. R. Civ. P. 12(b)(6) (authorizing dismissal of complaint for failure to state a claim for relief).[2]

**B.   The Nevada Supreme Court has rejected a "mixed motives" theory of retaliatory discharge, as alleged by Plaintiff.**

As support for his retaliatory discharge claim, Plaintiff claims his "protected activity**,** objecting to workplace discrimination and harassment, was a *motivating factor* in the adverse

---

[2] Plaintiff also described himself as a whistleblower in his proposed first amended complaint: "Miller's complaints were protected activity under NRS section 613.330(a) and (b) and under the Tribe's Employee Handbook, *which protect against retaliation for whistleblowing*." (ECF No. 24-1 p. 16) (emphasis added). In ruling on Plaintiff's motion to amend his complaint, however, the Court concluded: "*Unlike a whistleblower*, Plaintiff need not establish that he publicly exposed his employer's misconduct to prevail on his tortious discharge claim." (ECF No. 29 p. 4) (emphasis added). Given Plaintiff's clear and unequivocal identification of himself as a whistleblower, the Court had no basis to infer otherwise in ruling Plaintiff was not required to "publicly expose[] his employer's misconduct." Plaintiff *was* required to report his complaints beyond his employer because he was, by his own admission, a whistleblower.

5

1  employment action since the Tribe placed [Plaintiff] on probation and subsequently terminated
2  him based on his workplace discrimination and harassment claims." (ECF No. 32 ¶ 81) (emphasis
3  added). The Nevada Supreme Court, however, has specifically rejected a "mixed motives" theory
4  of retaliatory discharge. *See Allum v. Valley Bank of Nevada*, 970 P.2d 1062, 1066 (Nev. 1998)
5  ("We hold that recovery for retaliatory discharge under state law may not be had upon a 'mixed
6  motives' theory; thus, a plaintiff must demonstrate that his protected conduct was *the* proximate
7  cause of his discharge.") (emphasis in original). Here, Plaintiff alleges that his reports of
8  misconduct were a "motivating factor" in his probation extension and discharge rather than the
9  proximate cause of those events. Under the circumstances, the retaliatory discharge cause of
10 action fails to state a claim for relief and should be dismissed. *See* Fed. R. Civ. P. 12(b)(6)
11 (authorizing dismissal of complaint for failure to state a claim for relief).

12 **C.    Bad faith discharge is a contract claim for which the United States Court of Federal Claims has jurisdiction and the United States has not waived sovereign immunity.**
13

14       The United States Court of Federal Claims is vested with exclusive jurisdiction for all
15 contract claims exceeding $10,000.00 against the United States. 28 U.S.C. § 1491(a)(1);
16 *South Fork Livestock P'ship v. United States*, 183 F. Supp. 3d 1111, 1117 (D. Nev. 2016). Here,
17 Plaintiff's administrative claim seeks $750,000.00 in damages (ECF No. 32-16, p. 2) and his
18 second amended complaint asserts a breach-of-contract claim: "Wrongful termination in bad faith
19 under the Federal Tort Claims Act." (ECF No. 32 ¶¶ 87-92). The elements for that cause of action
20 are: 1) the employer and employee entered into an employment contract; 2) the employee
21 established contractual rights of continued employment and developed a relationship of trust,
22 reliance and dependency with the employer; and 3) the employer, acting in bad faith, discharged
23 the employee. (ECF No. 32 ¶ 88, citing *D'Angelo v. Gardner*, 819 P.2d 206, 211 (Nev. 1991)).

