**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOHN MILLER,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>*Defendant-Appellee.* | No. 19-15122<br><br>D.C. No.<br>3:17-cv-00121-<br>MMD-WGC<br><br>OPINION |

Appeal from the United States District Court
for the District of Nevada
Miranda M. Du, Chief District Judge, Presiding

Argued and Submitted April 29, 2020
San Francisco, California

Filed March 26, 2021

Before: Ronald Lee Gilman,[*] Susan P. Graber, and
Daniel P. Collins, Circuit Judges.

Opinion by Judge Collins

---

[*] The Honorable Ronald Lee Gilman, United States Circuit Judge
for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

## SUMMARY[**]

### Federal Tort Claims Act

The panel affirmed in part and reversed in part the district court's dismissal of plaintiff's wrongful termination action as barred by the Federal Tort Claims Act's discretionary function exception, and remanded the case for further proceedings.

Plaintiff alleged claims arising from his termination as a police officer with the Reno-Sparks Indian Colony, a federally-recognized Indian Tribe. The Tribe manages its police force through a contract with the Bureau of Indian Affairs ("BIA"), and that contract designates the Tribe's police officers as Federal Government employees for purposes of tort liability. The district court dismissed the action on the sole ground that all of plaintiff's claims were barred by the Federal Tort Claims Act's discretionary function exception and that the court therefore lacked subject matter jurisdiction.

The panel first addressed plaintiff's claims that his termination was undertaken in retaliation for his having complained about workplace discrimination and harassment. In determining whether the discretionary function exception barred these claims, the panel applied the two-part test set forth in *United States v. Gaubert*, 499 U.S. 315 (1991), and *Berkovitz v. United States*, 486 U.S. 531 (1988). First, concerning whether the act or omission on which the claim was based "involves an element of judgment or choice," the

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

panel held that plaintiff's first two causes of action were based upon the exercise of judgment or choice by the Tribe and therefore the first element of the *Gaubert-Berkovitz* test was met as to these claims. Specifically, the panel held that plaintiff's reliance on rules governing the procedure for making the termination decision did not establish an applicable federal statute, regulation, or policy that specifically proscribed a retaliatory action by the Tribe. Second, concerning whether the judgment was of the kind that the discretionary function exception was designed to shield, the panel rejected plaintiff's contention that his allegations of intentional torts and bad-faith conduct sufficed to defeat the discretionary function exception because such acts were not the product of any plausible objective. The panel held that there was no categorical carve-out at the second step of the test for "bad faith" or "intentional" torts. Because both elements of the *Gaubert-Berkovitz* test were satisfied, the discretionary function exception barred plaintiff's two retaliation-based wrongful termination claims.

The panel next addressed whether the discretionary function exception also barred plaintiff's third cause of action alleging that his termination was wrongful because it was the result of a process that did not adhere to the procedural requirements of the contract between the Tribe and the BIA and other relevant provisions. The panel applied the standards set forth in *Sabrow v. United States*, 93 F.3d 1445 (9th Cir. 1996), and *Vickers v. United States*, 228 F.3d 944 (9th Cir. 2000), to identify the relevant federal regulations and policy documents that constrained the Tribe's behavior, and then determined whether they contained mandatory requirements that the Tribe allegedly breached in its handling of plaintiff's employment situation. The panel held that the first element of the *Gaubert-*

*Berkovitz* test was not met as to this claim, and the Federal Tort Claims Act's discretionary function exception did not apply. As a result, the district court erred in concluding that plaintiff's third cause of action was barred.

The panel held the district court erred in concluding that the discretionary exception function barred the two additional claims plaintiff sought to raise in the Third Amended Complaint. Plaintiff's two new claims alleged, respectively, that the Tribe was negligent and grossly negligent in terminating him. Because these claims rested on a failure to follow the mandatory requirements prescribed in the BIA Handbook, the first element of the *Gaubert-Berkovitz* test was not met and the discretionary function exception did not apply. The panel concluded that the district court erred in denying leave to amend to assert these new claims.

## COUNSEL

Scott W. Souers (argued), Alling & Jillson Ltd., Lake Tahoe, Nevada, for Plaintiff-Appellant.

Holly Ann Vance (argued), Assistant United States Attorney; Elizabeth O. White, Appellate Chief; Nicholas A. Trutanich, United States Attorney; United States Attorney's Office, Reno, Nevada; for Defendant-Appellee.

## OPINION

COLLINS, Circuit Judge:

John Miller appeals the district court's dismissal of his operative complaint, which alleges various causes of action arising from his termination as a police officer with the Reno-Sparks Indian Colony, a federally recognized Indian Tribe.  The Tribe manages its police force through a contract with the Bureau of Indian Affairs ("BIA"), and that contract designates the Tribe's police officers as Federal Government employees for purposes of tort liability.  As a result, Miller's claims are governed by the Federal Tort Claims Act ("FTCA"), and the United States is the sole defendant.  The district court held that all of Miller's claims were barred by the FTCA's discretionary function exception, 28 U.S.C. § 2680(a), and the court denied leave to amend as futile.  Reviewing de novo, *Bibeau v. Pacific NW Research Found., Inc.*, 339 F.3d 942, 944 (9th Cir. 2003), we affirm in part, reverse in part, and remand the case for further proceedings.

