Scott W. Souers, Esq., NV Bar No.13405
ALLING & JILLSON, LTD.
Post Office Box 3390
Lake Tahoe, NV 89449-3390
Ph. (775) 588-6676 ✦ Fx. (775) 588-4970
ssouers@ajattorneys.com
Attorneys for Plaintiff

Alling & Jillson, Ltd.
Post Office Box 3390 ◊ 276 Kingsbury Grade
Lake Tahoe, Nevada 89449
PH (775) 588-6676 ◊ FX (775)588-4970

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

JOHN MILLER,

                Plaintiff(s),

vs.

UNITED STATES OF AMERICA, and
DOES 1-25,

                Defendant.

Case No. 3:17-CV-00121-MMD-WGC

**THIRD AMENDED COMPLAINT**

Plaintiff JOHN MILLER alleges:

### JURISDICTION AND PARTIES

1.     This action arises under the Federal Tort Claims Act, Sections 2671 through 2680 of Title 28 of the United States Code (28 U.S.C.A.§§ 2671-2680). This Court is vested with jurisdiction pursuant to Section 1346(b) of Title 28 of the United States Code (28 U.S.C.A. § 1346(b)).

2.     Plaintiff JOHN MILLER ("MILLER") resides in Reno, Nevada, which is within the Northern District of the State of Nevada. The acts and omissions that form the basis of this lawsuit occurred in Washoe County, State of Nevada, which is within the District of Nevada.

3.     The Bureau of Indian Affairs in the Department of Interior ("BIA") is the interested agency of Defendant United States of America ("DEFENDANT").

4.     The true names and capacities, whether individual, corporate, associate, or otherwise of Defendant Does 1 through 25, are unknown to Plaintiff. Plaintiff sues these Defendants by those fictitious names and requests permission to amend this Third Amended Complaint to show the true

1   names and capacities of these Defendants when they are ascertained. Plaintiff further alleges that

2   the Defendants described as Does 1 through 25 are negligently, intentionally, or in some other

3   manner are directly and proximately responsible for the damages alleged in this Third Amended

4   Complaint, together with the named Defendants.

5                              **GENERAL ALLEGATIONS**

6          5.     MILLER is informed and believes, and based on that information and belief alleges,

7   that at all times mentioned herein, DEFENDANT employed the law enforcement personnel and

8   administration of the Reno Sparks Indian Colony (the "Tribe"), including without limitation

9   MILLER, for purposes of receiving protection under the Federal Tort Claims Act; DEFENDANT

10   and MILLER were at all times mentioned herein acting within the scope of DEFENDANT's

11   employment.

12          6.     MILLER was a law enforcement officer employed by the Tribe from on or about

13   June 27, 2013, until he was terminated on or about August 22, 2014.

14          7.     The Tribe's letter offering employment states that MILLER would undergo a new

15   hire introductory period of ninety (90) days, and upon successful completion of the probationary

16   period he would be reclassified as a regular, full-time, non-exempt employee.

17          8.     MILLER successfully completed his ninety (90) day introductory probationary period

18   and was accordingly reclassified as a regular, full-time, non-exempt employee.

19          9.     As a regular, full-time, non-exempt employee, MILLER had established contractual

20   rights of continued employment with the Tribe.

21                    Public Law 93-638 Self Determination Contract

22          10.    On or about March 3, 2005, DEFENDANT entered into a P.L. 93-638 self-

23   determination contract (the "Contract") with the Tribe in which, among other terms, DEFENDANT

24   agreed to provide monies to the Tribe for law enforcement personnel and administration and

25   investigative services, and to monitor the Tribe's use of said monies in accordance with the

26   Contract's terms and applicable law. *See* **Exhibit 1**, *P.L. 93-638* Contract, at pp.12, 31.

27          11.    The Contract was ratified by the Tribe and the BIA on a multi-year basis, and at all

28

*Alling & Jillson, Ltd.*
Post Office Box 3390 ◊ 276 Kingsbury Grade
Lake Tahoe, Nevada 89449
PH (775) 588-6676 ◊ FX (775) 588-4970

times relevant to this Third Amended Complaint, remains in full force and effect.

12.     Section F.6(1) of the Contract states: "For the purpose of Federal Tort Claims Act Coverage, the Contractor (Tribe) and its employees . . . are deemed to be employees of the Federal government while performing work under this contract." *Id.*, at pp.46-47.

13.     MILLER was not a federal employee, but for the purpose of receiving protection under the Federal Tort Claims Act in carrying out his employment with the Tribe, the Contract provides that DEFENDANT is the employer of the Tribe and the Tribe's employees, including without limitation MILLER, and the Contract charges DEFENDANT with monitoring the Tribe's employment actions to ensure compliance with all laws and Contract terms.

14.     Section C.2(2)(j)(v) of the Contract states: "The Contractor shall adhere to the general requirements of tribal personnel systems and policies prior to taking any adverse action against contract employees. If the tribal personnel system does not contain provisions for adverse actions, the following (1. through 6.) shall be followed." Subsection (3) requires that the Contractor set a hearing date not less than fifteen days after the employee has been given a written statement of allegations; subsection (4) requires that the Contractor provide the employee and the employee's counsel at the hearing with an opportunity to confront each adverse witness; subsection (5) requires that the Contractor provide the employee and the employee's counsel at the hearing with an opportunity to delineate issues, to present factual contentions in an orderly manner and to generally protect the employee's interest; subsection (6) requires that the Contractor reconsider the decision to take the adverse action based solely on evidence given at a hearing and provide the employee at the time the decision is announced with a written statement of the reasons for the decision and the evidence relied upon in reaching the decision. *Id.*, at pp. 19-20.

BIA Office of Justice Services Law Enforcement Handbook

15.     BIA Office of Justice Services Law Enforcement Handbook, Rules and Procedures (the "BIA Handbook") § 4-48-01(D) provides that "*[b]ecause of the potential liability associated with BIA, P.L. 93-638 contracted programs and Tribal programs receiving federal funding*, the

Alling & Jillson, Ltd.
Post Office Box 3390 ◊ 276 Kingsbury Grade
Lake Tahoe, Nevada 89449
PH (775) 588-6676 ◊ FX (775) 588-4970

1  Office of Justice Services (OJS) has an obligation to provide for audits and inspections of the

2  programs it operates and funds." (Emphasis added).

3      16.    BIA Handbook § 4-48-01 (E) provides, "[s]pecial agents assigned to the PSD

4  [professional standards division] will investigate without bias all allegations of misconduct assigned

5  to them. Agents will conduct fair, objective, and impartial investigations and audits . . ." Subsection

6  H provides that "PSD will investigate all allegations of misconduct and perform audits of 638

7  contract programs in accordance with 25 CFR part 12."

8      17.    25 CFR part 12.53 requires that "[t]he Deputy Bureau Director, OJS maintains an

9  internal affairs component that investigates all allegations of misconduct by BIA officers, and any

10  officer receiving funding and/or authority from the BIA. All allegations of misconduct must be

11  thoroughly investigated and appropriate actions taken when warranted. Any person having

12  knowledge of officer misconduct must report that information to the officer's supervisor." *See*

13  **Exhibit 2**, BIA Office of Justice Services Law Enforcement Handbook, Rules and Procedures, at

14  § 4-48-01(D).

15      18.    BIA Handbook § 4-48-05, "Employee Rights During an Internal Investigation"

16  provides that District SAC's, Chiefs of Police and supervisors are required to report all allegations

17  of misconduct as defined above to PSD within 24 hours of occurrence. PSD will review all

18  allegations to determine the appropriate classification and will investigate or refer allegations

19  accordingly." *Id.*, at § 4-48-05.

20      19.    BIA Handbook § 4-48-05 requires that "[p]rior to an interview or special

21  examination, the PSD supervisor will provide the employee under investigation with confidential

22  written notification of the allegation. This notification will include a copy of the original complaint

23  or a summary adequately listing the relevant facts, and the employee's rights and responsibilities

24  during the investigation." *Id.*, at § 4-48-05.

25      20.    BIA Handbook § 4-48-06 "Investigation" states that "[t]he objective of the

26  investigation is to determine the truth. PSD investigations will be objective, fair, and thorough."

27

28

Alling & Jillson, Ltd.
Post Office Box 3390 ◊ 276 Kingsbury Grade
Lake Tahoe, Nevada 89449
PH (775) 588-6676 ◊ FX (775)588-4970

Subsection D provides that "[i]nvestigators will conduct an interview with the accused employee. An accused employee has the right . . . to be accompanied by an attorney, union representative, supervisor or other personal representative during any interview concerning allegations of misconduct." *Id.*, at § 4-48-06.

21.     BIA Handbook § 4-48-09 "Conclusion of Internal Affairs Investigations" mandates that "[a]fter a thorough, impartial investigation of a particular misconduct allegation has been completed, the responsible investigator will review all the evidence and circumstances and reach one of the five following conclusions: (1) Unfounded . . . (2) Exonerated . . . (3) Not sustained . . . (4) Sustained . . . (5) Policy or Training Failure . . ." *Id.*, at § 4-48-09.

22.     On or around September 28, 2011, the Tribe's Council implemented the BIA Handbook as the policies and procedures for the Tribe's Police Department. *See* **Exhibit 3**, Tribe Council Meeting Minutes, at 3-4.

Tribe Employee Handbook

23.     MILLER received and signed an employee handbook from the Tribe ("Tribe Employee Handbook") on or about June 27, 2013.[1]

24.     Tribe Employee Handbook § 164.902 describes the appeals process that Tribe employees must follow if the Tribe subjected them to disciplinary action. *See* **Exhibit 4**, Reno-Sparks Indian Colony, Human Resources Policies and Procedures, Policy Number 164.902.

25.     The Tribe Employee Handbook did not provide employees with rights required by the Contract, including, but not limited to: right to a hearing date set within 15 days of the allegation; the opportunity to confront witnesses and present factual contentions at a hearing with counsel present; and the requirement that the Tribe reconsider its decision to take adverse action.

26.     The Tribe Employee Handbook did not provide employees with rights required by the BIA Handbook, including, but not limited to: the requirement that a special agent be assigned

---

[1] The Tribe has revised its employee handbook since terminating MILLER. References to the "Tribe Employee Handbook" relates to the handbook in effect during MILLER's employment with the Tribe.

Third Amended Complaint

Alling & Jillson, Ltd.
Post Office Box 3390 ◊ 276 Kingsbury Grade
Lake Tahoe, Nevada 89449
PH (775) 588-6676 ◊ FX (775) 588-4970

1   to investigate the allegation of misconduct; the requirement that a fair, objective, and thorough

2   investigation be conducted; the requirement that the Chief of Police report the allegation of

3   misconduct to PSD within 24 hours; the right to provide the employee under investigation with

4   confidential, written, notification of the allegation including a copy of the original complaint or a

5   summary listing all relevant facts and the employee's rights and responsibilities prior to interviewing

6   the employee.

7       27.     The Tribe Employee Handbook merely referenced a two-step appeals process in

8   which the employee could appeal the disciplinary action by filing an appeal with the employee's

9   supervisor, and if the employee wished to pursue their appeal after meeting with the supervisor, the

10  employee could present a written request to the Appeals Chairperson to empanel an Appeals

11  Committee, who could decide whether to interview the employee before approving or disapproving

12  the disciplinary action.

13      28.     Section 164.209(c) of the Tribe Employee Handbook states that "the Appeals

14  Committee's task is hear the appeals and insure that both parties have equal opportunity to present

15  their case consistent with this policy." *Id.*

16      29.     Section 164.209 (C)(5) of the Tribe Employee Handbook states that "the Appeals

17  Committee will review documentation and if deemed necessary interview [the] employee, supervisor

18  or other interested witnesses and/or subject matter experts." *Id.*

19                          MILLER'S Termination

20      30.     On or around August 25, 2014, DEFENDANT, as the Tribe's employer for Federal

21  Tort Claim purposes, mailed a letter to MILLER declaring that he was terminated for cause because

22  he had allegedly reported a fraudulent unemployment claim to the State of Nevada Unemployment

23  Office on August 14, 2014.

24      31.     The termination letter stated that MILLER's fraudulent unemployment claim was a

25  "clear violation" of the Tribe's Human Resources Policy §164-202, Code of Ethics, and grounds for

26  immediate termination pursuant to RSIC Human Resources Policy §164.901, Disciplinary Actions.

27

28                          Page 6 of 19

                          Third Amended Complaint

Alling & Jillson, Ltd.
Post Office Box 3390 ◊ 276 Kingsbury Grade
Lake Tahoe, Nevada 89449
PH (775) 588-6676 ◊ FX (775)588-4970

1   See **Exhibit 4**, RSIC Letter to Plaintiff.

2   32.    MILLER was the victim of identity theft and had not filed an unemployment claim.

3   33.    MILLER informed DEFENDANT, through the Tribe, that he had not filed the

4   unemployment claim and invoked his rights to defend himself against the allegation to demonstrate

5   his innocence and keep his job.

6   34.    DEFENDANT and the Tribe failed to follow the disciplinary processes mandated by

7   the Contract, the BIA Handbook, and the Tribe Employee Handbook prior to terminating MILLER.

8   35.    DEFENDANT and the Tribe immediately terminated MILLER without placing him

9   on administrative leave, without investigating the allegation or interviewing him, and without

10  holding a hearing at which he could cross-examine witnesses and provide his own evidence with the

11  assistance of counsel.

12  36.    On or about September 2, 2014, MILLER appealed the termination to DEFENDANT,

13  through the Tribe, and cited § 164.901 of the Tribe Employee Manual.[2] MILLER's appeal requested

14  that he be reinstated. *See* **Exhibit 6**, MILLER's Appeal of Termination.

15  37.    On September 5, 2014, the Nevada Department of Employment, Training and

16  Rehabilitation ("DETR") informed DEFENDANT, through the Tribe, that MILLER was a victim

17  of identity theft and the unemployment claim allegedly filed by MILLER was part of an identity

18  theft case. *See* **Exhibit 7**, DETR Notes Search.

19  38.    From September 5, 2014, DEFENDANT and the Tribe were informed and knew, or

20  should have known, that MILLER was the victim of identity theft and had not filed an

21  unemployment claim with the state of Nevada.