24       Applying those elements, Plaintiff alleges that he "entered into an employment contract
25 when he became employed by the Tribe…"; he "established contractual rights of continued
26 employment" after his 90-day probation period ended; and the Tribe "acted in bad faith when it
27 breached the employment contract by terminating him [for reporting misconduct]." (ECF No. 32
28 ¶¶ 89-92). Those allegations are clearly contract-based in nature and thus the United States Court

of Federal Claims has exclusive jurisdiction to decide them. *See Ontario Power Generation, Inc. v. United States*, 369 F.3d 1298, 1301 (Fed. Cir. 2004) ("claims alleging the existence of a contract between the plaintiff and the government fall within the Tucker Act's waiver [of sovereign immunity]"). Moreover, under Nevada law, bad faith discharge requires the existence of a contractual agreement between the parties, thereby further demonstrating that subject matter jurisdiction lies with the United States Court of Federal Claims rather than this Court. *See Sands Regent v. Valgardson*, 105 Nev. 436, 439 (Nev. 1989) (claim for bad faith discharge "presuppose[s] that the parties had an employment agreement"). Lastly, the FTCA contains an exemption from coverage for claims arising from an "interference with contract rights." 28 U.S.C. § 2680(h). That provision provides yet another reason to dismiss Plaintiff's contract-based claim for bad faith discharge because the United States has not waived sovereign immunity for such a claim. Accordingly, the claim fails for lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1) (authorizing dismissal of complaint for lack of subject matter jurisdiction).

**D.   Plaintiff's claim for bad faith discharge impermissibly alleges a public policy violation based on the Tribe's purported breach of contract under state law.**

Plaintiff's claim for bad faith discharge derives from state law, specifically from *D'Angelo v. Gardner*, 819 P.2d 206, 211 (Nev. 1991). (ECF No. 32 ¶ 88). The United States' contractual obligations, however, are determined by federal law – not state law. *See Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988) ("The obligations to and rights of the United States under its contracts are governed exclusively by federal law."). Because Plaintiff impermissibly relies on state law to purportedly demonstrate what the United States' contractual obligations are in this case, Plaintiff's claim for bad faith discharge is unavailing and should be dismissed. *See* Fed. R. Civ. P. 12(b)(6) (authorizing dismissal of complaint for failure to state a claim for relief).

**E.   Plaintiff's tortious discharge claim fails because the public policies he identifies find no support under Nevada law.**

For his third cause of action, Plaintiff asserts a claim for tortious discharge. (ECF No. 32 ¶¶ 94-119). Tortious discharge occurs when an employee is discharged for reasons that violate public policy. *Wayment v. Holmes*, 912 P.2d 816, 818 (Nev. 1996). Public policy tortious

discharge actions are "severely limited to those rare and exceptional cases where the employer's conduct violates strong and compelling public policy." *Sands Regent*, 777 P.2d at 900. Here, Plaintiff identifies three purported public policies to support his tortious discharge claim, but he fails to provide any legal authority to establish their existence under Nevada law.

First, Plaintiff alleges that employers, as a matter of public policy, are required to "protect[] employees who object to and expose illegal conduct or practices of employers or superiors." (ECF No. 31 ¶ 97). That assertion is identical to, and duplicative of, the allegations of Plaintiff's first cause of action: retaliatory discharge. Therefore, Plaintiff's tortious discharge claim based on that purported public policy violation fails for the reasons previously argued.

Plaintiff next alleges that employers, as a matter of public policy, are required to "abide by their employee handbooks' due process provisions prior to terminating employees." (ECF No. 32 ¶ 99). That purported public policy, however, finds no support under Nevada law. Indeed, Plaintiff fails to cite any authority that even remotely demonstrates the existence of such a public policy in Nevada. On the contrary, Nevada cases that discuss employee handbooks evaluate whether those handbooks impose contractual obligations on an employer; no case holds that an employee handbook establishes a public policy that would support a tortious discharge claim. *See D'Angelo*, 819 P.2d at 209 ("contractual obligations can be implicit in employer practices and policies as reflected in an employee handbook"); *Yeager v. Harrah's Club, Inc.*, 897 P.2d 1093, 1097 (Nev. 1995) ("Nothing in the handbook states that the twenty-three listed infractions are the exclusive causes for termination, nor does the handbook say that an employee will not be terminated on other grounds or for no reason at all. . . . [Defendant] merely intended the handbook to be a guideline for employees to measure their conduct against."). Moreover, as argued earlier, claims asserting the existence of contractual obligations with the United States fall under the jurisdiction of the United States Court of Federal Claims rather than this Court. *Ontario Power Generation, Inc., v. United States*, 369 F.3d 1298, 1301 (Fed. Cir. 2004). Under the circumstances, it is improper for Plaintiff to rely on an employee handbook to establish a purported public policy for his tortious discharge claim. Accordingly, Plaintiff's tortious discharge claim based on such a public policy should be dismissed.