## I

## A

The Reno-Sparks Indian Colony is a federally recognized Indian Tribe in northwest Nevada.  *See* 86 Fed. Reg. 7554, 7556 (Jan. 29, 2021).  In 2005, pursuant to § 102 of the Indian Self-Determination Act ("ISDA"), 25 U.S.C. § 5321, the Tribe entered into a "self-determination contract" with the BIA governing tribal law-enforcement services ("the Contract").  Such contracts under the ISDA allow a tribe to perform tasks that would otherwise have been carried out by the Federal Government and to do so using "money that the Government would have otherwise spent on the program."  *Menominee Indian Tribe v. United*

*States*, 577 U.S. 250, 252 (2016).  The Tribe and the BIA ratified the Contract on a multi-year basis, and it was in effect at all relevant times here.  Although the Contract states that the Tribe shall "perform all tribal law services on the Reno-Sparks Indian Colony," its provisions concerning "Tort Claims" specify that, "[f]or the purpose of Federal Tort Claims Act Coverage, the [Tribe] and its employees . . . are deemed to be employees of the Federal government while performing work under this contract."

Under the auspices of the Contract, the Tribe employed Miller as a law-enforcement officer from June 27, 2013 until his termination on August 22, 2014.  When he began his employment, Miller was subject to a 90-day introductory probationary period, and upon his successful completion of this period, he became a regular, full-time employee.  Miller alleges that, starting in January 2014, his "colleagues and superiors subjected him to workplace discrimination and harassment regarding his race, sex, perceived sexual orientation, and temporary physical disabilities."  In particular, Miller contends that Sergeant Lance Avansino subjected him to harassment based on Miller's being "the wrong color of skin" and Avansino's perception that Miller was gay.  In April and May 2014, Miller complained about this discrimination and harassment to the Tribe's Chief of Police, Darrell Bill, but without success.

On June 26, 2014, Sergeant Avansino informed Miller during a performance review that Avansino was extending Miller's probationary period until December 27, 2014.  When Miller complained that he had already completed the 90-day probationary period, Avansino responded that a previous Acting Chief of Police had adopted a one-year probationary policy that superseded the standard 90-day probationary period applicable under the Tribe's general

human-resources policies.   Later that day, after the performance review meeting, Miller sent Avansino an email requesting a copy of the alleged one-year probationary policy.  Miller was never provided with such a copy, and he denies that any such policy existed.

Miller scheduled a meeting on July 14, 2014 with Chief Bill to discuss both the alleged harassment and the allegedly unauthorized probation reinstatement, but Bill did not come to the scheduled appointment.   Shortly thereafter, Miller submitted a formal workplace discrimination claim to Tribal Administrator Gerald Smith, but no action was taken in response.   Miller also filed an administrative appeal of Avansino's reinstatement of probation, but the Tribe later denied his request to appeal.

On August 25, 2014, the Tribe mailed Miller a letter notifying him that it was terminating him for cause on the ground that he had allegedly filed a fraudulent unemployment claim with the Nevada Unemployment Office on August 14, 2014.  The termination letter stated that Miller's alleged fraudulent unemployment claim was a clear violation of the Tribe's written Code of Ethics and that it provided grounds for immediate termination.     Miller informed the Tribe that he had not filed the unemployment claim and that he had been the victim of identity theft.

Miller promptly filed an administrative appeal of his termination.  Three days later, Miller met with Chief Bill, Sergeant Avansino, and another officer concerning his appeal, but to no avail.  An Appeals Committee upheld his termination in October 2014.

**B**

In June 2015, Miller filed a formal charge of discrimination with the Nevada Equal Rights Commission and the U.S. Equal Employment Opportunity Commission ("EEOC"), but the EEOC concluded that, in light of the involvement of an Indian Tribe, it had no jurisdiction over the matter. *Cf. Snyder v. Navajo Nation*, 382 F.3d 892, 896–97 (9th Cir. 2004); *EEOC v. Karuk Tribe Hous. Auth.*, 260 F.3d 1071, 1082 (9th Cir. 2001).

Miller thereafter filed an administrative wrongful termination claim with the Department of the Interior, in accordance with the pre-filing requirements of the FTCA. *See* 28 U.S.C. § 2675(a).  Miller's administrative claim alleged that he had been the "victim of continuous employment harassment" by Chief Bill and Sergeant Avansino and that he consequently had filed a "workplace harassment complaint" with the Tribe.  But because he "was considered a 'problem child,'" Miller alleged, the Tribe instead terminated him on the pretextual ground that he had committed unemployment fraud.  In fact, Miller asserted, the fraudulent unemployment claim was the result of identity theft, and the Tribe therefore effectively "punished [him] for being the victim of a crime."  Miller's administrative claim also alleged that, before terminating him, the Tribe had failed to provide Miller with the sort of investigation "guaranteed to [him] by department policy and procedures." Had those procedures been followed, Miller contended, his innocence of the unemployment-fraud allegation would have been confirmed, and that "would have allowed [him] to maintain [his] employment[,] reputation and financial stability."  In support of this assertion, Miller's claim referenced a December 2015 letter from the Nevada Department of Employment, Training & Rehabilitation

("DETR") absolving him of unemployment fraud.[1]   The Department of the Interior ultimately sent Miller a letter notifying him that it had denied his claim and informing him of his right to file suit in federal court.