22  39.    On September 5, 2014, MILLER met with Chief Bill, Sergeant Avansino, and

23

24  [2]Section 164.901 of The Revised Tribe Employee Handbook provides employees with an opportunity to relate their
25  version of an incident and provide an explanation or justification to the supervisor *before* being subjected to any
    disciplinary action. Section 164.901 also provides that employees who commit flagrant misconduct or prohibited conduct
26  may be suspended from one to ten days at the time of the incident pending a management investigation and review of
    the matter; employees who are cleared of such charges shall be reinstated with full back pay and with no loss of benefits
    or seniority.

27

28  Page 7 of 19

Alling & Jillson, Ltd.
Post Office Box 3390 ◊ 276 Kingsbury Grade
Lake Tahoe, Nevada 89449
PH (775) 588-6676 ◊ FX (775) 588-4970

1   Sergeant Zuniga in response to MILLER's appeal of his termination.

2       40.     Sergeant Avansino drafted an "Appeals Meeting Summary", which concludes by

3   stating that "Chief Bill explained to MILLER he was free to contact H.R. to continue with his

4   Appeal." *See* **Exhibit 8**, Appeals Meeting Summary.

5       41.     On or around September 11, 2014, MILLER requested that DEFENDANT, through

6   the Tribe, empanel an Appeals Committee pursuant to the Tribe Employee Handbook § 164.902.

7   *See* **Exhibit 9**, Appeals Committee Request.

8       42.     MILLER's request for an Appeals Committee cited to the Tribe Employee

9   Handbook and argued that DEFENDANT and the Tribe had violated various procedural

10  requirements prior to terming him, and wrongfully held him to a standard of guilty until proven

11  innocent. *See* **Exhibits 6 and 9.**

12      43.     After receiving MILLER's Request for an Appeals Committee, DEFENDANT,

13  through the Tribe, continued to violate the BIA Handbook's procedural requirements, including

14  without limitation the requirement of interviewing the accused employee prior to termination.

15      44.     On October 2, 2014, DEFENDANT, through the Tribe, issued a letter to MILLER

16  ("Appeals Committee Letter") stating the Tribe reviewed various documents, including the BIA

17  Office of Justice Services Law Enforcement Handbook, § 4-48.6, which requires the Tribe to

18  interview the accused employee prior to termination; DEFENDANT and the Tribe failed to

19  interview MILLER before terminating him. *See* **Exhibit 10**, Appeals Committee Letter.

20      45.     The Appeals Committee Letter informed MILLER that the Appeals Committee was

21  upholding the termination, and that the decision was final and binding. Id.

22      46.     Despite having information and knowledge since September 5, 2014, that MILLER

23  was the victim of identity theft and had not filed the unemployment claim, on October 2, 2014,

24  DEFENDANT, through the Tribe, upheld MILLER's termination and did not provide MILLER any

25  further rights or opportunities to challenge his termination. *Id.*

26      47.     On or about December 17, 2015, DETR issued a letter reaffirming that it had

27

28

Third Amended Complaint

Alling & Jillson, Ltd.
Post Office Box 3390 ◊ 276 Kingsbury Grade
Lake Tahoe, Nevada 89449
PH (775) 588-6676 ◊ FX (775)588-4970

1 determined a person other than MILLER appeared to have obtained MILLER's identifying

2 information and created the unemployment claim without MILLER's knowledge. *See* **Exhibit 11**,

3 DETR Letter.

4     48.    MILLER is informed and believes that DEFENDANT and the Tribe's actions in

5 terminating him were illegal and malicious since DEFENDANT and the Tribe had known, or should

6 have known, since September 5, 2014, that MILLER was the victim of identity theft and the Tribe

7 used the occurrence of the fraudulent unemployment claim as grounds to terminate MILLER while

8 denying MILLER his rights under the Contract and BIA Handbook.

9     49.    DEFENDANT'S conduct complained of herein violates various sections of the

10 Contract and BIA Handbook since DEFENDANT and the Tribe denied MILLER his rights provided

11 in the Contract and BIA Handbook in the course of terminating him.

12     50.    Prior to and during the course of DEFENDANT's terminating Miller for being the

13 victim of identity theft, DEFENDANT was charged with carrying out Section C.2(2)(j)(v) of the

14 Contract, sections 4-48-01(D), (E), (H), 4-48-05, 4-48-06 and 4-48-09 of the BIA Handbook, and 25

15 CFR part 12.53, which DEFENDANT failed to carry out.

16     51.    DEFENDANT's wrongful conduct falls within the scope of MILLER's employment

17 since the Contract and BIA Handbook specifically addressed the process of employee disciplinary

18 action and charged DEFENDANT with ensuring MILLER was provided with express due process

19 employment rights prior to terminating MILLER, which were designed to protect against wrongful

20 termination.

21 Federal Tort Claim

22     52.    On or around May 2, 2016, MILLER filed a Federal Tort Claim against the Tribe and

23 the Department of the Interior alleging wrongful termination. *See* **Exhibit 12**, Plaintiff's Federal Tort

24 Claim.

25     53.    On or about September 8, 2016, the United States Department of the Interior issued

26 a letter to MILLER informing him of his right to file suit in the United States District Court. *See*

27

28

Third Amended Complaint

Alling & Jillson, Ltd.
Post Office Box 3390 ◊ 276 Kingsbury Grade
Lake Tahoe, Nevada 89449
PH (775) 588.6676 ◊ FX (775) 588.4970

1    **Exhibit 13**, United States Department of Interior Letter to Plaintiff Informing of Right to Sue.

2    54.    Plaintiff filed his Complaint with this Court on February 24, 2017.

3    **I.    FIRST CAUSE OF ACTION FOR WRONGFUL TERMINATION / TORTIOUS DISCHARGE UNDER THE FEDERAL TORT CLAIMS ACT**

4

5    55.    MILLER realleges and incorporates by reference all preceding and succeeding paragraphs as if set forth in full.

6

7    56.    The element for wrongful termination / tortious discharge in Nevada is: (1) employer improperly dismissed employee for reasons that violate public policy. *Wayment v. Holmes*, 112 Nev.

8    232, 912 P.2d 816 (1996).

9

10    57.    Claims for tortious discharge derive from "outrageous" conduct that violates public policy. *State v. Eighth Judicial Dist. Court*, 42 P.3d 233, 240 (Nev. 2002); *D'Angelo*, 819 P.2d at

11    212.

12

13    58.    "It is precisely in such cases, i.e., where no comprehensive statutory remedy exists, that courts have been willing to create public policy tort liability." *D'Angelo*, 819 P.2d at 218, citing

14    *Wehr v. Burroughs Corp.*, 438 F. Supp. 1052, 1055 (E.D. Pa. 1977), aff'd, 619 F. 2d 276 (3d Cir.

15    1980).

16    Public Policy Requires Government Employers Not Knowingly Violate Employment Due Process Provisions Expressed in Contracts, Statutes and Employee Handbooks Prior to and in the Course of Terminating Employees for Bad Cause.

17

18

19    59.    Contracts, statutes and employee handbooks guarantee employment due process rights to employees, which employees must rely on to defend themselves when facing wrongful

20    employment discipline or termination.

21

22    60.    Public policy prohibits employers who intend to discharge employees for illegitimate reasons from bypassing contractual and statutory due process requirements – in this case specifically

23    referenced in the Contract, BIA Handbook, Tribe Employee Handbook and 25 CFR § 12.53.

24

25    61.    It is against strong and compelling public policy for a government employer to terminate an employee after knowingly violating due process requirements expressly provided in

26

27

28    Page 10 of 19

─────────────────────────

Third Amended Complaint

Alling & Jillson, Ltd.
Post Office Box 3390 ◊ 276 Kingsbury Grade
Lake Tahoe, Nevada 89449
PH (775) 588-6676 ◊ FX (775) 588-4970

1   contracts, statutes and employee handbooks; such practice is inconsistent with and not supportive

2   of the public good since contracts, statutes and employee handbooks often provide employees with

3   their only protection against their employer's wrongful disciplinary or terminating acts.

4   62.   Knowingly violating an employee's employment due process rights particularly

5   offends public policy when a government employer, such as DEFENDANT knows, or should know,

6   that an employee has not violated any term of employment, yet intentionally denies the employee due

7   process rights to prevent disclosure of the employer's knowledge that the employee is innocent.

8   63.   As of September 5, 2014, DEFENDANT, through the Tribe, knew or should have

9   known that MILLER was the victim of identity theft and had not filed the unemployment claim, and

10   DEFENDANT intentionally denied MILLER his employment due process rights provided in the

11   Contract, BIA Handbook and federal statute to terminate him without providing MILLER the

12   opportunity to demonstrate his innocence or establish that DEFENDANT knew he had not filed the

13   claim.

14   64.   MILLER insisted he was innocent and diligently sought to invoke his rights under the

15   Contract, BIA Handbook, Tribe Employee Handbook, and federal statute, which DEFENDANT

16   denied, preventing MILLER the opportunity to demonstrate his innocence or establish that it knew

17   he had not filed the claim.

18   65.   Despite having knowledge that MILLER had not filed the unemployment claim,

19   DEFENDANT illegally denied MILLER his employment due process rights as provided by the

20   Contract, BIA Handbook, Tribe Employee Handbook and federal statute.

21   66.   MILLER informed DEFENDANT, through the Tribe, of its failure to provide him

22   with his employment due process rights on several occasions, but DEFENDANT illegally continued

23   to refuse to provide MILLER his due process rights.

24   67.   On September 5, 2014, DEFENDANT, through the Tribe, knew or should have known

25   MILLER had not filed an unemployment claim and a reasonable investigation, as promised by the

26   Contract, BIA Handbook, Tribe Employee Handbook and federal statute would have demonstrated

27

28

Third Amended Complaint

Alling & Jillson, Ltd.
Post Office Box 3390 ◊ 276 Kingsbury Grade
Lake Tahoe, Nevada 89449
PH (775) 588-6676 ◊ FX (775) 588-4970

1  that MILLER had not filed the claim, or that DEFENDANT already knew he had not filed the claim,

2  and that DEFENDANT had wrongfully terminated MILLER in violation of his employment due

3  process rights.

4       68.    DEFENDANT, through the Tribe, illegally failed and refused to enforce MILLER's

5  employment due process rights expressed in the Contract, BIA Handbook, Tribe Employee

6  Handbook and federal statute to hide its knowledge that MILLER was the victim of identity theft.

7       69.    It is against sound public policy and the common good for a government employer

8  to illegally disregard employment due process rights imposed by the employer's own contracts and

9  handbooks before terminating an employee to claim it did not have knowledge of an employee's

10  innocence.

11       70.    By terminating MILLER after refusing to follow the employment due process rights

12  provided in the Contract, BIA Handbook, Tribe Employee Handbook, and federal statute,

13  DEFENDANT violated public policy; DEFENDANT knowingly ignored its own employment

14  disciplinary procedures to terminated MILLER and claim it was not informed that MILLER was in

15  fact the victim of identity theft and had not filed the unemployment claim.

16       71.    MILLER has suffered damages as a result of the wrongful termination, in an amount

17  to be determined at trial, explained in detail in Section IV below.

18           Public Policy Requires Employers Not Terminate Employees for being Victims of
         Crime.

19

20       72.    Sound public policy and the public good require that employers, particularly

21  government employers, not discipline or terminate their employees for being victims of crime.

22       73.    It is a violation of public policy for an employer, particularly a government employer,

23  to accuse an employee of committing a crime, and terminate the employee based on committing an

24  alleged crime, when the employer is informed and knows, or should know, that the employee was

25  in fact the *victim* of the crime.

26       74.    It is a violation of public policy for an employer, particularly a government employer,

Third Amended Complaint

Alling & Jillson, Ltd.
Post Office Box 3390 ◊ 276 Kingsbury Grade
Lake Tahoe, Nevada 89449
PH (775) 588-6676 ◊ FX (775)588-4970

1  to disregard an employee's insistence that he is the victim of the crime that the employer has

2  wrongfully accused him of committing, and deprive the employee of his due process rights to prevent

3  the employee from establishing his innocence.

4      75.  MILLER was the victim of identity theft; the perpetrator of the crime used MILLER's

5  identity to file a fraudulent unemployment claim in MILLER's name.

6      76.  DEFENDANT terminated MILLER based on the accusation that MILLER had

7  filed the fraudulent unemployment claim while he was an employee of DEFENDANT for

8  purposes of Federal Tort Claims Act coverage.

9      77.  MILLER insisted he had not filed the unemployment claim and invoked his due

10  process rights pursuant to the Contract, BIA Handbook, the Tribe Employee Handbook, and federal

11  statute.

12      78.  DEFENDANT was informed and knew, or should have known that MILLER was the

13  victim of identity theft, refused to provide MILLER with his employment due process rights, and

14  affirmed its decision to terminate MILLER without investigating the unemployment claim or

15  allowing MILLER to defend against the accusation.

16      79.  DEFENDANT used the alleged crime as its basis to terminate MILLER when it knew,

17  or should have known, that MILLER was the victim of the crime.

18      80.  DEFENDANT, through the Tribe, wrongfully terminated MILLER in violation of

19  public policy since it terminated him based on allegations he had committed a crime, while informed

20  that MILLER was the victim of the crime.

21          MILLER'S Termination Derived from Outrageous Conduct

22      81.  DEFENDANT, through the Tribe, delivered to MILLER an August 25, 2014, letter

23  declaring MILLER was terminated for cause because he had allegedly reported a fraudulent

24  unemployment claim to the State of Nevada Unemployment Office on August 14, 2014. *See* **Exhibit**

25  **5.**

26      82.  On September 5, 2014, DETR informed DEFENDANT, through the Tribe, that

27

Alling & Jillson, Ltd.
Post Office Box 3390 ◊ 276 Kingsbury Grade
Lake Tahoe, Nevada 89449
PH (775) 588-6676 ◊ FX (775) 588-4970

28

1   MILLER was the victim of identity theft and had not filed the fraudulent unemployment claim.

2       83.    Despite DEFENDANT's information and knowledge that MILLER had not filed the

3   unemployment claim, MILLER's insistence that he had not filed the claim, and MILLER's futile

4   efforts to appeal the termination to prove his innocence, DEFENDANT upheld MILLER's

5   termination on October 2, 2014.

6       84.    MILLER's termination derived from outrageous conduct since DEFENDANT

7   intentionally disregarded DETR's information that MILLER was the victim of identity theft, yet still

8   upheld his termination on the false grounds that he had filed a fraudulent unemployment claim.