For his third public policy, Plaintiff alleges that employers are required to protect employees from the effects of crime. (ECF No. 32 ¶ 110-12). Again, however, Plaintiff fails to cite any authority to establish that such a public policy exists in Nevada. Nor can Plaintiff show that such a public policy is sufficiently "strong and compelling" to negate the presumption of at-will employment. *See Biesler*, 321 F. Supp. 2d at 1168 ("Under Nevada law, employment contracts are presumed to be at-will, and an employer may fire an employee for any reason or for no reason at all."); *Sands Regent*, 777 P.2d at 900 (concluding that a legislative public policy against age discrimination was not sufficiently strong to warrant an exception to the at-will employment doctrine). Accordingly, Plaintiff's tortious discharge claim based on that alleged public policy should be dismissed. *See* Fed. R. Civ. P. 12(b)(6) (authorizing dismissal of complaint for failure to state a claim for relief).

**F.    The discretionary function exception bars Plaintiff's FTCA claims.**

The United States is immune from suit unless it has expressly waived such immunity and consented to be sued. *Gilbert v. DaGrossa*, 756 F.2d 1455, 1458 (9th Cir. 1985). The FTCA does not waive sovereign immunity for claims against the United States "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). Congress designed this limitation, known as the discretionary function exception, to "prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. Gaubert*, 111 S. Ct. 1267, 1273 (1991). The discretionary function exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984). The discretionary function exception must be strictly construed in favor of the United States. *U.S. Dep't of Energy v. Ohio*, 503 U.S. 607, 615 (1992).

A two-pronged test determines whether the discretionary function exception applies. First, the court must determine whether the alleged negligent or wrongful act of a federal employee

involved "an element of judgment or choice." *Gaubert*, 111 S. Ct. at 1273. A challenged action satisfies this prong if there is no federal statute, regulation or policy that "specifically prescribes a course of action for an employee to follow[.]" *Id*.

If the first prong of the test is satisfied, the second prong requires that the challenged decision be of "the kind that the discretionary function exception was designed to shield." *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). Under that prong, the court determines if the discretionary conduct at issue is "susceptible to policy analysis." *Gaubert*, 111 S. Ct. at 1275. When government policy allows a government agency to exercise its discretion, it must be presumed "that the agent's acts are grounded in policy when exercising that discretion." *Id*. at 1274; *Miller v. United States*, 163 F.3d 591, 593-94 (9th Cir. 1998). "Even if the decision is an abuse of the discretion granted, the exception will apply." *Terbush v. United States*, 516 F.3d 1125, 1129 (9th Cir. 2008) (citations omitted); 28 U.S.C. § 2680(a).

Applying the two-pronged test here demonstrates that the discretionary function exception bars Plaintiff's FTCA claims. Personnel actions, such as the decision to extend an employee's probation and terminate his employment, clearly involve an element of judgment or choice. *See Richman v. Straley*, 48 F.3d 1139, 1146-47 (10th Cir. 1995) ("Decisions regarding employment and termination are inherently discretionary…[because s]uch sensitive decisions are precisely the types of administrative action the discretionary function exception seeks to shield from judicial second-guessing"); *Sydnes v. United States*, 523 F.3d 1179, 1184 (10th Cir. 2008) ("employment decisions generally involve a significant degree of discretion by personnel supervisors").

As for the test's second prong, personnel decisions require the type of policy analysis that the discretionary function exception was enacted to protect. *See Tonelli v. United States*, 60 F.3d 492, 496 (8th Cir. 1995) ("Issues of employment supervision and retention generally involve the permissible exercise of policy judgment and fall within the discretionary function exception"); *Vickers v. United States*, 228 F.3d 944, 950 (9th Cir. 2000) ("This court and others have held that decisions relating to the hiring, training and supervision of employees usually involve policy judgments of the type Congress intended the discretionary function exception to shield."); *Sydnes*,

523 F.3d at 1186 ("employment and termination decisions are, as a class, the kind of matters requiring consideration of a wide range of policy factors[.]").