On February 24, 2017, Miller filed suit against the United States under the FTCA.   Alleging facts comparable to those set forth above, Miller's operative Second Amended Complaint asserted three wrongful termination causes of action under Nevada law against the United States.   The Government moved to dismiss, but before the district court ruled on the motion, Miller sought leave to file a Third Amended Complaint.   Miller premised his motion on "newly discovered facts" that he said showed that, at the time the Tribe upheld his termination, it already *knew* that he had been the victim of identity theft.   Specifically, Miller had obtained a document from DETR suggesting that on September 5, 2014—after the Tribe had terminated him but before the Appeals Committee upheld that termination— DETR had notified the Tribe that the alleged fraudulent unemployment claim was a case of identity theft.   The DETR document, which Miller attached to his proposed Third Amended Complaint, contained a brief notation stating that,

---

[1] Specifically, DETR stated in its letter that it had "determined that a person other than [Miller] appears to have obtained [his] personal identifying information and created this [unemployment] claim without [his] knowledge."   As the letter explained:

> This claim shows hallmarks of having been involved in a large identity theft ring having roots in Florida. While the person or persons who filed the claim have not been apprehended and prosecuted and therefore there is no firm proof of identity theft, the circumstances indicate that you were not involved in filing this claim and are a victim of identity theft in this instance.

on "09/05/2014," DETR "[a]dvised Reno Sparks Indian Colony that claim was hijack in ID Theft case."  In light of this additional information, Miller sought leave to assert two new causes of action—negligence and gross negligence.

The district court dismissed the Second Amended Complaint, concluding that all of the claims were barred by the discretionary function exception.  The court held that the same would be true of the additional claims contained in Miller's proposed Third Amended Complaint, and the court therefore denied his motion for leave to amend.  Because none of the other issues raised by the Government's motion to dismiss would alter these conclusions, the court declined to address them.  Miller timely appealed.

## II

All of Miller's claims in the operative Second Amended Complaint rest exclusively on the FTCA.  Miller properly invokes the FTCA, because the Tribe's Contract with the BIA specifies that, "[f]or the purpose of Federal Tort Claims Act Coverage," the Tribe and its employees "are deemed to be employees of the Federal government while performing work under this contract."  Thus, subject to the various limitations and exceptions set forth in the FTCA, the United States is liable in tort, to the same extent as a "private person," "for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission" of any tribal employee "while acting within the scope of his [or her] office or employment" in performing work under the Contract.  28 U.S.C. § 1346(b)(1); *see also id*. § 2674.

The applicable substantive rules of tort law for claims under the FTCA are supplied by "the law of the place where the act or omission occurred," *id*. § 1346(b)(1), which all

parties, and we, agree is Nevada. Two of Miller's Nevada-law claims challenge the *substance* of the termination decision. His first claim for "retaliatory discharge" falls under the rubric of Nevada's cause of action for "tortious discharge." *See D'Angelo v. Gardner*, 819 P.2d 206, 216 (Nev. 1991) ("The essence of a tortious discharge is the wrongful, *usually retaliatory*, interruption of employment by means which are deemed to be contrary to the public policy of this state." (emphasis added)). The gravamen of this claim is that Miller's "protected activity" in complaining about workplace discrimination "was a motivating factor in the adverse employment action." His second cause of action for "bad faith" wrongful termination similarly alleges that the Tribe acted in bad faith when it fired Miller "for reporting his superiors' conduct of workplace discrimination and harassment." By contrast, Miller's third cause of action, which is also for "tortious discharge" in violation of public policy, relies primarily on the theory that the *process* by which the termination decision was made was deficient.[2] Specifically, this claim alleges that, in the process leading up to Miller's termination, the Tribe denied him "his procedural rights" as set forth in the Contract and other applicable provisions.

The district court dismissed the action on the sole ground that all of Miller's claims were barred by the FTCA's discretionary function exception and that the court therefore lacked subject matter jurisdiction. *See Sabow v. United States*, 93 F.3d 1445, 1451 (9th Cir. 1996) ("Where the

---

[2] This third cause of action briefly alleges, in the alternative, that Miller's termination also tortiously violated public policy to the extent that it was motivated by retaliation. Because this alternative aspect of Miller's third claim is entirely duplicative of his first cause of action, we disregard it.

discretionary function exception to the FTCA applies, no
federal subject matter jurisdiction exists."). As applicable
here, the discretionary function exception bars liability
against the United States for any of Miller's claims that are
"based upon the exercise or performance or the failure to
exercise or perform a discretionary function or duty on the
part of" a tribal employee, "whether or not the discretion
involved be abused." 28 U.S.C. § 2680(a). The district court
held that the Tribe's "ultimate decision . . . whether to fire"
Miller was "discretionary" within the meaning of this
exception and that, because all of Miller's claims rested on
that termination, the action had to be dismissed. The district
court explicitly rejected Miller's argument that, because his
distinct procedural challenge to his termination rested on the
Tribe's failure to follow "mandatory BIA and Tribe
procedures," that challenge therefore fell outside the
discretionary function exception.