9       85.    It is outrageous conduct for a government employer to terminate an employee for

10  allegedly committing a crime when the employer is informed and has knowledge that the employee

11  was actually the victim of the crime that he was accused of committing.

## II.   SECOND CAUSE OF ACTION FOR NEGLIGENCE UNDER THE FEDERAL TORT
         CLAIMS ACT.

14      86.    MILLER realleges and incorporates by reference all preceding and succeeding

15  paragraphs as if set forth in full.

16      87.    DEFENDANT, as the Tribe and MILLER's employer for purposes of Federal Tort

17  Claims Act coverage, owed MILLER a duty of care to consider the information DETR provided on

18  September 5, 2014 – that MILLER was the victim of identity theft – prior to terminating MILLER.

19      88.    DEFENDANT breached its duty by disregarding the information provided by DETR,

20  and by failing to investigate and provide MILLER his employment due process rights to determine

21  whether he had filed the unemployment claim prior to terminating MILLER.

22      89.    DEFENDANT breached its duty by terminating MILLER for allegedly filing a

23  fraudulent unemployment claim when it knew, or should have known, MILLER was the victim of

24  identity theft and had not filed the claim.

25      90.    DEFENDANT's breach was the legal cause of MILLER's injuries; but for the Tribe's

26  disregarding the information provided by DETR and its subsequent wrongful termination of

27

28                                     Page 14 of 19
                              _____
                                  Third Amended Complaint

Alling & Jillson, Ltd.
Post Office Box 3390 ◊ 276 Kingsbury Grade
Lake Tahoe, Nevada 89449
PH (775) 588-6676 ◊ FX (775) 588-4970

1   MILLER, MILLER would not have sustained the injuries of which he complains.

2          91.    MILLER sustained damages as alleged in section IV below.

3   **III.    THIRD CAUSE OF ACTION FOR GROSS NEGLIGENCE UNDER THE FEDERAL
           TORT CLAIMS ACT.**
4
5          92.    MILLER realleges and incorporates by reference all preceding and succeeding

    paragraphs as if set forth in full.
6
7          93.    DEFENDANT, as the employer of the Tribe and MILLER, owed MILLER a duty of

    care to consider the information DETR provided on September 5, 2014 – that MILLER was the
8
9   victim of identity theft – prior to terminating MILLER.

10         94.    DEFENDANT, through the Tribe, breached its duty by failing to exercise even the

11  slightest degree of care when it terminated MILLER for allegedly filing a fraudulent unemployment

12  claim despite being informed and having knowledge that MILLER was the victim of identity theft

    and had not filed the claim.
13
14         95.    DEFENDANT, through the Tribe, engaged in an act or omission respecting legal duty

    of an aggravated character, or with willful, wanton misconduct, when it terminated MILLER for
15
16  allegedly filing a fraudulent unemployment with knowledge that MILLER was the victim of identity

    theft and had not filed the claim.
17
18         96.    The Tribe's breach was the legal cause of MILLER's injuries; but for the Tribe's

19  disregard of the information provided by DETR and its subsequent termination of MILLER,

    MILLER would not have sustained the injuries of which he complains.
20
21         97.    MILLER sustained damages as alleged in section IV below.

22  **IV.    MILLER'S DAMAGES UNDER ALL CAUSES OF ACTION.**

23         98.    MILLER realleges and incorporates by reference all preceding and succeeding

    paragraphs as if set forth in full.
24
25         99.    As a direct and proximate result of DEFENDANT's wrongful termination from

26  employment and negligence, MILLER has suffered, is now suffering, and will continue to suffer

27
28                                     Page 15 of 19
    _____
                        Third Amended Complaint

Alling & Jillson, Ltd.
Post Office Box 3390 ◊ 276 Kingsbury Grade
Lake Tahoe, Nevada 89449
PH: (775) 588-6676 ◊ FX: (775) 588-4970

1  irreparable injury and damages.

2      100.   As a direct and proximate result being wrongfully accused of committing a crime and

3  DEFENDANT's wrongful termination, MILLER has suffered tremendous anxiety, sleeplessness and

4  fear regarding his loss of employment and its long-term effect on him and his family and his future

5  career as a law enforcement officer.

6      101.   As a direct and proximate result of DEFENDANT's wrongful termination, MILLER

7  was unable to secure employment as a law enforcement officer with other agencies due to the damage

8  done to his reputation as a result of the wrongful termination.

9      102.   As a direct and proximate result of DEFENDANT's wrongful termination, MILLER

10  continues and will continue to suffer from the effects of having to disclose to potential law

11  enforcement employers that he was terminated from prior law enforcement employment for allegedly

12  filing a fraudulent unemployment claim.

13      103.   As a direct and proximate result of DEFENDANT's wrongful termination, MILLER

14  was denied accrued but unpaid benefits at the time of his termination, in an amount according to

15  proof.

16      104.   As a direct and proximate result of DEFENDANT's wrongful termination, MILLER

17  lost all benefits and future benefits associated with his employment.

18      105.   As a direct and proximate result of DEFENDANT's wrongful termination, MILLER

19  has been damaged in lost wages in an amount within this Court's jurisdiction, according to proof.

20      106.   As a direct and proximate result of DEFENDANT's wrongful termination, MILLER

21  has suffered additional damages in an amount according to proof.

22      107.   As a law enforcement officer, MILLER's character, reputation, and employment

23  history with law enforcement agencies is paramount to his ability to acquire and maintain

24  employment. Considering that DEFENDANT terminated MILLER for allegedly filing a fraudulent

25  unemployment claim, MILLER must forever disclose to prospective employers his prior employment

26  and the grounds for its termination and MILLER has especially been damaged as a law enforcement

27

28

Third Amended Complaint

Alling & Jillson, Ltd.
Post Office Box 3390 ◊ 276 Kingsbury Grade
Lake Tahoe, Nevada 89449
PH (775) 588-6676 ◊ FX (775) 588-4970

1 | officer looking to advance in his career.

2 | **V.   MILLER HAS EXHAUSTED HIS ADMINISTRATIVE REMEDIES.**

3 | 108.   MILLER realleges and incorporates by reference all preceding and succeeding
4 | paragraphs as if set forth in full.

5 | 109.   On May 2, 2016, MILLER filed with the United States Department of the Interior a
6 | federal tort claim for wrongful termination against the Tribe and the Department of the Interior.

7 | 110.   On or about September 8, 2016, the United States Department of the Interior issued
8 | a letter denying the claim and informing MILLER of his right to file suit in the United States District
9 | Court.

10 | 111.   MILLER's federal tort claim satisfied the requirement under 28 U.S.C. § 2675(a) that
11 | a claim must be presented to the appropriate Federal Agency and must be finally denied in writing
12 | before instituting an action against the United States for money damages.

13 | **VI.   DEFENDANT IS VICARIOUSLY LIABLE UNDER**
    | **RESPONDEAT SUPERIOR**.

14 | 112.   MILLER realleges and incorporates by reference all preceding and succeeding
15 | paragraphs as if set forth in full.

16 | 113.   Pursuant to Section F.6(1) of the Contract, DEFENDANT is the employer of the Tribe
17 | and all of the Tribe's law enforcement personnel and administration, including without limitation
18 | MILLER.

19 | 114.   As the employer of the Tribe and all of the Tribe's law enforcement personnel and
20 | administration, DEFENDANT is vicariously liable for the Tribe's tortious conduct under respondeat
21 | superior.

22 | 115.   "The Ninth Circuit has repeatedly allowed federal district courts to hear federal
23 | question claims against tribal members when the tribal member has exhausted his administrative
24 | remedies." *Hall* v. *United States of America,* Nev. Dist. Case Number CV-N-02-0578-HDM (RAM),
25 | at p. 7 (2004) *citing e.g. Arizona Public Service Co. v. Aspaas,* 77 F.3d 1128 (9th Cir. 1995); *Stock*

Alling & Jillson, Ltd.
Post Office Box 3390 ◊ 276 Kingsbury Grade
Lake Tahoe, Nevada 89449
PH (775) 588-6676 ◊ FX (775)588-4970

Third Amended Complaint

*West, Inc. v. Confederated Tribes of the Coleville Reservation*, 873 F.2d 1221 (9ᵗʰ Cir. 1989).

WHEREFORE, Plaintiff prays for judgment against DEFENDANT as follows:

1. General damages in an amount according to proof;

2. Special damages in an amount according to proof;

3. Costs of suit; and

4. Such other and further relief as the Court considers proper.

ALLING & JILLSON, LTD.

DATED: September 14, 2021

SCOTT W. SOUERS, ESQ., SBN#13405
Attorneys for Plaintiffs
*ssouers@ajattorneys.com*

Third Amended Complaint

1

## **CERTIFICATE OF SERVICE**

2     The undersigned hereby certifies that on today's date the foregoing Third Amended

3   Complaint was electronically filed and that service will be made to the following individual via the

4   Court's CM/ECF system:

5

6   Holly A. Vance
    Assistant United States Attorney
7   holly.a.vance@usdoj.gov

8

DATED: September 14, 2021

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MATTHEW LASTER
Alling & Jillson, Ltd.

Page 19 of 19

Third Amended Complaint

**Alling & Jillson, Ltd.**
Post Office Box 3390 ◊ 276 Kingsbury Grade
Lake Tahoe, Nevada 89449
PH (775) 588-6676 ◊ FX (775)588-4970

# EXHIBIT 1
# Public Law 93-638 Contract

# EXHIBIT 1

ATTACHMENT 2

DEPARTMENT OF THE INTERIOR

BUREAU OF INDIAN AFFAIRS

PHOENIX AREA OFFICE

WESTERN NEVADA AGENCY

PUBLIC LAW 93-638, AS AMENDED

SECTION 108 MODEL CONTRACT

# ANNUAL FUNDING AGREEMENT

WITH THE

Reno-Sparks Indian Colony

CONTRACT NO.  CTH61T65351

reference.   The provisions of applicable Federal
Regulations shall apply, unless such regulations have
been waived by the Secretary.   Such regulations are
incorporated in this agreement by reference.

1.   **Program(s) to be Performed by Contractor.**   **Law
Enforcement Services**   A program function to
maintain security on Indian communities through
effective crime prevention and law enforcement. The
program provide for costs necessary to carry out
police activities. Includes the costs of uniformed
police officers, whether Federal, Tribal or other
investigative and special officer's and others
authorized to carry on enforcement activities. This
contract does not include investigative functions
and costs of permanent facility construction. The
detention services function is contracted
separately between the Bureau and a City or County
Government through Detention Agreements.

2.   **Plan of Operation.**   **Statement of Work**  The
Contractor shall provide all necessary qualified
and licensed personnel, equipment, materials and
services to perform all tribal law services on the
Reno-Sparks Indian Colony, with the exception of
federal violation (major crimes). The investigation
of major crimes shall not be contracted and shall
continue to be performed by the Bureau, as provided
in the "Non-Contracted Portion of Bureau Program"
section.   Respective special U.S. Attorney
guidelines for the investigation of major crimes
shall be followed, where applicable.

   a.   Services shall be provided in accordance with
defined authority, procedures and guidelines
contained in the Reno-Sparks Tribal Law and
Order Code, the Reno-Sparks Indian Colony
Tribal Constitution, 25 CFR, court decisions
and other applicable rules, regulations,
ordinances and statutes.

   b.   The Contractor shall obtain all necessary
licenses, permits, and approval required by
local, State and Federal statutes to perform
under this contract.

position description. Evaluation criteria may include, but is not limited to: (1) investigations, (2) arrests, (3) court appearances, (4) crime prevention, (5) knowledge of law, (6) firearms, (7) patrol, (8) physical fitness, (9) public relations, (10) report writing, (11) execution of legal documents, (12) care and maintenance of equipment other than firearms, (13) overall performance. Performance ratings shall be documented, and placed in individual official personnel folders.

iv.   The Contractor shall adhere to the general requirements of tribal procedures, systems and policies for reviewing citizen complaints. If the Contractor does not have established provisions for citizens complaints investigations, the following shall be used:

The chief contract law enforcement officer shall acknowledge in writing to the complainant, receipt on any complaint of misconduct made against a construct police officer. After appropriate investigation into the allegation(s), the chief contract law enforcement officer shall notify, in writing, the complaint with final disposition. Disciplinary action(s) shall be conducted in accordance with tribal personnel policies/procedures and documented in individual official personnel folders. Unfounded/exonerated dispositions shall also be documented. If the chief contract law enforcement officer is accused of misconduct, his immediate supervisor or other appropriate tribal government official(s) shall be notified in writing.

v.   The Contractor shall adhere to the general requirements of tribal personnel systems and policies prior to taking any

adverse action against contract employees. If the tribal personnel system does not contain provisions for adverse actions, the following (1. though 6.) shall be followed:

(1) Notify the employee of the contemplated action and give a full explanation of the reason(s) such action is contemplated.

(2) Provide the employee with a written statement of any specific violation of rules, regulations, or statutes the contractor alleges the employee has committed and the names of all persons upon whose testimony the allegation(s) are based.

(3) Set a hearing date not less than fifteen (15) days after the employee has been given the written statement of allegations(s).

(4) Provide the employee and the employee's counsel at the hearing with an opportunity to confront the cross-examine each adverse witness.

(5) Provide the employee and the employee's counsel at the hearing with an opportunity to delineate issues, to present factual contentions in an orderly manner and to generally protect the employee's interest.

(6) Reconsider the decision to take the adverse action based solely on the evidence given at the hearing and provide the employee at the time the decision is announced with a written statement of the reasons for the decision and the evidence relied upon in reaching the decision.

or more severe enforcement action by the Bureau;

b. Disallow (that is, deny use of funds) all or part of the cost of the activity or action not in compliance;

c. Wholly or partly suspend the current contract for the contractor's program; or,

d. Take other remedies that may be legally available.

3. The contractor may appeal the BIA decision for sanctions under the Disputes clause of the contract.

4. The Contractor shall submit one (1) Reporting Package of the final audit report within thirty (30) days after issuance to: Federal Audit Clearinghouse, Bureau of the Census, 1201 E. 10th Street, Jeffersonville, IN 47132. The Contractor should also send one (1) additional copy of the report to the Federal Clearinghouse for each federal funding agency for which one or more findings occurred in an audited program. The contractor shall also make copies of the final audit report available to the BIA and the public, upon request, within thirty (30) days of issuance.