In short, the Tribe's decisions to extend Plaintiff's probation and terminate him involved elements of judgment and choice and were the kinds of decisions that implicated policy concerns. Accordingly, Plaintiff's FTCA claims are barred by the discretionary function exception and should be dismissed. *See Crete v. City of Lowell*, 418 F.3d 54, 64 (1st Cir. 2005) ("[U]niformly[,] the federal circuit courts under the FTCA have found that employer decisions such as hiring, discipline, and termination of employees are within the discretionary function exception."); *Sydnes*, 523 F.3d at 1187 ("A federal agency's decision to terminate or request the termination of an employee involves an element of choice and is the kind of decision that implicates policy concerns relating to accomplishing the agency's mission.").

**G.     Plaintiff has failed to allege outrageous conduct that violates public policy.**

Claims for retaliatory and tortious discharge derive from "outrageous" conduct that violates public policy. *State v. Eighth Judicial Dist. Court*, 42 P.3d 233, 240 (Nev. 2002); *D'Angelo*, 819 P.2d at 212. Here, the Tribe informed Plaintiff that he was discharged for filing an unemployment claim with the State of Nevada while employed with the Tribe. (ECF No. 24-1 ¶ 40). However, it was not until *after* Plaintiff's termination that the State of Nevada determined that a person fraudulently used Plaintiff's identifying information to submit an unemployment claim without Plaintiff's knowledge. (ECF Nos. 32 ¶ 58, 32-15 p. 2). Thus, at the time the Tribe terminated Plaintiff, it had a legitimate reason for doing so. Under the circumstances, Plaintiff's termination could not have been "outrageous" and, for that reason, his retaliatory and tortious discharge allegations fail to state claims for relief. *See* Fed. R. Civ. P. 12(b)(6) (authorizing dismissal of complaint for failure to state a claim for relief).

**H.     Plaintiff has failed in his burden to demonstrate that the Court has subject matter jurisdiction over his FTCA claims.**

The United States is immune from suit unless it has expressly waived such immunity and consented to be sued. *Gilbert*, 756 F.2d at 1458. The burden of demonstrating a waiver of

11

sovereign immunity rests with the party filing suit. *Kokkonen v. Guardian Life Ins. Co.*, 114 S. Ct. 1673, 1675 (1994).

The FTCA waives the United States' sovereign immunity for torts committed by federal employees acting within the scope of their employment. *Nurse v. United States*, 226 F.3d 996, 1000 (9th Cir. 2000). In 1990, after the ISDEAA's enactment, Congress extended the FTCA's waiver of sovereign immunity to claims "resulting from the performance of functions under a contract, grant agreement, or cooperative agreement authorized by the [ISDEAA] of 1975[.]" Dep't of the Interior and Related Agencies Appropriate Act, Pub. L. 101-512, Sec. 314, 104 Stat. 1915 (1990) (25 § 450(f) note). The provision's waiver of sovereign immunity, however, is limited: "[A]n Indian tribe, tribal organization or Indian contractor is deemed hereafter to be part of the Bureau of Indian Affairs…while carrying out any such contract or agreement and its employees are deemed employees of the Bureau…while acting within the scope of their employment in carrying out the contract or agreement." *Id.* Pursuant to that provision, a two-step test determines whether a court has subject matter jurisdiction over an FTCA action against the United States where an Indian tribe is alleged to be part of the government. *Shirk v. United States*, 773 F.3d 999, 1006 (9th Cir. 2014).

First, the court must assess whether the alleged tortfeasor's conduct is covered by the relevant contract or agreement. *Id.* This step requires a plaintiff to identify which contractual provision the alleged tortfeasor was "carrying out" at the time of the tort. *Id.* If the relevant federal contract does not encompass the activity that the plaintiff ascribes to the tortfeasor, there is no subject matter jurisdiction. *Id.* at 1007. Second, the court must decide whether the alleged tortious action falls within the scope of the tortfeasor's employment under state law. *Id.* at 1006. If the court determines that the alleged tortious conduct does not fall within the scope of the tortfeasor's employment, the court lacks subject matter jurisdiction to decide the case. *Id.* at 1007. A plaintiff's failure at either of the two steps is sufficient to defeat subject matter jurisdiction. *Id.* at 1006.