We agree with the district court that, to the extent that
Miller's claims alleged that the Tribe's decision to fire him
was retaliatory, those claims are barred by the discretionary
function exception. But the district court erred in concluding
that Miller's procedural challenge to his termination stood
on the same footing, and we therefore reverse its dismissal
of Miller's third cause of action.

**A**

We begin by addressing Miller's claims that his
termination was undertaken in retaliation for his having
complained about workplace discrimination and harassment.
In determining whether the discretionary function exception
bars these claims, we apply the two-part test set forth in
*United States v. Gaubert*, 499 U.S. 315 (1991), and *Berkovitz
v. United States*, 486 U.S. 531 (1988). Under that test, the
exception applies if (1) the act or omission on which the

claim is based "involves an element of judgment or choice"; and (2) "that judgment is of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536; *see also Gaubert*, 499 U.S. at 322–23. Applying these standards, we conclude that the discretionary function exception bars Miller's claims that the Tribe's decision to terminate him was impermissibly retaliatory.

**1**

The first element of the *Gaubert-Berkovitz* test reflects the obvious fact that, under the plain text of the statute, the "exception covers only acts that are *discretionary* in nature." *Gaubert*, 499 U.S. at 322 (emphasis added). The concept of discretion connotes a "choice" among various options, and therefore the exception cannot apply if the employee in question was "bound to act in a particular way." *Id*. at 329. Thus, if an applicable "'federal statute, regulation, or policy specifically *prescribes* a course of action,'" then the "requirement of judgment or choice is not satisfied," because "'the employee has no rightful option but to adhere to the directive.'" *Id*. at 322 (emphasis added) (quoting *Berkovitz*, 486 U.S. at 536). Similarly, if the particular option chosen by the employee is "specifically *proscribed* by applicable law," then the "discretionary function exception does not apply." *Broidy Cap. Mgmt., LLC v. State of Qatar*, 982 F.3d 582, 591 (9th Cir. 2020); *see also Nurse v. United States*, 226 F.3d 996, 1002 (9th Cir. 2000) ("In general, governmental conduct cannot be discretionary if it violates a legal mandate.").

"This court and others have held that decisions relating to the hiring, training, and supervision of employees usually involve policy *judgments* of the type Congress intended the discretionary function exception to shield." *Vickers v. United States*, 228 F.3d 944, 950 (9th Cir. 2000) (emphasis

added) (collecting cases).   Our recognition that "hiring" decisions involve the requisite element of judgment or choice necessarily means that the correlative decision to *fire* an employee is likewise one that, as a general matter, quintessentially involves a choice among options.   *See Sydnes v. United States*, 523 F.3d 1179, 1184 (10th Cir. 2008).   Given that the Tribe's termination decision would thus ordinarily be deemed discretionary, Miller had the burden to identify a "*federal* statute, regulation, or policy" that constrained the Tribe's substantive discretion in a way that precludes applying the discretionary function exception here.  *Berkovitz*, 486 U.S. at 536 (emphasis added); *see also Sydnes*, 523 F.3d at 1184.[3]  He failed to do so.

In addressing this issue, we note at the outset that Tribes are expressly excluded from coverage under the relevant laws that would preclude a private employer or a federal agency from doing what the Tribe allegedly did here.  *See*, *e.g.*, 42 U.S.C. § 2000e-3(a) (Title VII provision barring retaliation against employee for asserting discrimination claim); *id*. § 2000e(b) (excluding "an Indian tribe" and the "United States" from Title VII's definition of "employer"); *id*. § 2000e-16(a) (generally extending protection against

---

[3] As this passage from *Berkovitz* reflects, a plaintiff cannot rely on the premise that *state* law "specifically prescribes a course of action for an employee to follow," 486 U.S. at 536, except perhaps to the extent that "a *federal* policy incorporating state tort law" limits "the discretion of federal employees within the meaning of the FTCA," *Sydnes*, 523 F.3d at 1184.  Under the FTCA, state tort law is applied to the employee's conduct only *after* the federal discretionary function exception has been determined not to apply.  *See id*. (noting that a contrary approach would "put the cart before the horse").  Indeed, there would be little, if anything, left to the discretionary function exception if it could be defeated by the very state tort law sought to be applied under the FTCA.