**Sec. 3.**   <u>Monitoring and Records Review</u>.

1. The Contractor shall maintain books, records, documents, and other evidence and accounting procedures and practices, sufficient to reflect properly all direct and indirect costs of whatever nature claimed to have been incurred and anticipated to be incurred for the performance of this contract. The foregoing constitute "records" for the purposes of this clause.

2. The Contractor's facilities, or such part thereof as may be engaged in the performance of this contract, and his records shall be subject at all reasonable times to inspection and audit by the Awarding Official or his authorized representatives.

Contractor shall be required to maintain a record-keeping system which will allow for the maintenance of records to facilitate retrocession or reassumption. Such a records system, as a minimum, shall:

1. Provide for the creation, maintenance and safeguarding of records of lasting value, including those involving individual rights, such as permanent student records and transcripts.

2. Provide for orderly retirement of records used or created under the contract. Such records shall be returned to the Bureau for disposition according to the General Records Schedules and the Bureau Records Control Schedule.

Sec. 4. **Privacy Act Requirements**. Section 108(b) of the Indian Self-Determination Act states that records of the tribal government or tribal organizations shall not be considered Federal records for the purposes of the Privacy Act.

Sec. 5. **Freedom of Information**. Access to records maintained by the Secretary is governed by the Freedom of Information Act (5 U.S.C. 552) and other applicable Federal law. Except for previously provided copies of tribal records that the Secretary demonstrates are clearly required to be maintained as part of the record keeping systems of the DHHS or the DOI, or both, records of the contractors (including archived records) shall not be considered Federal records for the purpose of the Freedom of Information Act. The Freedom of Information Act does not apply to records maintained solely by Indian tribes and tribal organizations.

Sec. 6. **Tort Claims.**

**General**

1. For the purpose of Federal Tort Claims Act Coverage, the Contractor and its employees (including individuals performing personal services contracts with the Contractor to provide health care services) are deemed to be employees of the Federal government while performing work under this contract. This status is not changed by the source of funds used by the contractor to pay the employee's salary and benefits unless the employee receives additional compensation for performing

covered services from anyone other than the Contractor.

2. The Contractor shall designate an individual to serve as a tribal tort claims liaison. The liaison shall assist the Bureau in preparing a comprehensive, accurate and unbiased report on incidents so that claims may be properly evaluated in accordance with 25 CFR 900 Subpart M, Federal Tort Claims Act Coverage General Provisions. The Contractor shall notify the Awarding Official in writing who has been designated as liaison.

3. The Contractor shall notify the Awarding Official immediately in writing of any tort claim (including any proceeding before an administrative agency or court) filed against the Contractor or any of its employees that relates to performance of a self-determination contract or subcontract.

**Action on approved claims**

1. Any award, compromise, or settlement in an amount of $2,500 or less made pursuant to the provisions of section 2672 of Title 28, U. S. Code, shall be paid by the Contractor out of the funds available under the contract and shall be considered an allowable costs under the contract. When a claimant is represented by an attorney, the payment shall designate both the claimant and his attorney as payees. The payment shall be delivered to the attorney, whose address shall appear on the voucher.

2. The Bureau shall arrange for the payment of an award, compromise, or settlement in excess of $2,500.

# EXHIBIT 2

## BIA Office of Justice Services Law Enforcement Handbook, Rules and Procudures

# EXHIBIT 2




BIA-OFFICE OF JUSTICE SERVICES
*LAW ENFORCEMENT HANDBOOK*

Effective: 07/01/2008     Revised:
CALEA Standard(s)—1.3.5

## RULES AND PROCEDURES

4-48-01   ESTABLISHMENT AND PURPOSE OF PROFESSIONAL STANDARDS DIVISION

A. Department of Interior Executive Order 3178, issued March 16, 1994 established the Internal Affairs Division (IAD) within the Office of Justice Services (OJS).  IAD investigates allegations of misconduct against OJS employees to determine their validity.  IAD is now known as the Professional Standards Division-(PSD)

B. Applicability
All investigations and disciplinary actions are governed by this procedure, including but not limited to, applicable orders, rules, regulations, Code of Conduct, and appropriate tribal, local, state, and federal laws, rules and regulations.

C. Purpose
The purpose of PSD is to ensure that the professional standards of OJS are maintained through the internal system whereby objectivity, fairness and justice are ensured by an impartial investigation and review of the allegations of misconduct against OJS employees.  This system provides citizens with an equitable and effective avenue for redress of their legitimate grievances against OJS employees.  PSD readily accepts all complaints of misconduct and fairly and objectively investigates these complaints.  OJS employees determined to be guilty of misconduct will be appropriately disciplined, and a copy of the disciplinary actions taken will be provided to the PSD.  PSD also provides OJS employees due process to identify unfounded and unsubstantiated allegations.

D. Because of the potential liability associated with BIA, P.L. 93-638 contracted programs and Tribal programs receiving federal funding, the Office of Justice Services (OJS) has an obligation to provide for audits and inspections of the programs it operates and funds.  PSD will be alert for the discovery of training deficiencies and the need for new policies and policy changes.  This will be done through investigations and audits of OJS and tribal law enforcement programs.

MILLER057

  

BIA-OFFICE OF JUSTICE SERVICES
*LAW ENFORCEMENT HANDBOOK*

| Effective: 07/01/2008 | Revised: |
|---|---|
| CALEA Standard(s)--1.3.5 | |

E.  Areas of PSD Responsibility

Special Agents assigned to the PSD will investigate without bias all allegations of misconduct assigned to them.  Agents will conduct fair, objective, and impartial investigations and audits without fear of reprisals from supervisors, managers or the subjects of investigation from the affected district.  Any acts or threats of reprisal will be immediately reported to the Associate Director, PSD for appropriate action.  PSD acts on behalf of and reports to the Deputy Bureau Director, OJS, as the investigative body with the following areas of responsibility.

1. Maintain a record of allegations (complaints) of alleged or suspected misconduct against OJS employees as well as self-governance and tribal law enforcement employees.
2. Investigate the above allegations.
3. Inform complainants, employees accused, and the employee's supervisors of the results of the investigation.
4. Maintain a record of disciplinary actions take against employees deemed to have engaged in misconduct.
5. Maintain the confidentiality of PSD investigations and records.
6. When a training deficiency is discovered, PSD will notify the employee's supervisor, and if appropriate, the Deputy Bureau Director, OJS, and the Deputy Chief, Indian Police Academy.
7. When a policy change or the need for a new policy is noted, PSD will notify the Deputy Bureau Director, OJS.
8. Production of an annual summary that is made available to the public of the complaints received and investigated by the PSD, and their final dispositions.

F.  OJS employees are subject to the following standards of conduct.

1. Employee Responsibilities and Conduct for the Department of the Interior (DOI), 43 Code of Federal Regulations 20.735.
2. Employee Responsibilities and Conduct, 44 BIAM, Chapter 735
3. Law Enforcement Code of Conduct, 446 DOI Manual, Chapter 2, Appendix 1,
4. Standards of Ethical Conduct for Employees of the Executive Branch, 5 Code of Federal Regulations, Section 2635.
5. Ethics and Conduct, found in this handbook, the Law Enforcement Code of Conduct, and the Law Enforcement Code of Ethics.
6. Discipline and Adverse Actions, Departmental Manual 370 DM 752
7. Applicable State, County, Municipal and Tribal Laws.

G.  Professional Standards Division Location and Contact Information:
The PSD may be contacted at 1001 Indian School Rd. NW, Albuquerque, New Mexico 87104 (505)563-3800 or (505)563-3089 (fax).

4-48

MILLER058




BIA-OFFICE OF JUSTICE SERVICES
*LAW ENFORCEMENT HANDBOOK*

| Effective: 07/01/2008 | Revised: |
|---|---|
| CALEA Standard(s)—1.3.5 | |

H. PSD Investigation of Tribal Programs

PSD will investigate all allegations of misconduct and perform audits of 638 contract programs in accordance with 25 CFR part 12.

1. 25 CFR part 12.53 states - The Deputy Bureau Director, OJS maintains an internal affairs component that investigates all allegations of misconduct by BIA officers, and any officer receiving funding and/or authority from the BIA. All allegations of misconduct must be thoroughly investigated and appropriate actions taken when warranted. Any person having knowledge of officer misconduct must report that information to the officer's supervisor.

2. 25 CFR part 12.12 states:
The regulations in this part are not intended to discourage contracting of Indian country law enforcement programs under the Indian Self-determination and Education Assistance Act (Pub. L. 93-638, as amended, 25 U.S.C. 450). The Deputy Commissioner of Indian Affairs will ensure minimum standards are maintained in high risk activities where the Federal government retains liability and the responsibility for settling tort claims arise from contracted law enforcement programs. It is not fair to law abiding citizens of Indian country to have anything less than professional law enforcement in their community. Indian country law enforcement programs that receive Federal funding and/or commissioning will be subject to periodic inspection or evaluation to provide technical assistance, to ensure compliance with minimum Federal standards, and to identify necessary changes or improvements to BIA policies.

3. 25 CFR part 12.13 states:
If a program fails to comply with this section, BIA law enforcement commissions may be revoked, law enforcement contracts may be cancelled, and the program may no longer be eligible for tribal shares allocated from the law enforcement budgets.

I. Lack of Criminal Charges Do not Preclude Administrative Actions
The lack of criminal charge against an employee, and/or acquittal on a criminal charge does not prevent the law enforcement agency from taking administrative action against an employee. PSD will not initiate an administrative investigation until criminal actions are adjudicated or prosecution is declined. However, a preliminary investigation not involving contact with the subject of the investigation may be initiated.

4-48

**MILLER059**




BIA-OFFICE OF JUSTICE SERVICES
*LAW ENFORCEMENT HANDBOOK*

| Effective: 07/01/2008 | Revised: |
| CALEA Standard(s)—1.3.5 | |

4-48-02   RESPONSIBILITY FOR INVESTIGATION OF COMPLAINTS

A. District SAC's, Chiefs' of Police and supervisors are required to report all allegations of misconduct as defined above to PSD within 24 hours of occurrence. PSD will review all allegations to determine the appropriate classification and will investigate or refer allegations accordingly.

B. The appropriate law enforcement agency and/or PSD will investigate allegations of criminal misconduct.

C. PSD will review all allegations and either investigate themselves or refer the investigation to the District SAC or Agency Chief of Police. The employee's chain of command may investigate as follows:

1. Line supervisors can investigate Class III and IV offenses.
2. PSD will investigate Class I and II offenses and any others as determined by a PSD supervisor.
3. PSD will review all allegations and completed investigations.
4. Allegations of civil rights violations will be referred to the FBI for investigation
5. Complainants will be notified by mail regarding verification of receipt of their complaint, status reports, and notification of the results of the investigation. Notification will not be made to anonymous complainants.

D. District SAC's, Chiefs' of Police and supervisors who fail to report allegations of misconduct will face disciplinary action.

E. Frequently, by the time an allegation of criminal conduct reaches PSD, a law enforcement agency, such as a County Sheriff's Department, or a City Police Department has already initiated a criminal investigation.

1. On a case by case basis, PSD may or may not become involved in an on-going criminal investigation.
2. PSD will monitor the progress of all such criminal investigations.
3. PSD may use any information gathered during a criminal investigation in an internal administrative investigation.
4. At its discretion, PSD may conduct administrative investigations concurrently with or after a criminal investigation has concluded.
5. If an accused employee refuses to answer questions voluntarily, PSD will not compel a statement unless the prosecuting attorney has concurred or declined prosecution.

4-48

MILLER060

 

**BIA-OFFICE OF JUSTICE SERVICES**
***LAW ENFORCEMENT HANDBOOK***

| Effective: 07/01/2008        Revised | |
| --- | --- |
| CALEA Standard(s)—1.3.5 | |

F. 25 Code of Federal Regulations requires that all allegations of Civil Rights violations be reported to the FBI.

Only the FBI is authorized to conduct a full criminal Civil Rights investigation, but this does not preclude the BIA from conducting a simultaneous or subsequent internal administrative investigation concerning all allegations of use of excessive force and brutality.

## 4-48-03   AUTHORITY FOR PSD ACTIONS

A. Internal inquiries are performed under the authority of the Deputy Bureau Director, Office of Justice Services, with the management responsibility assigned to the program administrator or supervisor at the branch, section, unit district or agency level.   The final authority to exonerate, declare unfounded, not sustain, or to sustain any complaint rests solely with the Deputy Bureau Director, Office of Justice Services.

B. Formal discipline, when appropriate, is proposed by the affected employee's or law enforcement officer's immediate supervisor and approved by the supervisor's immediate supervisor, consistent with the applicable personnel management guidelines.

C. Immediate supervisors have the authority to issue informal personnel actions, when appropriate.

D. PSD has the authority to re-investigate a matter believed to be incomplete with the concurrence of the Deputy Bureau Director, OJS.

## 4-48-04   REPORTING OF COMPLAINTS:

A. Employees will assist persons who wish to make a compliant against a law enforcement employee in a professional manner.

1. Information regarding procedures for the public to register complaints against the organization or its employees will be made available at every District and Agency office.
2. Complaints may be received personally, in writing, via telephone, and/or anonymously.  Complaints from citizens who wish their names be held in confidence will be accepted for investigation.
3. When the complainant is intoxicated or under the influence of drugs while making the complaint, The supervisor will arrange for the complaintant to be interviewed at the earliest opportunity once he/she is sober.

4-48





BIA-OFFICE OF JUSTICE SERVICES
*LAW ENFORCEMENT HANDBOOK*

| Effective: 07/01/2008 | Revised: |
|---|---|
| CALEA Standard(s)–1,3,5 | |

B.  When employees who are not supervisors receive a complaint against OJS or any OJS employee, including citizen complaints, the employee will immediately notify his/her supervisor. When the applicable supervisor or commander is not on duty, the complainant should be referred to the appropriate on-duty supervisor, special agent in charge, or chief of police. If the complainant refuses such referrals, all available information should be recorded by the receiving personnel and forwarded to the applicable District Supervisor, Special Agent in Charge, or Chief of Police who will forward a copy of each complaint to the PSD. If the employee fears reprisal or lack of cooperation from the supervisor, he/she may notify PSD directly. PSD can be notified directly regarding complaints against supervisors or managers.