Here, Plaintiff fails to identify what contractual provisions the Tribe was "carrying out" when it extended Plaintiff's probation and terminated him. Nor does Plaintiff cite any Nevada law whatsoever to demonstrate that the Tribe's actions fell within the scope of its employment

12

under state law. Under the circumstances, Plaintiff has failed to satisfy *Shirk*'s two-part test, thereby depriving the Court of subject matter jurisdiction. Moreover, Plaintiff alleges that the Tribe's actions were "malicious," "intentional" and in "bad faith." (ECF No. 32 ¶¶ 59, 92). Such wrongful conduct is unlikely to fall within the parameters of a "638" contract or a tribe's scope of employment. Accordingly, Plaintiff's three FTCA claims should be dismissed for lack of subject matter jurisdiction. *See Manuel v. United States*, 2014 WL 6389572, *11 (E.D. Cal. Nov. 14, 2014) ("Plaintiff fails to establish that the Tribe's self-determination contracts authorized [the tribal employee's] acts or omissions underlying Plaintiff's negligence claim. . . . Plaintiff has also failed to allege facts showing that [the tribal employee] was carrying out any of the Tribe's self-determination contracts. The Court therefore finds that [the tribal employee] is not an employee of the federal government[.]").

**I.      The Civil Service Reform Act preempts Plaintiff's claims for retaliatory and tortious discharge.**

Plaintiff claims he was an employee of the United States during his tenure with the Tribe. *See* ECF No. 32 ¶ 5 ("[Tribe] law enforcement personnel and administration were employed by DEFENDANT[.]"); *Id.* ¶ 12 ("DEFENDANT is the Tribe's employer of law enforcement personnel[.]"). Accepting Plaintiff's assertion as true, the Civil Service Reform Act ("CSRA") preempts his retaliatory and tortious discharge claims.

The CSRA provides "a comprehensive system for reviewing personnel action taken against federal employees." *Elgin v. Dep't of Treasury*, 132 S. Ct. 2126, 2130 (2012). In enacting the CSRA, Congress intended to "limit the remedies of federal employees bringing claims closely intertwined with their conditions of employment to those remedies provided in the statute." *Lehman v. Morrissey*, 779 F.2d 526, 527 (9th Cir. 1985). Because the CSRA is the exclusive means for federal employees to challenge prohibited personnel practices, a federal employee may not resort to other statutes to challenge a decision falling within the CSRA's scope. *Elgin*, 132 S. Ct. at 2140; *see also Bush v. Lucas*, 103 S. Ct. 2404 (1983) (citing the comprehensive nature of civil service remedies as the reason for declining to create a "new judicial remedy" for federal employees who are discharged for exercising their first amendment rights).

Where state common law claims fall within the personnel actions that employees may bring under the CSRA, those state actions are preempted. *See Rivera v. United States*, 924 F.2d 948, 951 (9th Cir. 1991) ("Congress's purpose in enacting the CSRA was to channel grievances and disputes arising out of government employment into a single system of administrative procedures and remedies, subject to judicial review. To permit FTCA claims to supplant the CSRA's remedial scheme certainly would defeat that purpose."); *Saul v. United States*, 928 F.2d 829, 843 (9th Cir. 1991) ("We find the failure of Congress to even mention state tort remedies in the CSRA is glaringly significant. We conclude that Congress ignored these remedies because it left no room for them to operate."). *Munoz v. Locke*, 634 Fed. Appx. 166, 167 (9th Cir. 2015) ("The district court properly dismissed [plaintiff's] breach of contract, wrongful termination, and due process claims for lack of subject matter jurisdiction because the Civil Service Reform Act (CSRA) provides the exclusive administrative remedies for these claims.").