"discrimination based on race, color, religion, sex, or national origin" to *federal* employees); *see also Ayon v. Sampson*, 547 F.2d 446, 450 (9th Cir. 1976) ("Congress incorporated the protections against retaliation in its enactment of § 2000e-16."). While the Contract states that tribal employees such as Miller are deemed employees of the Federal Government "[f]or the purpose of *Federal Tort Claims Act* Coverage" (emphasis added), Miller has not contended that the Contract makes him an employee of the Federal Government for purposes of any such antidiscrimination statute or any other federal statute. Instead, in arguing that the Tribe lacked discretion here, Miller relies only on the Contract itself, federal regulations governing such contracts, and other BIA policies.[4]

Miller's primary contention is that the Tribe denied him various *procedural* rights that were afforded by the Contract and relevant federal regulations. These procedural rights, however, are not relevant to his claims challenging the *substance* of the Tribe's choice to terminate him. The applicability of the discretionary function exception to a particular "claim" turns on what it is "based upon" and whether *that* specific wrongful action involves "a discretionary function or duty." 28 U.S.C. § 2680(a). "Although the [FTCA] contains no definition of the phrase 'based upon,' the Supreme Court has held that the phrase is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his or her theory of the case." *Broidy*, 982 F.3d at 593–94 (simplified) (addressing the comparable phrase "based upon" in the

---

[4] In his briefs in this court, Miller likewise has not contended that we should consider *tribal* law as a source of limits on the Tribe's discretion for purposes of applying the FTCA's discretionary function exception. Therefore, we do not address that question.

Foreign Sovereign Immunities Act).   Miller's first two causes of action are both based on the theory that the Tribe improperly *retaliated* against him for having complained about discrimination and harassment.   *See supra* at 10–11. Consequently, a retaliatory action is an element of these two torts as pleaded by Miller.   Thus, to defeat the discretionary function exception as to these retaliation-based claims, Miller must, *inter alia*, point to some applicable federal statute, regulation, or policy that specifically proscribes such a retaliatory action by the Tribe.   Miller's reliance on rules governing the procedure for making the termination decision does not establish such a proscription.

Miller also claims that the Tribe is subject to the BIA's "Law Enforcement Handbook" and that this Handbook contains a provision stating that "[e]mployees may not be disciplined for allegations deemed unfounded, exonerated, or not sustained, and information from these investigations may not be placed in the employee's personnel file."   But this provision does not "specifically proscribe[]" *retaliation*, *see Broidy*, 982 F.3d at 591 (emphasis omitted), which is what Miller's first two causes of action are "based upon." *See supra* at 15–16.   This provision thus fails to establish that the Tribe's retaliatory termination decision was not discretionary.   *See Sydnes*, 523 F.3d at 1184 (similarly concluding that alleged retaliatory termination of employee of civilian contractor was discretionary because the regulations that plaintiff contended limited the agency's discretion "do not purport to preclude retribution by officials").

Accordingly, we conclude that Miller's first two causes of action are "based upon" the exercise of "judgment or choice" by the Tribe and that the first element of the

*Gaubert-Berkovitz* test is met as to these claims.   *See Gaubert*, 499 U.S. at 322.

## 2

The second element of the *Gaubert-Berkovitz* test reflects a recognition that an element of judgment or choice is *not* enough to warrant application of the discretionary function exception and that the judgment involved must be "of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536.  After all, "driving requires the constant exercise of discretion," but an "official's decisions in exercising *that* discretion can hardly be said" to be the sort that the exception was intended to protect.  *Gaubert*, 499 U.S. at 325 n.7 (emphasis added). "Because the purpose of the exception is to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort," the exception, "properly construed," "protects only governmental actions and decisions *based on considerations of public policy*." *Id.* at 323 (simplified) (emphasis added).  The inquiry is an objective one: what matters is not whether the employee's "subjective intent in exercising the discretion conferred by statute or regulation" was *actually* based on policy considerations, but whether the actions taken by the employee "are *susceptible* to policy analysis." *Id.* at 325 (emphasis added); *see also Gonzalez v. United States*, 814 F.3d 1022, 1032 (9th Cir. 2016) ("[W]e examine the nature of the Government's action—or in this case, omission—and decide whether it is susceptible to policy analysis under an objective assessment." (simplified)); *Miller v. United States*, 163 F.3d 591, 593 (9th Cir. 1998) ("The decision need not be actually grounded in policy

considerations, but must be, by its nature, susceptible to a policy analysis.").

As noted earlier, we have regularly concluded that "decisions relating to the hiring, training, and supervision of employees usually involve policy judgments of the type Congress intended the discretionary function exception to shield." *Vickers*, 228 F.3d at 950; *see also Nurse*, 226 F.3d at 1001 (holding that "policy-making defendants' allegedly negligent and reckless employment, supervision and training" of customs agents "fall squarely within the discretionary function exception"). And, for purposes of this second element of the discretionary function test, we similarly perceive no basis for treating *termination* decisions differently from hiring or training decisions. As the flip side of a hiring decision, a decision to fire an employee is equally susceptible to a policy analysis. *See Sydnes*, 523 F.3d at 1185–86 ("[D]ecisions regarding employment and termination . . . are precisely the types of administrative action the discretionary function exception seeks to shield." (simplified)). Indeed, we held in *Vickers* that an allegedly negligent "*delay* in discharging" an employee was "susceptible to policy analysis." 228 F.3d at 950–51 (emphasis added). We therefore have little difficulty in concluding that the decision to terminate Miller was likewise "of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536.