C.  When District SAC's, Chiefs' of Police or supervisors become aware of alleged misconduct by a law enforcement employee he/she will promptly:

1.  Take action to prevent aggravation of the incident.
2.  Ensure that physical evidence is preserved
3.  Ensure that injured parties receive appropriate medical treatment and that photographs are taken of visible injuries.
4.  Notify the appropriate law enforcement agency responsible for the investigation if the alleged misconduct is criminal,.
5.  Determine whether the accused employee will be on administrative leave pending the outcome of an investigation for very serious incidents. The employee must be placed on administrative leave for Class I and Class II allegations.
6.  Notify PSD, including the following information:
    a.  Name, date of birth, rank (job title), and location assigned of the accused employee.
    b.  If known, name, date of birth, address and telephone number of the complainant.
    c.  A summary of the incident(s) of alleged misconduct.
    d.  Any official reports normally prepared concerning the incident.
    e.  When feasible, a brief written statement signed by the complainant, summarizing the incident and the alleged misconduct.

D.  The District SAC, Chief of Police or supervisor may attempt to resolve a complaint by an explanation of BIA policies and procedures, where applicable. Attempts to resolve complaints will be noted on an official complaint form. However, the complaint will be forwarded to PSD for review.

E.  The District SAC, Chief of Police or supervisor will advise the complainant of the BIA's procedures for the processing and investigation of citizen complaints.

4-48

**MILLER062**

 

BIA-OFFICE OF JUSTICE SERVICES
*LAW ENFORCEMENT HANDBOOK*

| Effective: 07/01/2008   Revised: | |
| --- | --- |
| CALEA Standard(s)—1.3.5 | |

4-48-05   EMPLOYEE RIGHTS DURING AN INTERNAL INVESTIGATION

A. Prior to an interview or special examination, the PSD supervisor will provide the employee under investigation with confidential written notification of the allegation. This notification will include a copy of the original complaint or a summary adequately listing the relevant facts, and the employee's rights and responsibilities during the investigation.

B. All interviews will be conducted while the employee is on duty, unless the seriousness of the investigation is such that an immediate interview is required.

C. The interview will be held at the employee's work area, or at a location agreeable to both parties.

Investigators will not make promises or offer rewards as an inducement to answer any questions.

D. Accused employees or their supervisors may contact a PSD supervisor to ascertain the status of the investigation of a complaint filed against them.

4-48-06   INVESTIGATION

A. The objective of the investigation is to determine the truth.   PSD investigations will be objective, fair, and thorough.

   1. A proper investigation demands that the investigator keep an open mind at all times and gather all the facts.
   2. The accused employee will be given ample opportunity to deny or justify an alleged action.

B. PSD special agents will not conduct investigations of employees to whom they are related or with whom they have, or have had, a close association.

C. On initiating the investigation, the special agent will:

   1. Review all pertinent documents including but not limited to prior complaints, administrative documents, training records, etc.
   2. Compare the date the incident occurred with the date reported and document the reason for any delays in reporting.
   3. Obtain all related medical records as soon as possible in cases in which the medical condition of a witness, complainant, or accused employee is a factor.
   4. Obtain a signed medical consent form as early in the investigation as possible. The patient must sign a medical release before physicians or medical facilities can release information from medical records.

4-48




BIA-OFFICE OF JUSTICE SERVICES
*LAW ENFORCEMENT HANDBOOK*

| Effective: 07/01/2008 | Revised: |
| CALEA Standard(s)—1.3.5 | |

D. Investigators will conduct an interview with the accused employee. An accused employee has the right, if he/she wishes, to be accompanied by an attorney, union representative, supervisor or other personal representative during any interview concerning allegations of misconduct.

E. The employee's representative is limited to acting as an observer of the interview, except when the interview focuses on, or leads to, evidence of potential criminal activity by the employee. Should this occur, the employee's legal representative will be permitted to advise and confer with the employee.

F. Interviews will be recorded by PSD. The employee will be advised that the interview is being recorded.

G. PSD is not required to advise an accused employee of his constitutional "Miranda rights" unless:

1. The employee is in custody.
2. The interviewing investigator realizes that the employee will not be allowed to leave freely at the conclusion of the interview. At this point during the interview, the employee is effectively in custody and must be advised of his/her rights.

H. At the beginning of the interview, the investigator will provide the accused employee with the appropriate "Warning and Assurance" form. The circumstances of each investigation and the discretion of the investigator dictates which form the employee will be given.

1. Warning and Assurance to Employee Requested to Provide Information on a Voluntary Basis. The employee is advised that:
   a. He/she has the right to remain silent and that he/she can not be disciplined for exercising this right.
   b. His/her voluntary statements can be used against him/her in criminal or administrative disciplinary proceedings.
   c. False statements could subject the employee to disciplinary action including dismissal.
   d. An employee who is provided the "voluntary" interview form and declines to answer questions may later be provided the "required" interview form at the discretion of the interviewer.

4-48

**MILLER064**

  BIA-OFFICE OF JUSTICE SERVICES
\*LAW ENFORCEMENT HANDBOOK\*  

| Effective: 07/01/2008    Revised: |
| CALEA Standard(s)—1.3.5 |

2. Warning and Assurance to Employee Required to Provide   Information. The employee is advised that:

   a. He/she is required to fully and truthfully answer all questions and that refusal to do so, or providing false statements can result in administrative disciplinary action, including dismissal.

   b. Since his statements are compelled, they, nor any information or evidence gained by reason for those statements, can not be used against the employee in any criminal proceeding, except if an employee knowingly and willfully provides false statement or information, he/she may be criminally prosecuted for that action

I. When an employee admits to any act of misconduct, the investigator will obtain a brief written statement of the misconduct signed by the employee.

J. In accordance with criminal law and/or administrative regulations, an employee may be required to:

1. Submit to a physical line up,
2. Submit a full financial disclosure statement,
3. Have photographs taken.

K. Investigators may request that the employee:

1. Submit to breath, blood, urine or other necessary medical or laboratory examinations.
2. Submit to tests using instruments for the detection of deception.

L. No employee who is the subject of a criminal investigation will be required by OJS to answer questions or submit to examinations or tests in violation of his/her constitutional rights.

M. Investigations of complaints will be completed within 90 days. Investigations continuing over 90 days must be approved by a PSD supervisor.  Regular status reports will be filed with PSD every 30 days.

4-48-07    SUPERVISORY DUTIES AND RESPONSIBILITIES

A. The first-line supervisor has primary responsibility for maintaining and reinforcing officer conformance with the standards of conduct.

B. Supervisors will familiarize themselves with the officers in their unit, and closely observe their general conduct and appearance on a daily basis.

C. Supervisors will remain alert for indications of behavioral problems or changes that may affect officer's normal job performance. Such information should be documented by the supervisor.

 4-48




**BIA-OFFICE OF JUSTICE SERVICES**
**\*LAW ENFORCEMENT HANDBOOK\***

| Effective: 07/01/2008        Revised: |
| --- |
| CALEA Standard(s)–1.3.5 |

D. When a supervisor perceives that an officer may be having or causing problems, the supervisor will assess the situation and determine the most appropriate action.

E. A supervisor may recommend additional training to refresh and reinforce an officer's skills.

F. The supervisor may use counseling to:

1. Determine the extent of any personal or job problems that may be affecting performance, and to offer assistance and guidance.
2. Discuss minor and infrequent rule violations, and to discuss the substance and importance of the rules with the officer.

G. The supervisor will document all instances of counseling or additional training used to modify an officer's behavior.

4-48-08   INITIAL INVESTIGATION BY SUPERVISOR

A. Upon becoming aware or receiving notification of potential rules violations by an officer under his/her command, the supervisor will begin an immediate investigation of such allegations.

B. The supervisor's investigation will be limited to questioning the officer, witnesses and complainants, and securing all relevant evidence.

Property belonging to the law enforcement agency is subject to inspection where the employer has a reasonable suspicion that evidence of work-related misconduct will be found therein. Property includes, but is not limited to, vehicles, desks, files, storage lockers and any other relevant government property.

C. Upon completion of the investigation, the supervisor will forward to the Professional Standards Division through the chain of command:

1. A report of the alleged violation.
2. All documents and evidence relating to the investigation.

4-48

MILLER066




BIA-OFFICE OF JUSTICE SERVICES
*LAW ENFORCEMENT HANDBOOK*

| Effective: 07/01/2008 | Revised: |
|---|---|
| CALEA Standard(s)—1.3.5 | |

**4-48-09   CONCLUSION OF INTERNAL AFFAIRS INVESTIGATIONS**

A. After a thorough, impartial investigation of a particular misconduct allegation has been completed, the responsible investigator will review all the evidence and circumstances and reach one of the four following conclusions:

   1. Unfounded:
      The investigation revealed conclusively that the alleged act(s) did not occur.

   2. Exonerated:
      The investigation revealed that the alleged act(s) did occur, but the employee's actions were justified, lawful, and proper.

   3. Not sustained:
      The investigation failed to disclose sufficient information to clearly prove or disprove the allegation.

   4. Sustained:
      The investigation revealed sufficient evidence to justify a reasonable conclusion that the accused employee committed the misconduct alleged.

   5. Policy or Training Failure:
      The allegation is true, but employee's action was not inconsistent with policy and/or training and there is an indication of a need for policy review and revision and/or a need for training.

B. When a misconduct allegation is sustained, PSD will recommend that appropriate disciplinary action be taken against the employee.

C. The investigation may conclude that the officer's actions were not appropriate, but were the result of properly following faulty policy or poor training (insufficient or improper). The investigator will identify the policy or training deficiency in a written memo to PSD. Necessary changes will be made to the policy and/or training program in concert with IPA. When retraining is indicated, the officer's supervisor will coordinate retraining of the officer through IPA.

**4-48-10   REPORTS OF INTERNAL AFFAIRS INVESTIGATIONS**

A. The PSD supervisor will provide a copy of a completed PSD investigation following PSD's internal approval process to the appropriate Chief of Police or supervisor whose responsibility is to ensure that:

   1. The report is forwarded down the accused employee's chain of command to the employee's immediate supervisor.

   2. When an allegation is sustained, take appropriate disciplinary action against the guilty employee.

MILLER067



BIA-OFFICE OF JUSTICE SERVICES
*LAW ENFORCEMENT HANDBOOK*



| Effective: 07/01/2008 | Revised: |
|---|---|
| CALEA Standard(s)–1.3.5 | |

3. The PSD report and contents remain confidential and that access is limited to officials in the employee's chain of command, Personnel Manager, Security Manager, and when appropriate, Tribal officials.
4. Case file reports will be returned to PSD when all administrative actions are completed.

B. PSD will retain a copy of all reports.

C. PSD will provide written notification to the accused employee of the completion and results of the investigation.

D. PSD or the investigating supervisor will provide written notification informing the complainant of the receipt of the complaint, periodic status reports and notification of the results of the investigation. Periodic updates may be accomplished by telephone.

1. If the allegation was deemed unfounded, exonerated, or not sustained, the letter will briefly explain why.
2. If the allegation was deemed sustained, the letter will note that the appropriate disciplinary action has been recommended. The specifics of the discipline will not be disclosed.

E. All PSD records and reports are confidential documents, which are kept secured and held separately from other law enforcement and personnel records.

4-48-11   DISCIPLINARY AND ADVERSE ACTIONS AS A RESULT OF PSD INVESTIGATION

A. When disciplinary action is taken against an employee as the result of a PSD investigation, it will be taken only for such cause as will promote the efficiency of the law enforcement agency and will be carried out in accordance with applicable federal or tribal code, and/or applicable personnel management regulations.

B. The employee's immediately supervisor will provide a copy of the proposed and actual disciplinary action to the PSD within 30 days of the receipt of the PSD Findings Report.

C. Supervisors and Chiefs of Police who fail to take appropriate disciplinary action against an employee will themselves face disciplinary action.

D. The supervisor will use an employee's prior record, including past misconduct and disciplinary actions, in determining the appropriate discipline to be imposed, but may not use this information as substantive evidence in determining the employee's guilt in the present misconduct allegation.

MILLER068




BIA-OFFICE OF JUSTICE SERVICES
*LAW ENFORCEMENT HANDBOOK*

Effective: 07/01/2008     Revised:
CALEA Standard(s)—1.3.5

E. Employees may not be disciplined for allegations deemed unfounded, exonerated, or not sustained, and information from these investigations may not be placed in the employee's personnel file.

F. Consistent with the requirements of applicable code and regulations, disciplinary actions may be recommended/ taken based on substantial evidence as defined in this section. Consistent with the requirements of applicable code and regulations, adverse actions may be recommended/taken based on a preponderance of evidence as defined in this section.

G. An employee may be disciplined for violations of a criminal law even though the officer has not been, or has never charged with a substantive criminal offense. Also, acquittal on a criminal charge does not prevent the BIA from recommending and taking appropriate administrative action against an employee.

4-48-12    OFF-DUTY MISCONDUCT

Law Enforcement employees are held to a higher standard of conduct than other citizens, including public employees. An employee may not engage in conduct that adversely affects BIA law enforcement. Off duty misconduct, even non-criminal acts, can adversely affect the employee, and/or BIA law enforcement, and could warrant disciplinary action.

4-48



MILLER069



BIA-OFFICE OF JUSTICE SERVICES
*LAW ENFORCEMENT HANDBOOK*



Effective: 07/01/2008          Revised:
CALEA Standard(s)—

## 4-51    RECORDS MANAGEMENT

<u>POLICY</u>

Each law enforcement agency is responsible for maintaining strict control measures over records and will receive, retain, and distribute reports and other records according to applicable records and disposition schedules and laws.

<u>RULES AND PROCEDURES</u>

4-51-01    GENERAL

    A. Records Management System

       1. Each agency will maintain a records management system that collects, retrieves, stores, updates, and purges information created by the agency.
       2. The system may be either manual or automated or a combination of both.
       3. The system will provide for a master name index file which includes the names of persons identified in field and accident reports, based on legal requirements.

    B. Freedom of Information Act

       To protect both the individual's right to privacy and the public's right to know, all law enforcement agency personnel will comply with the provisions of the Freedom of Information Act as set forth in federal or tribal regulations. Each agency will maintain copies of the referenced codes, regulations, and handbooks in the area records are kept.

    C. Custodian of Records

       Each Agency will identify, by title, the person responsible for records and informational function, and a telephone number for that person. This may be a law enforcement assistant, a sworn officer, or another identified civilian employee. This individual will be considered the Custodian of Records. In any case, the Chief of Police has the ultimate responsibility for ensuring the integrity of all agency records.