Plaintiff's claim that his probation was extended and he was discharged in retaliation for reporting workplace misconduct falls within the CSRA's definition of prohibited "personnel" actions. *See Walker v. United States*, 2016 WL 1089237, *2 (D. Nev. Mar. 15, 2016) (holding that employee's termination "unquestionably" falls within CSRA's coverage); 5 U.S.C. § 2302(a)(2)(A)(xii) ("personnel action" includes "any…significant change in duties, responsibilities, or working conditions"). Here, Plaintiff did not pursue available remedies under the CSRA and he is therefore precluded from seeking relief in this action. Accordingly, the claims for retaliatory and tortious discharge should be dismissed for lack of subject matter jurisdiction. *See David v. United States*, 820 F.2d 1038, 1041 (9th Cir. 1987) (dismissing Plaintiff's retaliatory termination claim because "the exclusive remedy lay with the Civil Service Reform Act[.]"); *Rivera*, 924 F.2d at 952 ("We hold at the time [plaintiff] was subjected to retaliatory harassment by [defendant], her remedy was through CSRA, not the FTCA."); *Premachandra v. United States*, 739 F.2d 392, 394 (8th Cir. 1984) ("Had Congress intended for [federal] employment decisions to be reviewable in district courts in the context of actions under the Federal Tort Claims Act, it would not have so precisely defined the civil service remedy.").

**J.  Alternatively, Title VII of the Civil Rights Act preempts Plaintiff's claims for retaliatory and tortious discharge.**

To the extent not preempted by the CSRA, Title VII of the Civil Rights Act preempts Plaintiff's retaliatory and tortious discharge claims. Again accepting as true Plaintiff's assertion that he was a United States employee, Title VII is the exclusive remedy for claims of discrimination and retaliation arising from federal employment. *See Brown v. GSA*, 96 S. Ct. 1961, 1966 (1976) (describing Title VII as "an exclusive, preemptive administrative and judicial scheme for the redress of federal employment discrimination"); *Phelps v. U.S. Gen. Services Agency*, 2008 WL 4287941, *2 (N.D. Cal. 2008) ("Title VII is the exclusive remedy for all acts of discrimination by the federal government, whether the alleged discrimination is based on race, religion, sex, national origin, or retaliation."). A limited exception exists for "highly personal violation[s] beyond the meaning of 'discrimination.'" *Otto v. Heckler*, 781 F.2d 754, 757 (9th Cir. 1986); *see also Brock v. United States*, 64 F.3d 1421, 1423 (9th Cir. 1995) (concluding that plaintiff's rape and sexual assault claims were highly personal and, therefore, Title VII was not plaintiff's exclusive remedy).

Here, Plaintiff's retaliatory and tortious discharge claims allege that his probation was extended, and he was discharged, in retaliation for reporting workplace misconduct. (ECF No. 32 ¶¶ 79-81, 98). Plaintiff's allegations include no facts, however, that would render those events "highly personal violation[s] beyond the meaning of 'discrimination.'" And even if Plaintiff had alleged the requisite facts, the CSRA would preempt any claims based on those allegations. *See Cooper v. United States*, 112 F.3d 515, *1 (9th Cir. 1997) ("Because [Plaintiff's] allegations relate to or arise out of personnel actions that violate the CSRA's merit system principles, the district court did not err by concluding that [Plaintiff's] claims were preempted by the CSRA insofar as they fell outside of Title VII preemption."). To the extent Plaintiff's claims seek redress for garden-variety retaliatory conduct, they are preempted by Title VII and should be dismissed. *See* Fed. R. Civ. P. 12(b)(1) (authorizing dismissal of complaint for lack of subject matter jurisdiction).

15

**CONCLUSION**

For the reasons argued above, Plaintiff's second amended complaint should be dismissed in its entirety.

DATED: May 2, 2018.

        Respectfully submitted,

        DAYLE ELIESON
        United States Attorney

        s/ *Holly A. Vance*
        HOLLY A. VANCE
        Assistant United States Attorney

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing MOTION TO DISMISS was electronically filed and that service will be accomplished to the following individual(s) via the Court's CM/ECF system:

Scott W. Souers
sssouers@ajattorneys.com

DATED: May 2, 2018.                              s/ *Holly A. Vance*
                                                 HOLLY A. VANCE