Given that the Tribe's termination is thus "presumed" to be "grounded in policy," Miller's complaint could "survive a motion to dismiss" only by "alleg[ing] facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." *Gaubert*, 499 U.S. at 324–25. Citing *Franchise Tax Board of California v. Hyatt*, 407 P.3d

717 (Nev. 2017) (en banc), *rev'd on other grounds*, 139 S. Ct. 1485 (2019), Miller contends that his allegations of intentional torts and bad-faith conduct suffice to defeat the discretionary function exception because, in his view, such acts are not the product of *any* plausible policy objective. In *Hyatt*, the Nevada Supreme Court construed Nevada's state-law analog to the FTCA and adopted a construction similar to the one Miller advocates here. *See* 407 P.3d at 733. The Nevada high court is, of course, free to construe its state statute as it deems appropriate, but in several respects its reasoning does not fit the FTCA.

As an initial matter, the *Hyatt* court relied on the conclusion that the Nevada statute's discretionary function immunity "does not protect a government employee for intentional torts or bad-faith misconduct, as such misconduct, by definition *cannot be within the actor's discretion*." 407 P.3d at 733 (simplified) (emphasis added). As this quotation makes clear, Nevada's carve-out of intentional and bad-faith torts implicitly rests on the *first* element of the discretionary function test—whether there is discretion to perform the act—and then relies on *state* law to supply those limits. But under the FTCA the applicable limits on discretion must be derived from *federal* law, not state law. *See supra* note 3.

Moreover, to the extent that *Hyatt* relied on the second element of the discretionary function test in carving out intentional and bad-faith torts from Nevada's version of the FTCA, the Supreme Court's decision in *Gaubert* forecloses adopting that view in the context of the FTCA. In particular, recognizing such a carve-out based on the second element of the test would contravene *Gaubert*'s clear instruction that the "focus" of the second element "is not on the agent's subjective intent," 499 U.S. at 325, but instead requires an

*objective* inquiry.  *See also Gonzalez*, 814 F.3d at 1032; *Miller*, 163 F.3d at 593.  In addition, such a carve-out is inconsistent with *Gaubert*'s directive that the second element of the test turns on whether the challenged actions are "*the kind of conduct* that can be said to be grounded in the policy of the regulatory regime." *Gaubert*, 499 U.S. at 325 (emphasis added).  As that phrasing confirms, the inquiry is framed "at a higher level of generality" by "asking categorically (rather than case specifically) whether the kind of conduct at issue can be based on policy concerns." *Sydnes*, 523 F.3d at 1185.  Finally, any such *Hyatt*-style carve-out cannot be squared with the FTCA's express instruction that the discretionary function exception applies "whether or not the discretion involved *be abused*." 28 U.S.C. § 2680(a) (emphasis added).  Accordingly, there is no categorical carve-out, at the second step of the test, for "bad faith" or "intentional" torts.[5]

---

[5] Miller also points to *Hyatt*'s assertion that some federal courts have adopted a categorical exclusion.  *See* 407 P.3d at 731.  We disagree with *Hyatt*'s reading of the cited cases.  *See Coulthurst v. United States*, 214 F.3d 106, 110–11 (2d Cir. 2000) (discussing some of the circumstances in which an FTCA claim "involves negligence unrelated to any plausible policy objectives"); *Palay v. United States*, 349 F.3d 418, 431–32 (7th Cir. 2003) (discussing *Coulthurst*'s analysis of "types of negligence"); *id*. at 428 (confirming that "applicability of the exception depends not on the intent of the government actor 'but on the nature of the actions taken and on whether they are susceptible to policy analysis'" (quoting *Gaubert*, 499 U.S. at 325)); *Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 475–76 (2d Cir. 2006) (relying on *Coulthurst* to conclude that a "negligent guard" theory was not barred by discretionary function exception).  None pertained to *intentional* torts, so they are not instructive here.

Because both elements of the *Gaubert-Berkovitz* test are satisfied, the discretionary function test bars Miller's two retaliation-based wrongful termination claims.

## B

We next address whether the discretionary function exception also bars Miller's third cause of action, which alleges that his termination was wrongful because it was the result of a process that did not adhere to the procedural requirements of the Contract and other relevant provisions. As with Miller's prior claims, we answer this question by first identifying what acts or omissions this claim is "based upon" and then determining whether those actions reflect the performance of a "discretionary function or duty" under the same two-part *Gaubert-Berkovitz* test. 28 U.S.C. § 2680(a).