    D. Additional information regarding records may be found in 69 BIAM.

MILLER070

# EXHIBIT 3
## Tribe Council Meeting Minutes

# EXHIBIT 3

Proofed by: _____
Verna J. Nuño, Tribal Council Secretary

RENO SPARKS TRIBAL COUNCIL MEETING
ECONOMIC DEVELOPMENT
Conference Room – 34 Reservation Road
6:30 p.m.

September 28, 2011

I.   CALL MEETING TO ORDER – A Special Meeting of the Reno Sparks Tribal Council
     was held on September 28, 2011 with Chairman Arlan D. Melendez presiding. The
     meeting was called to order at 7:25 p.m.

II.  ROLL CALL – Secretary Verna J. Nuño took roll, and the following Tribal Council
     Members were present:  Chairman Arlan D. Melendez, Secretary Verna J. Nuño,
     Treasurer Jacqueline Quoetone, Council Member Joanne Bill, Council Member
     Brian Melendez, Council Member Kevin Eben, and Council Member Francis T.
     Dressler.  Absent: Vice Chairman Nathaniel D. Hunkup.  Chairman Melendez
     declared a quorum was present to conduct business.

III. CONSENT AGENDA
     A.  Gene Sanders, Finance Controller, requested approval to increase the FY2011 Tribal
         Budget to increase the SUTA line items. The increase from 1.5% to 2.10% occurred
         after the FY2011 Enterprise Budgets were enacted and Finance did not receive
         notification until after the first quarter tax reports were due.  The total increase will
         be $ 6,049.59.
     B.  Dr. Babak Nayeri, Clinic Director, requested approval to authorize the RSIC Public
         Works Department to finish shelled space at the Reno Sparks Tribal Health Center.
     C.  Chairman Melendez requested approval of a political contribution of $ 1,000 to
         support an event on September 29, 2011 in Las Vegas, Nevada for John Oceguera,
         Candidate for United States Congress, from 5:30 p.m. – 7:30 p.m.  Amount will be
         charged to the Tribal Council budget.
     D.  Chairman Melendez requested approval for Ernie Adler, RSIC State Lobbyist, to
         travel to Las Vegas, Nevada on September 29, 2011 to attend the John Oceguera,
         Candidate for United States Congress fundraising event.
     E.  Chairman Melendez requested approval to travel to Las Vegas, Nevada on
         September 29, 2011 to attend the John Oceguera, Candidate for United States
         Congress fundraising event.  Travel cost will be charged to the Chairman's budget.
     F.  Chairman Melendez requested approval of the 2011 Political Contributions List
         recommended by Ernie Adler, RSIC State Lobbyist, in the amount of $4,500.  Memo
         from Mr. Adler attached.
     G.  Steve Stout, Finance/Procurement, requested approval to purchase a Public Works
         vehicle 2012, GMC, TK 30743, one ton truck to be funded by the 2011 Vehicle CIP.
         Purchase price $ 30,513.75.

1



Proofread by: _____
                    Verna J. Nuño, Tribal Council Secretary

H. Steve Stout, Finance/Procurement, requested approval to purchase a Public Works vehicle Ford, F 250, ¾ ton truck to be funded by 2011 Vehicle CIP. Purchase price $ 32,168.00.

I. Steve Stout, Finance/Procurement, requested approval to purchase a Public Works Ford, Super Duty, F 450 12 Ft. Dump Truck, to be funded by 2011 Vehicle CIP. Purchase price $ 45,251.25.

J. Steve Stout, Finance/Procurement, requested approval to purchase a RSIC Motor Pool vehicle 2011/2012 Toyota Prius to be funded by 2011 Vehicle CIP. Purchase price $ 24,494.06.

K. Steve Stout, Finance/Procurement, requested approval to purchase a Tribal Court 2012 Ford Escape SUV to be funded by the FTA ARRA Tribal Transit Grant and BIA IRR Grant. Purchase price $ 23,345.00.

L. Steve Stout, Finance/Procurement, requested approval to purchase two Recreation vehicles 2012 GMC TG 23406, 12 passenger vans to be funded by the FTA ARRA Tribal Transit Grant. Purchase price $ 45,916.30.

M. Steve Stout, Finance/Procurement, requested approval to purchase two RSIC Clinic vehicles 2011/2012 Toyota Prius to be funded by FTA ARRA Tribal Transit Grant. Purchase price $ 48,988.12.

N. Steve Stout, Finance/Procurement, requested approval to purchase one Senior vehicle 2012 Toyota Sienna, to be funded by the FTA ARRA Tribal Transit Grant. Purchase price $ 27,175 including needed step-side cost.

O. Steve Stout, Finance/Procurement, requested approval to purchase two Recreation vehicles 2012 GMC TG 23406, 12 passenger vans to be funded by the FTA ARRA Tribal Transit Grant. Purchase price $ 45,916.30.

P. Steve Stout, Finance/Procurement, requested approval to purchase two Tribal Court vehicles 2012 Chevy Traverse vans, to be funded by a BIA grant. Purchase price $ 47,916.

Q. Rod Ariwite, Tribal Administrator, requested approval of travel/training for the Law & Order Committee members, Jane Smith, Lolita Thomas, Albert Hernandez, and Marla Dressler to attend, "Emerging Issues in Tribal Civil and Criminal Jurisdiction Conference" in San Diego, CA on October 10-11, 2011.

R. Chairman Melendez requested approval to attend the Inter-Tribal Council of Nevada 46th Annual Convention to be held on November 14-17, 2011 at Circus Circus Casino in Reno, Nevada. Deadline for early rate registration is October 14, 2011.

S. Victoria Oldenburg, Staff Attorney, requested approval to attend the Inter-Tribal Council of Nevada's 46th Annual Convention and banquet on November 14-17, 2011. Budget 100-120-020-7530 (Travel-Other) $ 199.00 Total Cost Early Bird Registration.

T. Steve Stout, Finance/Procurement, requested approval to purchase two Education vehicles 2012 GMC TG 23406, 12 passenger vans to be funded by the FTA ARRA Tribal Transit Grant. Purchase price $ 45,916.30.

Council Member Eben made a motion to approve the Consent Agenda with the change in Item # 14 from two to one van for $ 27,175, and the addition of Item #19 for purchase of Education vans. Council Member Melendez seconded the motion. Vote: 3 for, 1 against, and 4 abstentions (Motion passed).

2

MILLER072



Provided by: _____
Verna J. Nuño, Tribal Council Secretary

IV.   APPROVAL OF AGENDA – Additional action items submitted for consideration were:
1) Chairman Melendez requested approval for political contributions for an event to be held in Reno for candidates Marcus Conklin, Marilyn Kirpatrick, and Debbie Smith; 2) Chairman Melendez requested approval to travel to Las Vegas, Nevada to participate on a panel to discuss mining and the successful deterrent of the Oil Dri Mining issue; 3) Winston Sam, Secretary Election Board, requested a budget increase of $5,046; 4) Savita Shukla, CFO, requested approval of a resolution for total amount and management of the 2011 Christmas distribution; 5) Rod Ariwite, Tribal Administrator, requested approval of a budget modification to DOJ correctional facility grant; and, 6) Steve Stout, Procurement, requested approval of selected architect design firm for the Regional Correction Facility to be built in coordination with the Fallon Paiute Shoshone Tribe.  Council Member Eben made a motion to approve the agenda with additions. Secretary Nuño seconded the motion.  **Vote:  6 for, 0 against, and 2 abstentions (Motion passed).**

V.   NEW BUSINESS
A.   Scott Nebesky, Planning Director, requested endorsement of RSIC's Comprehensive Energy Audit Report and direction to staff regarding implementation of the report's recommendations, after a presentation to the Tribal Council from Pacific West and Planning staff about the results and recommendation of the completed audit.  Council requested a presentation also be made to the community.  **Council Member Eben made a motion to approve consideration of the Comprehensive Energy Audit Report and direct staff to implement the recommendations after a presentation from Pacific West.  Council Member Yarrow seconded the motion. Vote:  6 for, 0 against, and 2 abstentions (Motion passed).**

B.   Todd Kirsten, Community Member, requested financial support to attend the summit and conference being sponsored by Nike N7 in Beaverton, Oregon on October 28, 29, and 30, 2011.  Kirsten explained that Nike N7 is founded on a commitment to bring sport and all of its benefits to Native American and Aboriginal communities in the USA and Canada.  Recreation Manager Jean Wadsworth recommended that two Recreation staff also be provided opportunity to attend the training.  **Council Member Dressler made a motion to approve the financial support request to attend the Nike N7 conference to include Todd Kristen, Andrew Dunn, Manager Wadsworth, and one recreation staff to be funded by a Tribal source of funds.  Secretary Nuño seconded the motion.  Vote:  3 for, 0 against, and 5 abstentions (Motion passed).**

C.   Nida Harjo, Acting Chief of Police, requested approval to temporarily adopt the BIA 2nd Edition Handbook until the Police Department can develop and implement an RSIC law enforcement handbook.  Acting Chief Harjo noted that all law enforcement employees have access to the handbook and it's supporting documents at this time.  **Council Member Eben made a motion to approve the temporary**

3

Proofread by:
Verna J. Nuño, Tribal Council Secretary

adoption of the BIA handbook for use by the RSIC Police Department.  Council
Member Yurrow seconded the motion. Vote:  5 for, 0 against, and 2 abstentions
(Motion passed). (One out of room)

D.  Victoria Oldenburg, Staff Attorney requested approval of a resolution approving
HUD Section 184 Loan Guarantee Program and Section 184 Residential Lease.
Attorney Oldenburg withdrew her request for approval of the Residential Lease
because it was not complete.  After much discussion and community input regarding
the implications of the 184 loan program for the RSIC, Attorney Oldenburg
suggested that because of the many unanswered questions raised about the
implementation of the loan program, that the requested draft resolution be revised to
state that the Tribal Council supports looking into the program and direct the
Housing Director to also look into the possibility of the Tribe obtaining HUD
approval for participation. **Council Member Eben made a motion to approve
Resolution 2011-RS-42 to look into the HUD Section 184 Loan Guarantee
Program and that the Housing Board is included in any discussions and
decisions regarding the loan program.  Secretary Nuño seconded the motion.
Vote: 3 for, 2 against, and 3 abstentions (Motion passed).**

E.  Brian Melendez, RSIC Enrolled Member, requested approval of Land Lease
Agreement in Hungry Valley community to be used as a future home site. Melendez
informed the Council that he had contacted various Tribal programs to identify a site
and the process required.  The Housing Department located a site at the North end of
Fancy Dance Drive that requires minimal utility construction and hook-up as well as
earthwork.  Melendez stated he intends to obtain private financing to construct the
house.  After much input from the community, it was consensus of the Council that
more planning must occur to determine where future housing should be located not
only for HUD homes, but also alternative housing needs.  **Council Member Eben
made a motion to approve the Land Lease Agreement in the Hungry Valley
community to be used as a future home site.  Secretary Nuño seconded the
motion.  Vote:  5 for, 0 against, and 2 abstentions (Motion passed). (One at
podium)**

F.  Steve Moran, Business Enterprise/Economic Development Director requested
approval of a resolution to approve amendment to Special Attorney Contract with
Lionel Sawyer to extend the term of the contract for one year from July 15, 2011.
This attorney specializes in financial contracts and would assist the Tribe in
implementing AB299-Restitution Center Project.  Moran went over the reasons why
the project has been delayed, and that the extension will also require an increase to
the contract which is the next action item. **Council Member Melendez made a
motion to approve Resolution 2011-RS-43 to approve amended contract with
Lionel Sawyer.  Secretary Nuño seconded the motion.  Vote: 4 for, 1 against,
and 1 abstention (Motion passed).  (Two out of room)**

G.  Steve Moran requested approval of budget modification #2 to the Capital Budget for
Restitution Center/Land Exchange (310.310.023 account) to increase by $ 20,000 to

4

# EXHIBIT 4

**Reno-Sparks Indian Colony, Human Resources
Policies and Procedures, Policy Number 164.902**

# EXHIBIT 4

## Reno-Sparks Indian Colony
*Human Resources Policies and Procedures*

| | |
|---|---|
| **POLICY NUMBER:** | *164.902* |
| **REPLACES POLICY DATED:** | |
| **SUBJECT:** | *Appeals Process* |
| **EFFECTIVE DATE:** | *November 1, 2003* |
| **COUNCIL RESOLUTION NUMBER:** | *2003-RS-71* |
| **RESOLUTION DATE:** | *October 15, 2003* |

**OBJECTIVE:** To provide a means of fair, prompt and consistent appeals process for employee issues limited to disciplinary action received or illegal actions resulting in the loss of employee benefits.

**SCOPE:** All Regular Full and Part-time Employees

**POLICY:** Employee disciplinary action issues should be addressed at the lowest possible level within the RSIC operating structure, beginning with the employee's immediate supervisor. If the employee is not satisfied with the response presented by their supervisor the employee may take further action by filing an appeal. All appeals brought to management by an employee will be dealt with in a respectful and confidential manner within a specified number of business days.

No employee need fear reprisal, discrimination, or loss of employment for filing an appeal.

**DEFINITIONS:** Appeal: The process of requesting a review of management's decision to administer a disciplinary action. *Policies, Ordinances, Resolutions, and Formal Directives made by the Tribal Council, Federal, State; Local laws, regulations, and rules are not subject to this process.*

Business day: Refers to the business calendar of Monday through Friday, which excludes Saturday, Sunday, Tribal approved holidays, pre-approved Annual Leave, or business travel. (e.g., If an incident occurs on Thursday and it must be reported within five business days, the report is due on the following Thursday by close of business – 5:00 p.m.).

ιΕ0/200′d ϛϖ8# ΖϖːΖl Ζl0Ζ/ΖΖ/Ζl 1008 9ϛε ϛLL ɘɹoʇS SԀՈ ɘɥꓕ:ɯoɹℲ

Appeals Committee: An group of individuals from the RSIC who mediate issues in a manner similar to a court. Both parties present their facts and the Appeals Committee issues a decision based upon the information presented.

**PROCEDURES:**

**A. Selection of an Appeals Chairperson**

1. The Tribal Chairman will recommend to the RSIC Tribal Council, each January, three individuals from eligible RSIC employees to serve as Appeals Chairperson and two alternates. The term of service is for one year. (January 1 to December 31)

**B. Appeals Process.**

The appeal process is designed to allow the employee and management an opportunity to present their case in an efficient and respectful manner consistent with RSIC Human Resources Policies and Procedures.