Miller's third cause of action asserts a claim for "tortious discharge" under Nevada law, which requires the plaintiff to plead and prove, *inter alia*, that the defendant engaged in a "wrongful, usually retaliatory, interruption of employment by *means* which are deemed to be contrary to the public policy of this state." *D'Angelo*, 819 P.2d at 216 (emphasis added). The violation of "public policy" that forms the basis of Miller's third claim is the Tribe's failure to comply with the procedural requirements that were applicable under the Contract and other rules and policies.[6] In contrast to the first two claims, Miller's third cause of action thus does *not* rest

---

[6] In moving to dismiss, the Government argued that Nevada law would not recognize a "tortious discharge" cause of action based on these alleged procedural deficiencies. The district court found it unnecessary to address this issue and instead assumed *arguendo* that Miller's third cause of action states a claim under Nevada law. *See supra* at 10. We make the same assumption for purposes of this appeal and therefore express no view on that question.

on the assertion that the Tribe engaged in retaliation.  Rather, the violation-of-public-policy element of the tort rests on the Tribe's alleged violation of *procedural* rules during the process leading up to his termination.  Because these procedural violations are the actions that satisfy the wrongfulness element of this claim, they are what that claim is "based upon" for purposes of the FTCA.  *Broidy*, 982 F.3d at 593–94.

The question, then, is whether the procedural violations that Miller alleges here involve the performance of a discretionary function or duty under the FTCA.  We addressed comparable questions in *Sabow*, 93 F.3d at 1451–54, and in *Vickers*, 228 F.3d at 951–53, and we reached different conclusions in light of the distinct claims and records before us in each case.  Applying the reasoning of these cases to Miller's third cause of action, we conclude that the discretionary function exception does not apply.

In *Sabow*, the plaintiffs asserted a claim under the FTCA for negligent infliction of emotional distress based on the alleged failure of Navy officials "to follow specific investigative regulations and directives" applicable to the investigation of the death of one of plaintiffs' relatives, who was a Marine Corps Colonel.  93 F.3d at 1450–51.  Applying the two-step *Gaubert-Berkovitz* test, we held that this aspect of the claim was barred by the discretionary function exception because (1) none of the cited regulations and manuals imposed "mandatory" directives with respect to the challenged aspects of the investigation; and (2) the "discretionary judgments" at issue "involved social, economic, or political considerations."  *Id*. at 1453–54.

In *Vickers*, plaintiff Miriam Vickers sued the United States after her ex-husband, an Immigration and Naturalization Service ("INS") employee named Akanni

Kendalla, shot her with his INS-issued firearm after a domestic argument. 228 F.3d at 946–48. Among other things, Vickers alleged that the INS had been negligent "in failing to investigate" an earlier alleged incident in which Kendalla had used his INS-issued revolver to shoot at a former girlfriend.[7] *Id*. at 947–48 & n.3. As a result, Vickers alleged, Kendalla "was in possession of the gun he used to shoot her, a gun he otherwise would not, and should not, have had." *Id*. at 947. In holding that the discretionary function exception did not bar this claim, we distinguished *Sabow*, which we described as "recogniz[ing] that the discretionary function exception protects agency decisions concerning the scope and manner in which it conducts an investigation *so long as the agency does not violate a mandatory directive*." *Id*. at 951 (emphasis added). Reviewing the relevant regulations and administrative manual in *Vickers*, we concluded that they imposed a mandatory duty to conduct *some* investigation of "misuse of Service-issued firearms." *Id*. at 953. Because the decision not to investigate the earlier shooting incident "was not a matter of judgment or choice," the INS's effort to invoke the discretionary function exception failed at the first step. *Id*.; *see also Bailey ex rel. Estate of Bailey v. United States*, 623 F.3d 855, 860 (9th Cir. 2010) ("An agency does not retain discretion whether to act where a statute or policy directs *mandatory and specific action* and the agency has no lawful option but to adhere to the directive." (emphasis added)).

---

[7] Vickers also asserted a separate claim that the INS had negligently delayed its termination of Kendalla, but (as noted earlier, *see supra* at 18) we held that the discretionary function exception barred that particular claim. *Vickers*, 228 F.3d at 949–51.

24                MILLER V. UNITED STATES

In applying the standards set forth in *Sabow* and *Vickers*, we must first identify the relevant federal regulations and policy documents that constrain the Tribe's behavior and then determine whether they contain mandatory requirements that the Tribe allegedly breached in its handling of Miller's employment situation.  Given that, under the Contract between the Tribe and the BIA, the Federal Government is absorbing (within the limits of the FTCA) the Tribe's liability for tribal employees' relevant actions, it is hardly surprising that the Contract contains a number of provisions governing the procedures to be used to investigate potential misconduct.  For example, the Contract broadly states that all law-enforcement services must be conducted in accordance with, *inter alia*, the "procedures and guidelines contained in . . . 25 CFR," *i.e.*, the rules contained in Title 25 of the Code of Federal Regulations. *See also* 25 C.F.R. § 12.11 (stating that regulations contained in Part 12 of the C.F.R. apply to any "tribal law enforcement program receiving Federal funding").  In addition to meeting the various requirements set forth in those federal regulations, the Tribe's law-enforcement program must also meet the "minimal qualitative standards and procedures specified in," *inter alia*, the BIA's "Law Enforcement Handbook."  *See* 25 C.F.R. § 12.14.  In addition, the Contract provides that the Tribe shall "adhere" to any applicable "general requirements of tribal personnel systems and policies prior to taking any adverse action against contract employees."  If the Tribe does not have established policies and procedures concerning the handling and investigation of "citizen complaints" and the taking of "adverse action" against tribal law-enforcement personnel, then the Contract sets forth certain default provisions that must be followed in that regard.