**1. Step One – Employee and Management.**

To begin the process the employee must file an appeal with their supervisor. The written appeal (handwritten or typed) must follow these guidelines:

   a. The appeal must be filed within five (5) business days of the employee's disciplinary action. Failure to file within the five-day limit is an automatic loss of the right to appeal. Additionally, if the employee were to petition directly or indirectly to either the RSIC Tribal Council, Tribal Chairman, threaten witnesses or supervisors, or obtaining written petitions, will result in the cancellation of the employee's appeal and may be subject to disciplinary action.

   (i) Guidelines for filing an appeal. The appeal should contain the following information:

      (a) Date of appeal

      (b) Employee name

      (c) Reason for appeal

      (d) Any related information which was not part of the disciplinary action or will favorably support the employee's appeal

      (e) What the employees wishes to happen with their disciplinary action

      (f) Employee signature

   *An employee may seek assistance from Human Resources or RSIC representatives in drafting their appeal.*

   b. A copy of this appeal must be sent to Human Resources for reference and to monitor adherence to policy. Submitted appeals are kept separate of the employee's personnel folder.

   c. The employee and supervisor meet with second level management in attendance within three business days of the appeal filing. It is the responsibility of the Supervisor to arrange this meeting.

164 902 APPEALS PROCESS (2)
PAGE 2 OF 5

(i) The employee and their supervisor, with second level management in attendance, will discuss their issues and makes reasonable attempts to reach a resolution.

d. The supervisor is to write a summary of the meeting. This must be sent to the employee within three business days of the conclusion of the meeting by either certified mail or in person. A copy is to be forwarded to Human Resources.

   (i) If delivered in person to the employee, the delivery must be acknowledged in writing by the both employee and supervisor.

e. Willful neglect by the Supervisor to meet the requirements contained within this policy may result in disciplinary action, up to and including termination in accordance with Human Resources Policy and Procedure 164.901.

**2. Appeals Committee.**

a. If an employee wishes to pursue their appeal after meeting with their supervisor, they must present a written request to the Appeals Chairperson to empanel the Appeals Committee. This request must be filed within three business days of receiving the supervisor's written response. Failure to file within the three-day limit is an automatic loss of the right to appeal. A copy of this request must be sent to Human Resources for reference and filing.

3. Both the employee and supervisor agree that the Appeals Committee's decision is final and binding.

### C. Guidelines for Appeal Committee Proceedings

The Appeals Committee's task is hear the appeals and insure that both parties have equal opportunity to present their case consistent with this policy.

1. The Appeals Chairperson, upon receiving the employees' request will empanel the Appeals Committee within three business days of receipt of the employee's written request.

   a. The Appeals Chairperson will administer the proceedings of the Committee.

2. The Appeals Chairperson will ask the employee to submit the following information:

   a. Copy of original appeal sent to their immediate supervisor. (Procedure B.1.a – above)

   b. Any related information which was not part of the original appeal or will favorably support the employee's appeal. This includes names and telephone numbers (if any) of witness' the employee wishes to include with their appeal.

3. The Appeals Chairperson will ask the employee's immediate supervisor to submit the following information:

   a. Copy of the employee/supervisor meeting summary. (Procedure B.1.d. – above)

   b. Copy of Disciplinary Action that is the subject of the appeal.

   c. Any related information, which was not part of the original appeal or will favorably support the supervisor's taking disciplinary action against the employee. This includes names and telephone numbers (if any) of any witnesses the supervisor wishes to include.

164 902 APPEALS PROCESS (2)
PAGE 3 OF 5

4. Empanelling an Appeals Committee.

   a. All Regular Full and Part-time employees of the RSIC as a condition of employment, are obligated to participate in an appeal hearing if selected. They must meet the following criteria for inclusion in the Appeals Committee pool.

      (i)   Must have been employed by the RSIC for at least twelve-(12) months.
      (ii)  Not currently under disciplinary action

   b. Committee members are selected by the Committee Chairperson from the following categories:

      (i)   An individual from RSIC Management staff not involved with the appeal. (An employee selected to serve must have the written approval of their immediate supervisor before serving. All hours involved with this process are considered paid time consistent with RSIC policy and procedures – 164.602 Payday and Paychecks, 164.605 Overtime, 164.606 Compensatory Time, and other related policies).

      (ii)  An individual from RSIC Non-exempt staff not involved with the appeal. (An employee selected to serve must have the written approval of their immediate supervisor before serving. All hours involved with this process are considered paid time consistent with RSIC policy and procedures – 164.602 Payday and Paychecks, 164.605 Overtime, 164.606 Compensatory Time, and other related policies).

      (iii) Two individuals from the community and/or RSIC employees, who are not involved with the appeal.

   c. Individuals selected for service on the Appeal Committee must disclose to Human Resources all conflict of interest upon selection.

   d. Appeal Committee members are bound by the policies and practices of RSIC regarding confidentiality Human Resource Policy 164.203 Confidentiality and will sign a non-disclosure memorandum of understanding. Members of the Appeal Committee will not share information from the appeal with any other person(s) outside of the Appeal Committee without the express written permission of the Appeal Committee Chairman. Failure to maintain confidentiality will result in disciplinary action up to and including termination in accordance with Human Resources Policy 164.901.

5. Appeals Hearing. Under the administrative direction of the Appeals Chairperson the Appeals Committee will review documentation and if deemed necessary interview employee, supervisor or other interested witnesses and/or subject matter experts (e.g., Human Resources).

    a. Based upon the information and testimony gathered during the hearing the Appeals Committee will approve, disapprove, modify or rescind the disciplinary action based upon the information presented. This decision is to be a majority vote of the empanelled Appeals Committee.

6. The Appeals Chairperson will draft a final decision for the Appeal Committee's review and approval. The final decision is to contain the following:

    a. Final ruling and instructions for resolution, if any.

    b. Statement that the Appeal Committee's decision is final and binding. No further action by the Appeal Committee or RSIC Management is allowed under the RSIC Appeal Policy. An appeal is an internal administration matter.

    c. Dated signatures of Appeal Committee members.

7. An original of final ruling is to be sent to the employee by certified mail within five business days of the Committee's decision by the Appeal Committee Chairperson.

    a. A copy of the final ruling, original audiotapes with written summary are to be sent to Human Resources for reference filing by the Appeal Committee Chairperson or their designate within three business days.

    b. A copy of final ruling is to be sent to the employee's immediate supervisor for possible action where warranted. (e.g., Supervisor to amend disciplinary action) by the Appeal Committee Chairperson within five business days.

**ADMINISTRATIVE**
**RESPONSIBILITY:**    Human Resources is responsible for monitoring Appeals for conformance with policy. Appeals Committee Chairperson is responsible for conducting Appeals in accordance with this policy.

l£0/900˙d S⊅8#      ⊅⊅:Zl ∠l0Z/∠Z/Zl          l008 9S£ S∠∠                ⴹɹ0⅃S Sᗡ∩ ⴷᴚⵑ:ɯ0ɹɟ

# EXHIBIT 5
## RSIC Letter to Plaintiff

# EXHIBIT 5

August 25, 2014

RENO-SPARKS
INDIAN COLONY
HUMAN RESOURCES
98 COLONY ROAD
RENO, NEVADA
89502

OFFICE (775) 755-1303
FAX (775) 785-8776

John Miller
3150 Bristle Drive
Sparks, MN. 89434

Dear Mr. Miller:

A decision has been made to terminate your employment with Reno-Sparks Indian Colony (RSIC) effective immediately, August 22, 2014.

You are terminated for cause because you reported a fraudulent unemployment claim to the State of Nevada Unemployment Office on August 14, 2014.  This is a clear violation of RSIC Human Resources Policy 164-202, *Code of Ethics*, and grounds for immediate termination pursuant to RSIC Human Resources Policy 164.901, *Disciplinary Actions*.

Terminated employees are required to return all Tribal equipment upon termination. Please be advised that RSIC considers refusal to return company property to be theft.

As a terminated employee, there are a number of issues you will need to be aware of. Your health benefits will end at midnight Friday, August 25, 2014. You will receive information in the mail in the next few weeks on continuation under COBRA of any health care benefits in which you are enrolled. Any questions regarding your health benefits and transition to COBRA can be addressed to the RSIC Human Resource Benefits Coordinator.

I wish to bring to your attention that as a terminated employee you have the right to appeal this determination pursuant to RSIC Human Resources Policy and Procedure 164-902, *Appeals Process,* (enclosed).  Please contact the Human Resource Department for further information regarding your appeal rights.

To ensure you receive documents and notices from the RSIC, please contact us if your address changes. If you have any questions, please call the Human Resource Director at 775-785-1303.

Regards,

*Ssd- _____ For Chief Bill*

Darrell Bill, Chief of Police

Cc: HRD

*John Miller*

# EXHIBIT 6
## Plaintiff's Appeal of Termination

# EXHIBIT 6

## Reno-Sparks Indian Colony
### Notice of Appeal

September 2, 2014

*RE: Appeal of termination regarding employment of John Miller, pursuant to Human Resources policy 164.902, titled Appeals Process.*

**Statement of Facts:**

On August 25, 2014 I, John Miller, was terminated from employment as a Police Officer for the Reno-Sparks Indian Colony for an alleged violation regarding code of ethics. The termination was handed down by Sergeant Lance Avansino and Sergeant Joel Zuniga however; the termination letter was signed by Chief of Police Darrell Bill. According to Chief Darrell Bill on August 14, 2014 I allegedly filed a fraudulent unemployment claim through the Department of Training, Employment and Rehabilitation in regards to unemployment benefits.

**Reason for Appeal:**

Based on the statement of facts I provided above, I file my appeal based on the following information:

*Human Resources Policy 164.901, Disciplinary Actions, Supervisor's Responsibility* states, "Before being subjected to any discipline, an employee will be given an opportunity to relate his or her version of the incident or problem and provide an explanation or justification to the supervisor." Chief Bill has violated this policy in regards to my termination. This Human Resources policy is clearly established to afford the employee the opportunity to advise administration their side of the story and to clear up any misunderstanding. However, administration failed to provide me with this right and terminated me without giving me proper due process prior to disciplinary action being taken.

*Human Resources Policy 164.901, Disciplinary Actions* states, "Depending upon the circumstances, employees who commit alleged acts of violence, flagrant misconduct, prohibited conduct, or serious safety violations may be suspended from one to ten days at the time of the incident pending a management investigation and review of the matter. Employees who are cleared of such charges shall be reinstated with full back pay with no loss of benefits or seniority. Employees who are not cleared of such charges may be terminated without delay. The RSIC Tribal Police will conduct investigations of alleged criminal conduct." However, I was never afforded the right of a management review. The RSIC Tribal Police Department found me guilty and terminated me for code ethics without any proof of evidence or any information to support the allegations.

*Presumption of Innocence:* Is the principle that one is considered innocent until proven guilty. However, this concept has not been applied to my termination. RSIC Tribal Police allege that I submitted a fraudulent unemployment claim to the State of Nevada which is categorized as a felony in the State of Nevada. Yet, I have not been notified that there is an investigation into the matter nor have any criminal charges been filed.

The most common type of unemployment fraud are persons who are already receiving monetary benefits for the state and continue doing so after they find new employment. It is common knowledge that to file an unemployment claim I would have to validate my last employer. This would require the State of Nevada confirming with the RSIC that I am no longer employed by the RSIC and the reason for termination to award benefits. The type of fraud I am being accused of is impossible, unless someone in Human Resources was willing to lie for me, which is ludicrous. Therefore, to say that I filed an unemployment claim while having full knowledge that my employer would be contacted to verify and that I would be accused of a possible felony is ridiculous. The RSIC Tribal Police Department would know its ridiculous too, if they had done their due diligence and conducted a proper investigation into the matter.

**Resolution:**

Based on the information above I request that I be reinstated with back pay provided. The RSIC Tribal Police Department have alleged a violation in regards to code of ethics, but have failed to complete a thorough investigation into the matter and have failed to show any substantiated evidence to support their claim.

The RSIC Tribal Police Department has failed to afford me the right of due process, a fair and unbiased investigation to substantiate the allegations and the right "I am innocent until proven guilty."

John Miller                                                    Date

# EXHIBIT 7

## DETR Notes Search

# EXHIBIT 7

Notes Search

Page 1 of 2



Good Afternoon HCSPROCK HCSPROCK

Tuesday, April 17, 2018

View Open Work Items | @ Help | Contact | Resources | Logoff

## NOTES SEARCH

HCSPROCK HCSPROCK

Claimant ID, SSN or Name is required to perform search.