These various regulations and policy documents contain several requirements that are pertinent here.  First, § 12.53 of the applicable regulations describes the BIA's "internal affairs program," which "investigates all allegations of misconduct by . . . any officer receiving funding and/or authority from the BIA." 25 C.F.R. § 12.53.  To ensure that the BIA's internal affairs unit will be able to undertake this task, § 12.53 specifically provides that "[a]ny person having knowledge of officer misconduct *must* report that information to the officer's supervisor," who then "*must* immediately report allegations to the internal affairs unit." *Id*. (emphasis added).  The Handbook, in turn, further describes the procedures applicable to the BIA internal affairs unit, which the Handbook states "is now known as the Professional Standards Division—(PSD)."  The Handbook reiterates that tribal Chiefs of Police and supervisors "are required to report all allegations of misconduct . . . to PSD within 24 hours of occurrence."  Upon receipt of such a report, PSD will review the allegations and decide either to investigate the allegations itself or to refer it elsewhere.  The Handbook also sets forth various procedural rights that an employee has during such an investigation and affirms that "PSD investigations will be objective, fair, and thorough."

Miller's operative complaint sets forth these procedural protections, among others, and specifically alleges that the Tribe failed to comply with them in connection with its investigation of whether Miller had committed unemployment fraud.  Given the mandatory reporting requirements set forth explicitly in 25 C.F.R. § 12.53 and the Handbook, the Tribe's "failure to report" the fraud allegation against Miller to the PSD "constituted a failure to follow the *mandatory* requirements proscribed by agency regulations as implemented by policy guidelines" in the Handbook.  *Vickers*, 228 F.3d at 953 (emphasis added).  Moreover, the

failure to notify the PSD is sufficiently causally related to the ultimate termination decision because that omission allowed the Tribe to escape the BIA's oversight, thereby enabling the Tribe (according to the complaint) to conduct a sham investigation and to fire Miller on the invalid and pretextual ground that he had committed unemployment fraud. *Cf. Dichter-Mad Fam. Partners, LLP v. United States*, 709 F.3d 749, 751 (9th Cir. 2013) (affirming dismissal of FTCA claim where "[t]hose policies that are arguably mandatory lack the causal relationship to the plaintiffs' alleged injuries required to establish jurisdiction, even under a generous reading of the complaint").

Accordingly, under *Vickers*, the first element of the *Gaubert-Berkovitz* test is not met as to this claim, and "the FTCA's discretionary function exception does not apply." 228 F.3d at 953. We therefore "need not proceed to the second part of the FTCA test and determine whether that judgment or choice was of the type Congress intended" to protect. *Id*. As a result, the district court erred in concluding that Miller's third cause of action was barred by the discretionary function exception.

**III**

In denying Miller's motion for leave to file a Third Amended Complaint, the district court relied solely on the ground that the discretionary function exception barred all of the claims asserted in that proposed complaint. We hold that the district court erred in concluding that the discretionary function exception barred the two additional claims Miller sought to raise in that complaint.

In addition to reasserting the three claims that we have already discussed,[8] Miller's proposed Third Amended Complaint included two new claims alleging, respectively, that the Tribe was negligent and grossly negligent in terminating him.  The gravamen of these two new claims was Miller's allegation, based on the DETR document discussed earlier, that the Tribe terminated him "despite being informed and having knowledge" that Miller had been "the victim of identity theft and had not filed" the fraudulent unemployment claim.  We agree with Miller that, because the BIA Handbook mandated that tribal employees could "not be disciplined for allegations deemed unfounded, exonerated, or not sustained," the Tribe lacked discretion to fire him on grounds that it *knew* to be false and unsubstantiated.  Because these claims rest on "a failure to follow the mandatory requirements" prescribed in the BIA Handbook, the first element of the *Gaubert-Berkovitz* test is not met and the discretionary function exception does not apply.  *Vickers*, 228 F.3d at 953.  The district court therefore erred in concluding that the discretionary function exception provided sufficient grounds to deny leave to amend to assert these two new claims.[9]

\*          \*          \*

For the foregoing reasons, the judgment of the district court is affirmed to the extent that it dismissed the retaliation-based causes of action in Miller's Second

---

[8] The Third Amended Complaint added some additional allegations to these original three claims, but those amendments do not affect our earlier analysis.

[9] As with the earlier claims, we express no view as to whether these two new claims state a cause of action under the applicable Nevada law. *See supra* note 6.

Amended Complaint (*i.e.*, the first and second causes of action).  We reverse the judgment to the extent that the district court relied on the discretionary function exception in (1) dismissing the third cause of action in the Second Amended Complaint and (2) denying leave to amend to assert the two new claims in Miller's proposed Third Amended Complaint.  The matter is remanded for further proceedings.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**