SSN: 3038   Claimant ID: 4039071   Name: MILLER, JOHN J

Address: 1155 NE 113TH ST   City/State/Zip: MIAMI FL, 33161   Phone:

| | Claim ID | BYB | BYE | Liable State | Program | Status |
|---|---|---|---|---|---|---|
| Claim: | 1681035 | 08/10/2014 | 08/08/2015 | NV | 01 | Expired |

Monetary: 1fsgh   WBA: 412   MBA: 10712   RBA: 10712   Fund: UI

Language: English

Notes Search Fields

Note Type:   Reason Code:   Search Note   Create Note

Created By:   Date Range: From   To

Show Hidden Only: ☐   Show Important Only: ☐   View ScratchPad   View EBCD   View TA

| | Description | Note Type | Reason | Created By | Date Created |
|---|---|---|---|---|---|
| ☐ | Advised claimant we have no update regarding letter he requested, request was forwarded to Administration per procedure & is out of our hands. | Claim | | AMDORBOUGH | 12/09/2015 08:22 AM |
| ☐ | JLFORTUNE 12/04/2015 04:20:04 PM advised claimant that we are still waiting for a response about the letter he requested | Collections | | JLFORTUNE | 12/04/2015 04:20 PM |
| ☐ | JLFORTUNE 12/02/2015 08:47:38 AM advised claimant that his request for a letter regarding his identity theft was forwarded by our department manager, Steve, to the next higher chain of command. | Collections | | JLFORTUNE | 12/02/2015 08:47 AM |
| ☐ | Spoke to claimant who provided ph# (775) 343-9791 and address of 3150 Bristol Branch Dr. Sparks NV 89434. Claimant needs to be scheduled for in person id check information forwarded to Chantel to set up. | | | ICPAYETTE | 10/03/2014 11:40 AM |
| ☐ | Advised Reno Sparks Indian Colony that claim was hijack in ID Theft case. | BFC Investigations Telephone Conversation | | SCZUELKE | 09/05/2014 02:14 PM |
| ☐ | ACTIVE FRAUD INVESTIGATION. Confidential. Do not remove issues. Refer caller to BPC 775-684-0475 | Claim | Suspected Fraud | AMDORBOUGH | 08/12/2013 08:13 AM |
| ☐ | Issue created manually by user: AMDORBOUGH | | | BATCH | 08/12/2013 08:13 AM |
| ☐ | EUC program ended 1/1/14, Final EUC payment BWE 12/28/13, Last EUC weekly filing BWE 3/1/14, EUC BYE charged to 3/1/14. | Claim | | BATCH | 03/17/2013 05:58 AM |
| ☐ | EUC payout date 1/1/14, BYE extended to 12/27/14, last payment date 12/28/13. | Claim | | BATCH | 12/18/2013 03:37 PM |

Edit

NRS 612.265, 612.533 and Nevada case law restrict the use of this information in any proceeding or lawsuit not arising under NRS Chapter 612. This information is from the Department of Employment, Training and Rehabilitation Employment Security Division

4/17/2018

**MILLER120**

# EXHIBIT 8

## RCIS Appeal Meeting Summary

# EXHIBIT 8

RECEIVED SEP 0 9 2014

Darrell Bill
Chief of Police



**Reno-Sparks Indian Colony**
**POLICE DEPARTMENT**
405 Golden   Reno, Nevada 89502
Phone: (775) 785-8776

## *Appeals Meeting Summary*

On 9-5-2014 at approximately 1305 hours, Chief Bill, Sgt Zuniga and I met with John Miller at the RSIC P.D.  The meeting was the first in the appeals process.

During the meeting Miller explained the following:

Miller did not file the claim and believes his personal information was breached after submitting his resume on Craig's List.  Miller had not contacted the State Of Nevada in regards to the claim that was filed, nor had he contacted the RSIC H.R. Dept.  Miller did do his, "Due diligence", by investigating fraudulent unemployment claims on the internet. Miller informed us he was not under investigation by the State for the claim, and that a crime had not been committed.

I questioned Miller as to why he had not contacted the State to clear his name and get his job back.  I explained to him I would have showed up to the appropriate State Office the next morning after my termination to clear my name.  Sgt. Zuniga reminded Miller he suggested he immediately contact the State during the termination meeting.

Chief Bill asked Miller why he never contacted the H.R. Dept. when asked to do so by me (Sgt. Avansino) and H.R.  Miller explained he did after being informed to by me and spoke with Daniel Chu, however, their conversation was in regards to insurance and not the issue with the claim.  Miller explained he had never been contacted by H.R.  Miller never gave an explanation for not contacting the state.

At the conclusion Chief Bill explained to Miller he was free to contact H.R. to continue with his Appeal

Sgt. Avansino:

USAO 000016

# EXHIBIT 9
## RSIC Appeals Committee Request

# EXHIBIT 9

RECEIVED SEP 1 1 2014

*Reno-Sparks Indian Colony*
*Appeals Process*

Dear Appeals Chairperson,

I, John Miller, am respectively requesting you to empanel the Appeals Committee in regards to my termination on August 25, 2014 and pursuant to Human Resources policy 164.902, titled appeals process.

The RSIC, for allegedly violating code of ethics, in regards to a fraudulent unemployment claim, terminated my employment as a Police Officer. However, no administration investigation was conducted by the RSIC into my innocents and therefore they have no evidence supporting my termination. The RSIC Police Department has clearly held the notion that I am guilty until proven innocent, by terminating my employment without any fact finding or investigation.

Based on the above information I feel the Appeals Committee should look into my termination further.

I thank the Appeals Committee for their time and consideration in this matter and look forward to hearing from you on the next step in the process.

Sincerely,

John Miller

9/11/14
Date

# EXHIBIT 10
## Appeals Committee Letter

# EXHIBIT 10

October 2, 2014

**RENO-SPARKS**
INDIAN COLONY
TRIBAL COUNCIL

98 COLONY ROAD
RENO, NEVADA
69502
(775) 329-2936
FAX:
(775) 329-8710

Mr. John Miller
3150 Bristle Drive
*Sparks NV 89434*

RE:  Decision of Appeals

Dear Mr. Miller:

The Appeals Committee convened according to RSIC Appeal Policy 164.902 on Friday, September 19, 2014 and Wednesday, October 1, 2014.  The Appeals Committee understood that they were reviewing submitted information and documentation on your termination of August 24 2014.  We further understood that you were terminated because you reported a fraudulent unemployment claim to the State of Nevada Unemployment Office which violates the following H.R. Policy 164.202, Code of Ethics, and H.R. Policy 164.901 Disciplinary Actions.

The Appeals Committee reviewed: 1). Termination Letter submitted by Chief of Police Darrell Bill 2.) Letter of Notice of Appeal 3.) Appeals Meeting Summary 4.) Letter from Mr. Miller to the Appeals Chairperson 5.) BIA-OFFICE OF JUSTICE SERVICES*LAW ENFORCMENT HANDBOOK* section 4-48 . 6.) Letter from Director of Finance and Administration, subject: Fraud Issue and the fax sent to you from Debra Wakeman HRD with a copy of the notice of claim filed.

Based upon the information gathered and no further documentation received from you regarding this claim the Appeals Committee made the decision to uphold the termination. The Appeals Committee's decision is final and binding.  No further action by the Appeals Committee or RSIC Management is allowed under the RSIC Appeal Policy. (164.902.)

Submitted By:

Dee Dee Ramirez
Appeals Committee Chairperson

Enrico Castillo-Committee Member

Nila Shanley-Committee Member

Victoria Kane-Committee Member

Karen Matz-Committee Member

cc: Human Resources

# EXHIBIT 11

**Nevada Department of Rehabilitation and Training
Letter**

# EXHIBIT 11

EMPLOYMENT SECURITY
DIVISION

Office of the Administrator



Nevada Department of Employment,
Training and Rehabilitation

BRIAN SANDOVAL
Governor

DON SODERBERG
Director

RENÉE L. OLSON
Administrator

John Miller
3150 Bristol Branch Dr.
Sparks, NV  89434

December 17, 2015

SSN Last 4:  3038

Dear Mr. Miller:

In August, 2014 an unemployment insurance claim was initiated under your Social
Security Number and name. You have denied filing this claim for benefits.

The claim was made effective August 10, 2014 and was filed via internet. Through
investigation of this claim, the Division determined that a person other than yourself
appears to have obtained your personal identifying information and created this claim
without your knowledge.

This claim shows hallmarks of having been involved in a large identity theft ring having
roots in Florida. While the person or persons who filed the claim have not been
apprehended and prosecuted and therefore there is no firm proof of identity theft, the
circumstances indicate that you were not involved in filing this claim and are a victim of
identity theft in this instance.

The Division is assisting Federal Agencies in investigating the claim for benefits filed
under your name and Social Security Number as well as multiple others similarly
situated.

Sincerely,

Scott Kennedy
Chief of UI Operations
Nevada Employment Security Division

SK/sz

500 East Third Street • Carson City, Nevada 89713  •  (775) 684-3909 • Fax (775) 684-3910
2800 E. St. Louis Avenue • Las Vegas, Nevada 89104  •  (702) 486-6632 • Fax (702) 486-6633
www.nvdetr.org

MILLER081

# EXHIBIT 12
## Plaintiff's Federal Court Claim

# EXHIBIT 12

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS; Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit to Appropriate Federal Agency:<br><br>Department of the Interior<br>Reno-Sparks Indian Colony | 2. Name, address of claimant, and claimant's personal representative if any. (See Instructions on reverse). Number, Street, City, State and Zip code.<br><br>John Miller<br>3150 Bristle Branch Dr.<br>Sparks, NV 89434 |
|---|---|

| 3. TYPE OF EMPLOYMENT<br>☐ MILITARY  ☒ CIVILIAN | 4. DATE OF BIRTH<br>03/14/1987 | 5. MARITAL STATUS<br>Single | 6. DATE AND DAY OF ACCIDENT<br>08/25/2014 | 7. TIME (A.M. OR P.M.)<br>2:00 P.M. |
|---|---|---|---|---|

8. BASIS OF CLAIM (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary).

On 8/25/2014 at about 2:00 P.M. I was terminated from the Reno-Sparks Indian Colony (RSIC) Police Department as a Police Officer for an alleged ethnic violation. In June of 2013, I was hired as a Police Officer for the RSIC. During my employment, I was the victim of continous employment harrassment by Chief of Police Darrell Bill and Sergeant Lance Avansino. In June of 2014, I filed a workplace harrassment complaint to former Tribal Administrator Gerald Smith. In August of 2014, I was the victim of identity theft and my personal information was used in an attempt to obtain unemployment benifits. (See attached page)

| 9. | PROPERTY DAMAGE | |
|---|---|---|

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code)

None

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED. (See instructions on reverse side).

None

| 10. | PERSONAL INJURY/WRONGFUL DEATH | |
|---|---|---|

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT.

Respondant Superior - Loss of wages, loss of benifits, loss of opportunity for career, loss of opportunity for promotion and signficant harm to employement reputation.
Intentional Infliction of Emotional Distress - Failure to provide due process in the form of an Internal Affairs Investigation, which should be afforded pursuant to Bureau of Indian Affairs Policies and Procedures.

| 11. | WITNESSES | |
|---|---|---|

| NAME | ADDRESS (Number, Street, City, State, and Zip Code) |
|---|---|
| Lance Avansino | 405 Golden Lane Reno, NV 89502 |

| 12. (See instructions on reverse). | | AMOUNT OF CLAIM (in dollars) | | |
|---|---|---|---|---|
| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights). | |
| None | $750,000.00 | None | $750,000.00 | |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side). | 13b. PHONE NUMBER OF PERSON SIGNING FORM | 14. DATE OF SIGNATURE |
|---|---|---|
| | | |

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729). | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.) |

| Authorized for Local Reproduction<br>Previous Edition is not Usable<br>95-109 | NSN 7540-00-634-4046 | STANDARD FORM 95 (REV. 2/2007)<br>PRESCRIBED BY DEPT. OF JUSTICE<br>28 CFR 14.2 |
|---|---|---|



MILLER083

## INSURANCE COVERAGE

In order that subrogation claims may be adjudicated, it is essential that the claimant provides the following information regarding the insurance coverage of the vehicle or property.

| 15. Do you carry accident insurance?   ☐ Yes   If yes, give name and address of insurance company (Number, Street, City, State, and Zip Code) and policy number.   ☒ No |
| --- |

| 16. Have you filed a claim with your insurance carrier in this instance, and if so, is it full coverage or deductible?   ☐ Yes   ☒ No | 17. If deductible, state amount. None |
| --- | --- |

| 18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim? (It is necessary that you ascertain these facts). None |
| --- |

| 19. Do you carry public liability and property damage insurance?   ☐ Yes   If yes, give name and address of insurance carrier (Number, Street, City, State, and Zip Code).   ☒ No |
| --- |

## INSTRUCTIONS

Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident. If the incident involves more than one claimant, each claimant should submit a separate claim form.

Complete all items - insert the word NONE where applicable.

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY

Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid. A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.

If instruction is needed in completing this form, the agency listed in item #1 on the reverse side may be contacted. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplementing regulations. If more than one agency is involved, please state each agency.

The claim may be filed by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item number 12 of this form.

DAMAGES IN A SUM CERTAIN FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN TWO YEARS AFTER THE CLAIM ACCRUES.

The amount claimed should be substantiated by competent evidence as follows:

(a) In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of the injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

(b) In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

(c) In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

(d) Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.

A. Authority: The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B. Principal Purpose: The information requested is to be used in evaluating claims.

C. Routine Use: See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.

D. Effect of Failure to Respond: Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid."

## PAPERWORK REDUCTION ACT NOTICE

This notice is solely for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501. Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention: Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, DC 20530 or to the Office of Management and Budget. Do not mail completed form(s) to these addresses.

STANDARD FORM 95 REV. (2/2007) BACK

MILLER084

Continuing statement for Basis of Claim:

Using my victimization of a crime, the RSIC terminated my employment claiming I committed an ethics violation because an unemployment claim was filed, while I was still employed full-time. The RSIC failed to provide me with an Internal Affairs investigation, which is guaranteed to me by department policy and procedures. This investigation would have lead to my innocents and would have allowed me to maintain my employment reputation and financial stability. However, because I was considered a "problem child" my due process was ripped from me and I was punished for being the victim of a crime. In December of 2015 the State of Nevada issued me a letter advising me that I was the victim of identity theft.

_____

John Miller

# EXHIBIT 13
## United States Department of Interior Letter to Plaintiff Informing of Right to Sue

# EXHIBIT 13



## United States Department of the Interior

OFFICE OF THE SOLICITOR
SUITE 6201, FEDERAL BUILDING
125 SOUTH STATE STREET
SALT LAKE CITY, UTAH   84138

September 8, 2016

BIA C FTCA
CERTIFIED MAIL - RETURN RECEIPT REQUESTED

John Miller
3150 Bristle Branch Dr.
Sparks, Nevada 89434

Re:     Administrative Determination, T-Sal-714

Dear Mr. Miller,

By Standard Form 95, dated May 2, 2016, you filed a Federal Tort Claim, T-Sal-714, in the amount of $750,000.00 for a personnel claim regarding prior employment with Reno-Sparks Indian Colony.  Your claim has been referred to this office for determination under the Federal Tort Claims Act,  28 U.S.C. §§ 2671-80 (1994), which authorizes the administrative settlement of claims for money damages against the United States for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of an employee of the agency while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

We have carefully reviewed the administrative record in this matter and find no evidence of negligent or wrongful act by the United States.  Accordingly, your claim must be denied.  If you are dissatisfied with this determination, you are entitled to resubmit this claim together with new evidence for reconsideration within 6 months from the date of the mailing of this determination, or you may, within the same period, file suit in the United States District Court.

Should you have any questions regarding this determination, please feel free to contact Grant Vaughn at 801-239-0542.

Sincerely,

_John Sorell ___ for_

Grant Vaughn
Attorney-Adviser

Cc:  BIA